UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

IN RE FACEBOOK, INC., IPO SECURITIES AND
DERIVATIVE LITIGATION,                          OPINION & ORDER
                                                MDL No. 12-2389

----------------------------------------X


A P P E A R A N C E S:



        Attorneys for the NASDAQ Securities Actions
        ENTWISTLE & CAPPUCCI LLP
        280 Park Avenue
        26th Floor West
        New York, NY 10017
        By:  Vincent R. Cappucci, Esq.
             Jordan A. Cortez, Esq.
             Evan T. Raciti, Esq.
             Marc X. LoPresti, Esq.


        Attorneys for the NASDAQ Negligence Parties
        FINKELSTEIN THOMPSON LLP
        1050 30th Street NW
        Washington, DC 20007
        By:  Michael G. McLellan, Esq.
             Douglas G. Thompson, Jr., Esq.

        LOVELL STEWART HALEBIAN JACOBSON LLP
        61 Broadway Suite 501
        New York, NY 10006
        By:  Christopher Lovell, Esq.
             Victor E. Stewart, Esq.

        ZAMANSKY & ASSOCIATES LLC
        50 Broadway, 32nd Floor
        New York, NY 10004
        By:  Jacob H. Zamansky, Esq.
             Edward H. Glenn, Jr., Esq.
             Kevin D. Galbraith, Esq.



GOLDBERG, FINNEGAN & MESTER, LLC
1010 Wayne Avenue, Suite 950
Silver Spring, Maryland 20910
By:  Kevin I. Goldberg, Esq.

MILLER LAW LLC
115 South LaSalle Street, Suite 2910
Chicago, IL 60603
By:  Marvin A. Miller, Esq.
     Andrew Szot, Esq.

DITOMMASO LUBIN
17W 220 22nd Street, Suite 410
Oakbrook Terrace, IL 60181
By:  Vincent DiTommaso

GAINEY MCKENNA & EGLESTON
440 Park Avenue South, 5th Floor
New York, NY 10016
By:  Thomas J. McKenna, Esq.
     Gregory D. Egleston, Esq.

STAMELL & SCHAGER, LLP
One Liberty Plaza, 35/F
New York, NY 10006
By:  Richard J. Schager, Jr., Esq.
     Andrew R. Goldenberg, Esq.


Attorneys for NASDAQ Defendants
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
By:  William A. Slaughter, Esq.
     Paul Lantieri, III, Esq.
     Stephen J Kastenberg, Esq.

**Sweet, D.J.**

Pursuant to the transfer order from the United States Judicial Panel on Multidistrict Litigation (the "MDL Panel"), entered on October 4, 2012, 41 actions stemming from the May 18, 2012 initial public offering ("IPO") of Facebook, Inc. ("Facebook") are presently before this Court.

The instant motions relate to the class actions against the NASDAQ Stock Market LLC (the "Exchange"), its parent, the NASDAQ OMX Group, Inc. ("NASDAQ OMX," and collectively with the Exchange, "NASDAQ"), Robert Greifeld, NASDAQ OMX's Chief Executive Officer ("Greifeld"), and Anna M. Ewing, NASDAQ OMX's highest-ranking technology officer ("Ewing") (collectively, "Defendants") alleging federal securities (the "NASDAQ Securities Actions") and negligence claims (the "NASDAQ Negligence Actions") (collectively, the "NASDAQ Actions[1]") brought by First New York Securities LLC, T3 Trading Group, LLC

---

[1] The NASDAQ Actions include: First New York Securities, LLC, et al., v. NASDAQ OMX Group, Inc. et al., No. 12-cv-5630 (filed 7/23/12); Goldberg v. NASDAQ OMX Group, Inc., et al., No. 12-cv-4054 (filed 5/22/12); Yan v. NASDAQ OMX Group, Inc., et al., No. 12-cv-4200 (filed 5/25/12); Alfonso v. The NASDAQ Stock Market LLC, et al., No. 12-cv-4201 (filed 5/25/12); Levy v. The NASDAQ Stock Market LLC, et al., No. 12-cv-4315 (filed 6/1/12); Amin v. The NASDAQ Stock Market LLC, et al., No. 12-cv-4403 (filed 6/5/12); Steinman v. NASDAQ OMX Group, et al., No. 12-cv-4600 (filed 6/12/12); Roderick v. NASDAQ OMX Group, et al., No. 12-cv-4716 (filed 6/15/12); McGinty v. NASDAQ OMX Group, Inc., et al., No. 12-cv-5549 (filed 6/19/12); and Eagan v. NASDAQ OMX Group, Inc., et al., No. 12-cv-6882 (filed 9/11/12)., and the NASDAQ Negligence Parties consist of all plaintiffs in those actions.

2

and Avatar Securities, LLC (collectively, the "Securities
Plaintiffs") and the Negligence Plaintiffs (collectively with
the Securities Plaintiffs, the "NASDAQ Claimant Group" or
"Plaintiffs").

Plaintiffs move for an order partially lifting the
discovery stay imposed under Section 21D(b)(3)(B) of the
Securities Exchange Act of 1934, as amended by the Private
Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-
4(b)(3)(B) (the "PSLRA"), and for leave to amend the
Consolidated Amended Class Action Complaint ("CAC").
Defendants, in turn, move to dismiss the CAC pursuant to
F.R.C.P. 12(b)(6).

For the reasons set forth below, (1) Defendants'
motion to dismiss is granted in part and denied in part; (2)
Plaintiffs' motion to lift the stay is rendered moot; and (3)
Plaintiff's motion to amend is granted in part and denied in
part.

**Prior Proceedings**

On September 20, 2012, the MDL Panel held a hearing to
determine whether the pending 41 filed actions should be

transferred to the Southern District of New York.  On October 4, 2012, the MDL Panel issued a transfer order, finding that the "Southern District of New York is an appropriate transferee district for pretrial proceedings in this litigation," reasoning that "[m]uch of the relevant discovery will be located in New York, including most discovery relating to alleged NASDAQ trading errors and discovery from the underwriter defendants, many of whom are located in New York." In re Facebook. IPO Secs. & Derivative Litig., 2012 WL 4748325, at *3.  The cases were assigned to this Court for coordination or consolidation of the pretrial proceedings.  Id.

On October 10, 2012, this Court issued a Practice & Procedure Order Upon Transfer Pursuant to 28 U.S.C. § 1407 (the "October 10 Order"), governing the practices and procedures for the 41 related actions filed against the Facebook Defendants, NASDAQ, and certain underwriter defendants, including the three lead underwriters of the IPO,  Morgan Stanley & Co. LLC ("Morgan Stanley"), J.P. Morgan Securities, LLC ("JP Morgan"), and Goldman, Sachs & Co. ("Goldman Sachs") (collectively, the "Underwriter Defendants").[2]

---

[2] The Underwriter Defendants include Morgan Stanley & Co. LLC; J.P. Morgan Securities LLC; Goldman, Sachs & Co.; Merrill Lynch; Pierce, Fenner & Smith Inc.; Barclays Capital Inc.; Allen & Company LLC; Citigroup Global Markets Inc.; Credit Suisse Securities (USA); Deutsche Bank Securities Inc.; RBC Capital Markets, LLC; Wells Fargo Securities, LLC; Blaylock Robert Van LLC;

The October 10 Order outlined the "Organization, Designation and Responsibilities of Counsel" and set forth the procedures to "designate lead counsel by October 31, 2012, subject to the approval of the Court." (October 10 Order § VII(B).) The October 10 Order also outlined certain procedures "[i]n the event that counsel for each group of parties whose interests are similarly aligned cannot successfully designate lead counsel." (Id. § VII(B)(ii).)

Several parties, representing various interests of class members, filed competing motions for appointment of lead plaintiff and designation of lead counsel. According to the parties, extensive discussions took place with the various lead plaintiff movants and substantial progress toward agreement upon designation was made. On August 3, 2012, the NASDAQ Securities Plaintiffs filed a motion seeking the (1) consolidation of all NASDAQ actions, (2) their appointment as lead plaintiff pursuant to the PSLRA and (3) the approval of Entwistle & Cappucci LLP ("Entwistle & Cappucci") as lead counsel for the class. On

---

BMO Capital Markets Corp.; C.L. King & Associates, Inc.; Cabrera Capital Markets, LLC; CastleOak Securities, L.P.; Cowen and Company, LLC.; E*TRADE Securities LLC; Itau BBA USA Securities, Inc.; Lazard Capital Markets LLC; Lebenthal & Co., LLC; Loop Capital Markets LLC; M.R. Beal & Company; Macquarie Capital (USA) Inc.; Muriel Siebert & Co., Inc.; Oppenheimer & Co. Inc.; Pacific Crest Securities LLC; Piper Jaffray & Co.; Raymond James & Associates, Inc.; Samuel A. Ramirez & Co., Inc.; Stifel, Nicolaus & Co., Inc.; The Williams Capital Group, L.P.; and William Blair & Company, LLC.

November 5, 2012, the NASDAQ Negligence Parties filed a brief
seeking the designation of Finkelstein Thompson LLP
("Finkelstein Thompson") and Lovell Stewart Halebian Jacobson
LLP ("Lovell Stewart") as interim co-lead class counsel for the
NASDAQ Negligence Action.

By order on December 4, 2012 ("the December 4 Order"),
this court determined that the NASDAQ Actions were consolidated,
the Securities Plaintiffs were appointed lead plaintiffs in the
NASDAQ Actions, and the NASDAQ Negligence Plaintiffs were
appointed co-lead plaintiffs in the NASDAQ Negligence Actions.
Entwistle & Cappucci was appointed lead counsel for the NASDAQ
Securities Actions and Finkelstein Thompson and Lovell Stewart
were appointed co-lead counsel for the NASDAQ Negligence
Actions.  All other motions pending before the Court related to
these actions only were denied.

On April 30, 2013, the NASDAQ Claimant Group filed the
CAC, alleging damages in excess of $500 million.  On May 29,
2013, the U.S. Securities and Exchange Commission (the "SEC" or
the "Commission") issued the Cease-and-Desist Order (the "SEC
Order[3]") in the administrative proceeding against NASDAQ in

---

[3] See The NASDAQ Stock Mkt., LLC & NASDAQ Execution Servs., LLC, Rel. No.
69,655, 2013 WL 2326683 (May 29, 2013 (the "SEC Order").  The Court takes
judicial notice of the SEC Order.  See In re UBS Auction Rate Sec. Litig.,

connection with the Facebook IPO.

On June 25, 2013, the NASDAQ Claimant Group moved this Court to enter an order partially lifting the discovery stay imposed by the PSLRA to obtain limited discovery consisting of documents and testimony that NASDAQ, and any of their affiliates, parents, subsidiaries, agents and/or employees, provided to the SEC in connection with the SEC's investigation into the May 18, 2012 initial public offering ("IPO") of Facebook, and for leave to subsequently file a Second Consolidated Amended Class Action Complaint ("SCAC") incorporating relevant facts adduced from the requested discovery materials or alternatively from the SEC Order.  On July 2, 2013, Defendants filed a motion to dismiss Plaintiffs' negligence and federal securities claims alleged in the CAC. These motions were heard and marked fully submitted on October 3, 2013.

**Allegations of the CAC**

Familiarity with the general background of this case is assumed.  Certain allegations and facts are repeated in part

---

No. 08 Civ. 2967 (LMM), 2010 WL 2541166, at *12 n.9 (S.D.N.Y> June 10, 2010) (noting that is proper to take judicial notice of SEC materials, including SEC releases).

as relevant to the issues presented by the instant motions and are assumed true as set forth in the CAC.

Facebook is a worldwide social networking company that: (i) builds tools that enable users to connect, share, discover, and communicate with each other; (ii) enables developers to build social applications of Facebook or to integrate their websites with Facebook; and (iii) offers products that enable advertisers and marketers to engage with its users. As of February 2, 2012, Facebook had 845 million monthly users and 443 million daily users.

On February 1, 2012, in preparation for its IPO, Facebook filed a Form S-1 registration statement with the SEC. Facebook subsequently amended the registration statement several times, before filing their final Form S-1/A on May 16, 2012 (the "Registration Statement"). On May 18, 2012, Facebook also filed a Form 424(b)(4) Prospectus (the "Prospectus") with respect to the IPO.

NASDAQ OMX is a global publicly-traded company whose wholly-owned subsidiaries operate securities exchanges around the world. (CAC ¶¶ 63-65.) One of those subsidiaries is the Exchange, or NASDAQ LLC, which operates the NASDAQ Stock Market

in the U.S. (CAC ¶ 65.)  NASDAQ OMX is not a self-regulated
organization ("SRO").  At all relevant times, Defendants
Greifeld and Ewing were officers of NASDAQ OMX, not the
Exchange.  NASDAQ OMX routinely competes for new listings and
overall market share of trading in order to increase revenue and
profits.  (CAC ¶¶ 63-93.)  Specifically, NASDAQ OMX competes
against the New York Stock Exchange Euronext ("NYSE"), other
exchanges and broker-dealers to secure new listings of
securities and to increase its overall market share in trading
activity.  (Id. ¶¶ 66-69.)

The Exchange is an SRO and registered as a national
securities exchange under Section 6 of the Exchange Act.  See 15
U.S.C. §§ 78f & 78c(a)(26); Findings, Opinion, and Order of the
Comm'n, Exch. Act. Rel. No. 53, 128 (Jan. 13, 2006), 71 Fed.
Reg. 3,550 (Jan. 23, 2006) ("Exchange Registration Approval
Order").  Before it may permit the registration of an exchange
as an SRO, the SEC must determine, among other things, that the
exchange has a set of rules that are "consistent with the
requirements" of the Exchange Act, 15 U.S.C. §78s(b)(2), and
thus that are designed,

> to prevent fraudulent and manipulative acts and
> practices, to promote just and equitable principles of
> trade, to foster cooperation and coordination with
> persons engaged in regulating, clearing, settling,
> processing information with respect to, and

9

> facilitating transactions in securities, to remove
> impediments to and perfect the mechanism of a free and
> open market and a national market system, and, in
> general, to protect investors and the public interest
> . . . .

15 U.S.C. § 78f(b)(5). In addition, the SEC enforces exchanges'

compliance with the Exchange Act, the SEC's rules, and the

exchanges' own rules. Thus, the SEC may bring an action to

enjoin any activity by an exchange that violates the Exchange

Act or any rules promulgated thereunder. 15 U.S.C. § 78u(d). The

SEC also may suspend or revoke the registration of an exchange,

censure it, or restrict its activities, functions, and

operations, see 15 U.S.C. § 78s(h)(1), and can remove from

office or censure an officer or director of an exchange

responsible for such failure.  15 U.S.C. § 78s(h)(4).


On May 18, 2012, Facebook offered 421 million shares

of its common stock to the public at $38.00 per share on the

NASDAQ stock exchange, thereby valuing the total size of the IPO

at more than $16 billion.  The IPO was initially set to open at

11:00 a.m. Eastern Standard Time under the NASDAQ ticker symbol

"FB," but was delayed.  At the end of trading on the day of the

initial IPO, Facebook stock closed at $31.00 per share, which

was 18.42% below the IPO price.

Shortly thereafter, numerous plaintiffs filed lawsuits throughout the country raising claims about the adequacy of pre-IPO and Class Period disclosures under the federal securities laws, and federal and state claims against NASDAQ for failures relating to the Offering.  All of the plaintiffs allege that they suffered some loss as a result of these events, although the causes of action they assert vary.

Claims asserted against NASDAQ were filed on behalf of retail investors who contend that their orders to purchase or sell Facebook stock were not properly executed or confirmed as a result of systems issues experienced by NASDAQ on the day of the Facebook IPO.

The following movants and their proposed counsel are bringing federal securities and negligence claims against NASDAQ:

- The Securities Plaintiffs, represented by Entwistle & Cappucci;

- The Negligence Parties, represented by Finkelstein Thompson and Lovell Steward.

The NASDAQ Securities Actions have alleged federal securities claims against NASDAQ on behalf of a class of

purchasers and sellers of Facebook common stock made on NASDAQ on the day of the Facebook IPO, that NASDAQ made material misrepresentations and omissions concerning the capability of its technology and trading platform, which caused substantial damages to the NASDAQ Claimant Group, who collectively traded over 3 million shares at a total value in excess of $316 million on the day of Facebook's IPO.

The NASDAQ Negligence Actions allege state law negligence claims for damages on behalf of retail investors who placed trade orders during Facebook's IPO, based on NASDAQ's flawed design and testing of its software, as well as NASDAQ's decision not to halt trading or cancel impacted trades during the Offering.

A. **NASDAQ'S Cross Process for Opening Trading after an IPO**

NASDAQ's process for commencing trading in an IPO for a security listed on its Exchange, known as the "IPO Cross," was developed in consultation with market participants and is designed to identify a single price for the opening of trading in a security that is the subject of an IPO.  The price is determined based on supply and demand as represented by orders

12

submitted before the execution of the Cross. (CAC ¶ 134; <u>see</u>
<u>also</u> NASDAQ Rules 4120 & 4753.[4]) The Cross process is governed
principally by NASDAQ Rules 4120 and 4753. As this Court has
described, each of these rules has an extensive public
rulemaking history. <u>See</u> <u>In re Facebook, Inc., IPO Sec. & Deriv.</u>
<u>Litig</u>, MDL No. 12-2389, Civ. No. 12-6439, --- F. Supp. 2d
---, 2013 WL 525191, at *9 & *9 n.4 (S.D.N.Y. Feb. 13, 2013)
("*Zack*") (denying motion to remand); <u>see also</u> <u>Proposed Rule</u>
<u>Change Relating to Initial Quotations of IPOs</u>, Exch. Act Rel.
No. 34,254 (June 24, 1994), 59 Fed. Reg. 33,808 (June 30, 1994).
Until trading in a company's security opens on its listing
market on the day of its IPO, secondary market trading may not
commence on any other market. <u>See</u> 17 C.F.R. § 240.12f-2.

By rule, on the day of an IPO Cross, NASDAQ members
may place buy and sell orders for execution in the Cross in
advance of the opening of trading. (CAC ¶ 136; Rule
4120(c)(7)(B).) The Exchange places those orders in a "holding
bin" until the beginning of the "Display Only Period." (<u>See</u> <u>id.</u>)
During the Display Only Period, members can enter, modify, and
cancel orders and "observe the evolution of the prospective

---

[4] All of NASDAQ's current rules are available at
http://nasdaq.cchwallstreet.com. Copies of Rules 4120 and 4753 are attached
as Exhibits A and C to the Declaration of Paul Lantieri III, July 7, 2013
("Lantieri Decl.").

auction price through NASDAQ's dissemination of auction imbalance information, thereby enabling members (and their customers) to participate in IPO price discovery." (CAC ¶ 135; see also id. ¶¶ 136-37.) The Display Only Period lasts at least 15 minutes, and may be extended in five-minute intervals. (CAC ¶¶ 136-37; see also NASDAQ Rules 4120(c)(7)(B) & (C).) NASDAQ's decision to expand the "pre-market order window" from 15 minutes to four hours, (see CAC ¶¶ 119-125), was implemented by amending Rule 4120 through the Exchange Act's public rulemaking process before the Facebook IPO. See IPO Order Holding Bin Rule Filing, 77 Fed. Reg. 19,044. It applies to the opening of trading after the IPO of any security listed on NASDAQ, not just Facebook. See Rule 4120(c)(7)(B). It reflects NASDAQ's regulatory judgment that allowing earlier order entry for all IPOs would "result[] in a higher level of order interaction at the open" and thus, in furtherance of the goals of the Exchange Act, "remove impediments to and perfect the mechanism of a free and open market." See IPO, 77 Fed. Reg. at 19,045 (citing 15 U.S.C. § 78f(b)(5)).

After the Display Only Period, the remaining steps in the Cross process typically take a small fraction of a second. (See CAC ¶ 249; see also SEC Order ¶ 7 ("The electronic calculation . . . usually takes approximately one to two

14

milliseconds to complete.").) NASDAQ's IPO Cross Application
analyzes buy and sell interest and determines the price at
which the largest number of shares will trade. (CAC ¶ 138; see
also NASDAQ Rule 4753(b).) After performing this calculation,
the system checks whether, in the very brief intervening
moment, NASDAQ received any cancellations of orders that would
be included in the Cross. (CAC ¶ 142.) If this "validation
check" fails, the system re-calculates the price and volume of
the Cross, taking into account orders and order modifications
received since the initial calculation. (See CAC ¶ 143.) If the
validation check passes, NASDAQ sends the opening "bulk" trade
to the consolidated tape, disseminates the opening price, and
sends Cross transaction confirmation reports to its members.
(CAC ¶ 138.)

NASDAQ designed the validation check to protect the
integrity of the IPO process.  "NASDAQ's IPO Cross system is
designed to ensure that cancellations submitted while the Cross
is calculating, and up until the last moment before the Cross is
completed, are accounted for in the Cross." (CAC ¶ 142); see
also Proposed Rule Change to Amend Rule 4626 – Limitation of
Liability, Exch. Act Rel. No. 67,507 (July 26, 2012), 77 Fed.
Reg. 45,706, 45,709 (Aug. 1, 2012) ("Accommodation Proposal");
id. at 45,708 ("[T]he benefits of the Cross include optimizing

15

an opening price and allowing investors to cancel their orders at the last possible moment.").)  Prior to the IPO, NASDAQ had not tested a backup system should the validation check fail.

## B. NASDAQ's Actions Taken to Secure the Facebook IPO

NASDAQ OMX competed aggressively with the NYSE for the Facebook IPO.  (Id. ¶¶ 104-110.) The Facebook IPO was important to Defendants as the offering was expected to be, and in fact became, the largest IPO in NASDAQ's history.  (Id. ¶ 112.)  To secure the IPO, Defendants shortened from two years to three months the "seasoning" period usually required for inclusion in the NASDAQ-100 Index.  (Id. ¶¶ 113-18.)  News reports observed that "[i]nclusion in the NASDQ-100 Index may have spurred Facebook toward NASDQ," because it could "create $2 billion to $3 billion of systematic demand for the stock."  (Id. ¶ 114.)

Defendants also made numerous statements prior to and after securing the Facebook IPO regarding the capability and reliability of NASDAQ's technology and trading platforms (CAC ¶¶ 168-69) in the months leading up to the Offering, including that:

16

- NASDAQ is "always committed to working with regulators, exchanges and market participants to ensure transparent trading and a fair and orderly market **for the benefit of investors.**" (CAC ¶ 172 (citing 2011 Form 10-K));

- "[NASDAQ] provides technology to customers with the speed, scale and reliability required **to meet the specific needs of their markets.**" (Id. at ¶ 169 (citing 2011 Form 10-K));

- "[O]ur platforms are highly scalable with current capacity at ten times the average daily volume allowing significantly higher transaction volume to be handled at low incremental cost." (Id.)

- "Our platform continues to stand out as a reliable, flexible, and high capacity system **delivering high levels of execution quality and speed under even extremely demanding market conditions.**" (Id. at ¶ 173 (citing 2011 Form 10-K));

- NASDAQ's "continued investment in technology to meet customers' demands for speed, capacity, and reliability as markets adapt to a global financial industry, as increasing numbers of new companies are created, and as emerging countries show ongoing interest in developing their financial markets." (Id. at ¶ 180 (citing First Quarter 2012 Form 10-Q));

- "No trading platform on the planet **is faster or more scalable.**" (Id. at ¶ 186 (citing May 11, 2012 Investor Day Conference));

- "Our technology can help trade and clear any and every financial instrument on the planet." (Id.);

- "We have unique capabilities unmatched by any exchange in the world." (Id.);

- "[NASDAQ] delivers innovative products and services **that provide transparency to institutional, retail and individual investors.**" (Id.);

- "[W]e're well known for our technology, **no trading platform in the world can operate faster or at the scale that we operate.** . . . [O]ur technology can trade and clear really any instrument on the planet." (Id. at ¶ 188 (citing May 11, 2012 Investor Day Conference)); and

17

- "We process billions of transactions in a day at sub-microsecond speeds to millions of customers. And as much as that's table stakes, that's hard work just to make sure you have that reliability and capability." (Id.)

These statements contributed to NASDAQ securing the Facebook IPO, and its subsequent promotion of the Offering.

## C. Defendants' Testing in the Pre-IPO Period Revealed Systems issues Regarding the Facebook IPO

Prior to the Facebook IPO, Defendants undertook a series of tests on NASDAQ's systems.  (CAC ¶¶ 119-125, 225-27, 230-33.)  The CAC alleges that Defendants' testing revealed system limitations, including design deficiencies in the IPO Cross system that threatened the reliability of NASDAQ's trading platforms to properly execute the Offering.  (Id.)  Despite this "knowledge that NASDAQ's trading systems were susceptible to failure," NASDSAQ continued to publicize its technology and proceed with the IPO.  (Id. ¶ 121, 122 ("Defendants had knowledge of potentially significant problems with NASDAQ's IPO software in the days leading up to the Facebook IPO, but chose to move ahead with the Facebook IPO before these problems were thoroughly investigated and competently resolved); see also SEC Order ¶ 18-20, 23 (NASDAQ's prior testing revealed that the asymmetric design of the procedure for re-calculating the cross

18

caused the computer to take into account only one cancellation, the first cancellation, that had occurred before the re-calculation was made).)

Plaintiffs allege that NASDAQ's IPO systems issues were at least in part the result of NASDAQ's failure to design for or adequately test a high volume of quote cancellations during the Cross process. (CAC ¶ 249; see also SEC Order ¶¶ 20-23 (it was foreseeable that if more than one cancellation had been received prior to the "re-calculation," the re-calculation would have to be repeated and so on continuously in a "loop," such that the market could not open, but NASDAQ did not test how to escape this "loop," or what would happen if NASDAQ disabled the validation check in order to escape the "loop").)

Additionally, the CAC alleges that the "stress tests" Defendants conducted on NASDAQ's systems accounted for only a small fraction of the anticipated total trading volume for the IPO.  NASDAQ's testing simulated trading volumes of 6 to 53 million shares and simulated 40,000 pre-market orders.  (CAC ¶¶ 120-22, 225-28; see also SEC Order ¶ 12.)  In the Facebook IPO, more than 80 million shares traded in the first thirty seconds of trading with a total trading volume of 567 million shares and over 496,000 orders were entered into the Cross.  (CAC ¶¶ 120-

22, 225-28; see also SEC Order ¶ 12.)  Because of this
discrepancy, Plaintiffs allege that Defendants failed to verify
whether NASDAQ's systems could properly execute the IPO.  (CAC
¶¶ 124, 223-25.)  Further, Defendants expanded the pre-market
window for investors to place orders for an IPO from 15 minutes
to 4 hours.  (CAC ¶¶ 119-125.)  This contributed to the systems
errors that occurred.

Greifeld has acknowledged that NASDAQ's systems
constituted a "poor design for the Facebook opening cross IPO,"
and that the testing before the IPO "didn't account for the
increasing volume at which cancellations can come in."  (CAC ¶¶
9, 232.)  As a result, NASDAQ "was unprepared for the increasing
numbers of cancelled orders in the hours leading up to
Facebook's debut."  (Id.) The "higher the number of orders (and
cancellations or changes to those orders), the more income is
generated for NASDAQ."  (Id. ¶ 119.)

D. **Systems Issues Affecting the Facebook IPO Cross**

On May 18, 2012, NASDAQ began accepting orders for the
Facebook IPO Cross into its trading system's holding bin at 7:00
a.m., and announced that the Display Only Period for the Cross
would commence at 10:45 a.m., such that secondary trading would

20

begin at 11:00 a.m. (CAC ¶¶ 136, 140.) At 10:58 a.m., NASDAQ

extended the Display Only Period by five minutes at the request

of Facebook's lead underwriter. (CAC ¶ 140; see also SEC Order ¶

14.)

At 11:05 a.m., NASDAQ attempted to execute the

Facebook IPO Cross, print the opening trade to the tape, and

initiate secondary trading, but the Cross process did not

operate as expected. (CAC ¶¶ 141-43.) During that calculation,

NASDAQ received a cancellation of an order that would have been

included in the Cross. Accordingly, the validation check

triggered a re-calculation. (CAC ¶ 143.) During the few

milliseconds of the re-calculation, NASDAQ received additional

cancellations, which triggered additional re-calculations. (Id.)

This pattern continued, "creating a loop preventing the Cross

from calculating a final opening price" and commencing secondary

trading at the scheduled time. (Id.; see also SEC Order ¶¶ 18-20

(the "loop," revealed during prior testing, caused a delay

because the re-calculation of the cross price had to be made

repeatedly to catch up with and capture previous cancellations,

but each time it could only recalculate one cancellation).)

Immediately thereafter, executives of NASDAQ OMX

decided to complete the Cross despite the problems created by

the "loop."  (CAC ¶¶ 198, 200; see also SEC Order ¶¶ 23-25

(certain executives of NASDAQ OMX, including Greifeld, held a

"Code Blue" conference call and decided to complete the Cross).)

At 11:13 a.m., NASDAQ issued a Market System Status message

advising the public that it was experiencing a delay in

delivering the opening print in Facebook stock and that the

"first print in Facebook [would] open at approximately 11:30

ET." (CAC ¶¶ 196-201.)  The message did not relate the IPO Cross

system failure, or the then-known problems associated with the

Cross.  (Id.)  Shortly before 11:30 a.m., in order to escape the

"loop" and complete the Cross, NASDAQ decided to switch over to

the backup system Cross, after first disabling the validation

check routine, which had not previously been tested.  (Id. ¶¶

29-42.)  The switch to the failover system allowed the Cross to

complete and secondary trading to open, and at 11:30:09 a.m.

NASDAQ released the opening trade at $42. (See CAC ¶¶ 146, 149,

151, 199.)  The participants at the meeting were allegedly

aware, though, that switching to this untested backup system

would cause NASDAQ to fail to process a number of cancellations

and to assume an unauthorized "error" position in Facebook.

(See CAC ¶¶ 201-202; see also SEC Order ¶¶ 23-25.)


        NASDAQ LLC's Rule 4120(a) provides the Exchange with

the authority to halt trading under certain circumstances,

including when NASDAQ LLC determines that there is
"extraordinary market activity" which is likely to have a
"material effect on the market for security" and "[i]n
circumstances in which [NASDAQ] deems it necessary to protect
investors and the public interest."  Rule 4120(a).  NASDAQ OMX
executives determined that no such condition existed and did not
halt trading.  (CAC ¶¶ 230-231.)  At this point, NASDAQ OMX
again disseminated two messages to market participants, stating
that NASDAQ was "investigating an issue in delivering trade
execution messages" for the Facebook IPO Cross and that it was
"working to deliver" such confirmations.  (CAC ¶¶ 202-06.)
NASDAQ did not acknowledge details concerning the delayed
confirmations, the inaccurate price data feeds or the failure to
execute certain eligible, pre-market orders.

At 1:50 p.m., NASDAQ delivered pre-market order
confirmations.  (CAC ¶ 207; see also SEC Order ¶ 36.) By this
time, the system failures had caused more than 30,000 Cross-
eligible orders entered between 11:11 a.m. and 11:30:09 a.m. to
remain "stuck" and unexecuted.  (CAC ¶ 209; see also SEC Order ¶
38.)  Approximately 13,000 "stuck" orders were released into the
secondary market at 1:49:49 p.m., causing a "93-cent decrease in
Facebook's share price between 1:50 p.m. and 1:15 p.m."  (Id.)
NASDAQ issued two messages to market participants stating that

NASDAQ expected to "deliver all executions from the [Facebook IPO Cross]" at 1:50 p.m. and, later, that such confirmations had "been electronically disseminated." (CAC ¶¶ 207-08.) However, Plaintiffs were unable to close positions until trading began the following Monday at inferior prices. (CAC ¶ 216 ("The offline matching process for orders entered in Facebook between 11:11 and 11:30 AM resulted in nothing done. . . .").)

The initial failure of the design which created the "loop," NASDAQ's determination to switch to the untested failover system, and NASDAQ's decision to proceed with the modified Cross at 11:30 a.m. proximately caused damages to various subclasses of Plaintiffs. (CAC ¶¶ 201-208.)

First, the back-up IPO Cross Application fell behind incoming orders such that orders entered between 11:11 a.m. and 11:30 a.m. were not included in the Cross. Some were cancelled by members before the Cross; some were correctly entered into the market at 11:30 a.m.; and the remainder were cancelled or released into the market at 1:50 p.m. (CAC ¶¶ 7, 28, 145-46; see also SEC Order ¶ 27 (immediately after secondary market trading began, NASDAQ's Chief Economist noticed a discrepancy between the final indicative volume total ($82 million) and the actual volume in the print ($75.7 million), indicating that Cross-

24

eligible orders were not handled properly, but NASDAQ failed to run a real time status check to reveal this problem or address this issue following the Cross).)  This damaged classes of individuals attempting to or having purchased Facebook stock. Persons in the cross execution subclass who had entered orders to sell as part of the pre-open cross did not have their sales executed and did not receive the $42.00 per share cross price. (CAC ¶¶ 300-301; see also SEC Order ¶¶ 38-39.)  These persons suffered a loss after 1:50 p.m. when their stock, which should have been sold at the $42.00 pre-opening cross price, was belatedly sold at the lower prices then prevailing.  (CAC ¶ 381.)

Second, NASDAQ's system did not immediately disseminate confirmation reports for orders executed in the IPO Cross. (CAC ¶¶ 7, 37, 145, 151.)  Without confirmation, these persons were deprived of the ability to sell at high prices in a rapidly falling market because they had no confirmation that they had purchased.  (CAC ¶ 123.)

Finally, accurate quoting data was not delivered to NASDAQ's proprietary feed, causing a stale cross quote for a bid price higher than the ask price. (See CAC ¶ 31).  In furtherance of the Congressional mandate to link all securities markets

25

"through communication and data processing facilities," 15

U.S.C. § 78k-1(a)(1)(D), the SEC, through Regulation NMS,

requires all national securities exchanges to send to the

Securities Information Processor ("SIP"): (i) the exchanges'

"top of book" (i.e., best bids and offers ("BBOs")); and (ii)

reports of executed trades. The SIP consolidates and makes the

data available to the public. See 17 C.F.R. §§ 242.601, 602 &

603. After the Facebook IPO Cross, trading occurred on NASDAQ

and other markets. (See CAC ¶ 121 (more than 80 million shares

of Facebook traded in the first 30 seconds of trading and

approximately 567 million shares traded on May 18).) NASDAQ

accurately and timely reported its executed Facebook trades to

the SIP (Plaintiffs do not allege otherwise), but temporarily

did not deliver accurate Facebook quoting data to the SIP or to

NASDAQ's proprietary data feeds. (CAC ¶¶ 164-65; see also SEC

Order ¶ 31.)  Persons in the market trading subclass were harmed

by these data malfunctions, which prevented accurate quoting

data from being delivered to NASDAQ's proprietary feed and

instead the feed showed incorrect quote prices.  (CAC ¶ 161; see

also SEC Order ¶ 31.)


     **E. The SEC's Investigation Into and Enforcement
Proceeding Against NASDAQ's Handling of the Facebook
IPO**

26

After the Facebook IPO, the SEC began an investigation into the failings of the Offering.  The focus in the SEC investigation "was on the design limitation in NASDAQ's system and the Exchange's decision-making after that limitation came to light," both prior to and during the IPO.  (Affidavit of Vincent R. Cappucci on August 28, 2013; ("Cappucci Aff."), Exhibit B; SEC Press Release, dated May 29, 2013, at 1 ("SEC Release").) The SEC noted that "[t]oo often in today's markets, systems disruptions are written off as mere technical 'glitches' when it is the design of the systems and the response of the exchange officials that cause us the most concern."  (SEC Release at 1.)

The SEC's investigation into NASDAQ culminated in an enforcement proceeding against the Exchange and an Exchange affiliate.  The SEC "deem[ed] it necessary and appropriate in the public interest and for the protection of investors that public administrative proceedings and cease-and-desist proceedings be . . . instituted pursuant to Section[s] 19(h)(1) and 21C of the [Exchange Act]." (SEC Order § I.)  The SEC Order details: (i) the IPO Cross system failures preventing the commencement of open trading; (ii) NASDAQ's switch to an untested backup system that "failed to include 19 minutes of orders in its price/volume calculation," resulting in over 30,000 pre-market orders being either cancelled or executed at

27

inferior prices; (iii) NASDAQ's failure to deliver pre-market
order confirmations, preventing investors from determining
"whether their orders had been included in the cross . . . [and]
what position they held in Facebook securities;" and (iv)
NASDAQ's executing the 13,000 "stuck" orders at approximately
1:50 p.m. that caused "a 93-cent decrease in Facebook's share
price." (SEC Order ¶¶ 17-20, 26, 38, 39.)

        "When initiating an IPO, an exchange has an obligation
to ensure that its systems, processes and contingency planning
are robust and adequate to manage the IPO without disruption to
the market." (SEC Order ¶ 2.)  Based on the SEC's detailed
findings covering NASDAQ's system design, NASDAQ's preparedness
for the IPO, and the events of May 18, the SEC concluded that
NASDAQ failed to meet this obligation due to both a "design
limitation in NASDAQ's IPO Cross system" and as a result of
"[t]he decisions made by NASDAQ in response to trading
disruptions from the design limitation [that] led to further
downstream systems issues and caused NASDAQ to violate a
fundamental rule governing order priority as well as several
other Commission and NASDAQ rules." (SEC Order ¶ 3.)  The SEC
also found that NASDAQ violated "Rule 4757(a)(1) when it failed
to execute equally priced or better priced trading interest in
Facebook in price/time priority" in connection with the orders

that were not executed in the IPO Cross. Id. ¶ 58(a); see also
Id. ¶¶ 58(c)-(d), 63-64.[5]  While the SEC concluded that technical
regulatory violations flowed from the Exchange's decision to
proceed with the Cross, it did not conclude that the decision
itself, or the Exchange's subsequent decision not to halt
continuous market trading in Facebook stock, violated any law or
regulation.

     In light of the technical violations, the SEC imposed
a civil monetary penalty, censured the Exchange, ordered the
Exchange to cease and desist from committing violations of the
Exchange Act and SEC regulations thereunder, and ordered the
Exchange to comply with specified remedial undertakings. (Id. §
IV.)  These included remedial measures to: (i) "enhance its
technology change process"; (ii) "deploy new standardized global
change management software"; (iii) "dedicate a system and

---

[5] More specifically, the SEC determined that: (i) NASDAQ violated Rule
4120(c)(7) insofar as NASDAQ: did not "immediately initiate trading in
Facebook at the conclusion of the [Display Only Period]"; (ii) NASDAQ
violated Rule 4120(c)(7) by agreeing to extend the Display Only Period at the
request of Facebook's lead underwriter consistent with longstanding and
publicly disclosed practice, id. ¶ 14, but in the absence of explicit
authority for granting such a request; (iii) in connection with the error
position in Facebook stock that NASDAQ incurred in the Facebook IPO, NASDAQ
and a NASDAQ affiliate violated NASDAQ's rules and the Exchange Act's net
capital requirements, respectively; (iv) NASDAQ violated its price/time
priority rule in connection with a halt cross for another stock that was
impacted by NASDAQ's systems issues with the Facebook IPO; and (v) in
separate incidents wholly unrelated to the Facebook IPO in October 2011 and
August 2012, NASDAQ committed technical violations of the SEC's Regulation
SHO (concerning short sales) and Regulation NMS (concerning "trade throughs")
arising from human errors with respect to NASDAQ's systems for enforcing
compliance with those regulations. Id. ¶¶ 46-55, 58-62.

performance engineering team to daily monitoring and analysis of system performance, and [to] establish a new quality assurance organization"; and (iv) "make technical changes . . . designed to prevent a recurrence of the persistent re-calculation problem that affected the Facebook IPO." (SEC Order at ¶¶ 65-74.)  The Exchange consented to the entry of the SEC Order "[s]olely for purposes of [the SEC] proceedings" and without admitting or denying the SEC's findings. (Id. § II.)

## F. The Accommodation Plan for Facebook IPO Losses

NASDAQ Rule 4626(a) provides that "[e]xcept as provided for in paragraph (b) below, NASDAQ and its affiliates shall not be liable for any losses, damages, or other claims arising out of the NASDAQ Market Center or its use. . . . [Such losses] shall be absorbed by the member . . . ."  Prior to the Facebook IPO, paragraph (b) of Rule 4626 permitted NASDAQ to compensate members up to a maximum aggregate of $500,000 per month for losses sustained in that month by members related to their use of the Exchange. See NASDAQ Rule 4626(b)(1).

On July 23, 2012, NASDAQ filed with the SEC its Accommodation Proposal to amend NASDAQ Rule 4626 to permit NASDAQ to pay its members up to $62 million for losses relating

30

directly to the systems issues experienced by NASDAQ in the

Facebook IPO. (CAC ¶¶ 10, 299-306; Accommodation Proposal, 77

Fed. Reg. 45,706.)   After considering public comments, including

three comment letters submitted by counsel for Plaintiffs (CAC

¶¶ 299-306), the SEC approved the Accommodation Proposal on

March 22, 2013 as consistent with the requirements of the

Exchange Act and "in the public interest."[6] See Order Granting

Approval of a Proposed Rule Change to Amend Rule 4626 –

Limitation of Liability, Exch. Act Rel. No. 69,216 (Mar. 22,

2013), 78 Fed. Reg. 19,040, 19,045-47 (Mar. 28, 2013)

("Accommodation Approval Order"); (see also Lantieri Decl. Ex.;

CAC ¶ 12.)


     The SEC noted that it was not deciding whether

"regulatory immunity should apply to NASDAQ in connection with

its actions related to the Facebook IPO" or "whether NASDAQ or

---

[6] Rule 4626(b)(3) provides a specific procedure for claims related to the
systems issues NASDAQ experienced with the Facebook IPO. Claims must be
submitted to and verified by another SRO, the Financial Industry Regulatory
Authority, under criteria specified in the Accommodation Proposal. Rule
4626(b)(3). The Rule identifies the specific types of Facebook IPO orders
eligible for accommodation and the formula for calculating members' eligible
losses, along with procedures for the submission, consideration, and payment
of claims. Id. The criteria create a framework that seeks to replicate what
the expected execution prices of orders would have been had NASDAQ not
experienced systems issues, on the assumption that members would exercise
reasonable diligence to mitigate losses once made aware that their Cross
orders had not executed, or had executed at unexpected prices. See id.; see
also Accommodation Proposal, 77 Fed. Reg. at 45,710-11. Among other things,
the Rule makes payment contingent on members' submission of an attestation
detailing the amount of compensation they have provided to their customers,
and prioritizes payments to members who compensate their customers. Rules
4626(b)(3)(F)(i) & 4626(b)(3)(G).

any other person may have violated the federal securities laws
or any other laws" in connection with the Facebook IPO.
(Accommodation Approval Order at 24-25.)

The Accommodation Proposal does not guarantee that
non-NASDAQ LLC members, including the retail investors, will
receive any compensation for losses suffered in the Offering and
does not cover the entire losses that were caused by the system
failures.  (CAC ¶¶ 10-11, 299-313.)

## I. SRO Immunity Applies in Part and is Inapplicable in Part to Plaintiffs' Allegations

As a threshold matter, Defendants contend that all of
Plaintiffs' claims arise out of actions taken (or not taken) by
NASDAQ within the scope of its regulatory responsibilities and
accordingly are precluded under SRO immunity, requiring
dismissal of the claims and rendering any amendments to the CAC
or any requests to lift the discovery stay futile.  SRO immunity
provides protection not only from liability, but also from the
burdens of litigation, including discovery, and should be
"resolved at the earliest possible stage in litigation." Hunter
v. Bryant, 502 U.S. 224, 227 (1991); see also Mitchell v.
Forsyth, 472 U.S. 511, 526 (1985) (holding that because immunity
affords protection "from suit rather than a mere defense to

32

liability, . . . the denial of a substantial claim of absolute immunity is an order appealable before final judgment, for the essence of absolute immunity is its possessor's entitlement not to have to answer for his conduct in a civil damages action"); X-Men Sec., Inc. v. Pataki, 196 F.3d 56, 65 (2d Cir. 1999) ("The immunity protects the official not just from liability but also from suit on such claims, thereby sparing him the necessity of defending by submitting to discovery on the merits or undergoing a trial."); Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 75 (2d Cir. 1998) ("[It is] well established that an affirmative defense of official immunity should be resolved as early as possible by the court.").

Because Defendants are correct that an entitlement to immunity would require dismissal and preclude granting further discovery or amendments to the CAC, an initial examination as to whether Plaintiffs' claims are subject to SRO immunity is appropriate.

## A. The Applicable Standard

"There is no question that an SRO and its officers are entitled to absolute immunity from private damages suits in connection with the discharge of their regulatory

33

responsibilities." Standard Inv. Chartered, Inc. v. Nat'l Ass'n
of Sec. Dealers, Inc., 637 F.3d 112, 115 (2d Cir. 2001) (quoting
DL Capital Group, LLC v. Nasdaq Stock Mkt., Inc., 409 F.3d 93,
96 (2d Cir. 2005)); see also In re NYSE Specialists Sec. Litig.,
503 F.3d 89, 96 (2d Cir. 2007); D'Alessio v. NYSE, Inc., 258
F.3d 93, 105 (2d Cir. 2001); Barbara v. NYSE, 99 F.3d 49, 59 (2d
Cir. 1996); accord Scher v. Nat'l Ass'n of Sec. Dealers, Inc.,
218 Fed. Appx. 46, 47-48 (2d Cir. 2007) (summary order). This
immunity extends both to affirmative acts as well as to an SRO's
omissions or failure to act. See, e.g., NYSE Specialists, 503
F.3d at 97 (failure to supervise); Gurfein v. Ameritrade, Inc.,
411 F. Supp. 2d 416, 423 (S.D.N.Y. 2006) (same); Dexter v. DTC,
406 F. Supp. 2d 260, 263 (S.D.N.Y. 2005) (setting of ex-dividend
date); Am. Benefits Group, Inc. v. Nat'l Ass'n of Sec. Dealers,
Inc., No. 99 Civ. 4733, 1999 WL 605246, at *4 (S.D.N.Y. Aug. 10,
1999) (creation of reporting requirements for companies included
in the OTC Bulletin Board).

        The party asserting immunity bears the burden of
demonstrating its entitlement. D'Alessio, 258 F.3d at 104. In
assessing the applicability of absolute immunity to a given
claim, the SRO's motive and reasonableness are not considered.
See NYSE Specialists, 503 F.3d at 95-96 ("The doctrine's nature
is such that it accords protection from any judicial scrutiny of

the motive for and reasonableness of official action."); see
also Bogan v. Scott-Harris, 523 U.S. 44, 54 (1998)
(applicability of absolute immunity accorded to government
officials "turns on the nature of the act, rather than on the
[officials'] motive or intent").  It is likewise irrelevant
whether the complained of conduct complied with the securities
laws.  See NYSE Specialists, 503 F.3d at 98 n.3 ("[T]he central
question  . . . is not whether the SRO is acting (or not acting)
consistent with the laws it is supposed to apply but rather
whether the plaintiff's allegations concern the exercise of
power within the bounds of the government functions delegated to
it.") (internal citations omitted).

        The doctrine is "of a rare and exceptional character."
Barrett v. United States, 798 F.2d 565, 571 (2d Cir. 1986)
(internal quotation marks omitted).  Courts examine the
invocation of absolute immunity on a case by case basis, DL
Capital Group, 409 F.3d at 97, using a functional test based
upon examination of the "nature of the function performed."
Forrester v. White, 484 U.S. 219, 229, 108 S.Ct. 538, 98 L.Ed.2d
555 (1988); see also NYSE Specialists, 503 F.3d at 96.

        Absolute immunity inheres in SROs whenever they
exercise "quasi-governmental powers [ ] consistent with the

structure of the securities market as constructed by Congress, .
. . [but] when conducting private business, [an SRO] remains
subject to liability." Sparta Surgical Corp. v. Nat'l Ass'n of
Sec. Dealers, Inc., 159 F.3d 1209, 1213-15 (9th Cir. 1998). The
justification for this immunity is that Congress has enabled the
SROs to perform "a variety of regulatory functions that would,
in other circumstances, be performed by a government," and that
the government would be immune when performing these functions.
Id. Examples of such regulatory functions entitling an SRO to
immunity include (1) disciplinary proceedings against exchange
members, Barbara, 99 F.3d at 59; (2) the enforcement of security
rules and regulations and general regulatory oversight over
exchange members, D'Alessio, 258 F.3d at 106; (3) the
interpretation of the securities laws and regulations as applied
to the exchange or its members, id.; (4) the referral of
exchange members to the SEC and other government agencies for
civil enforcement or criminal prosecution under the securities
laws, id.; (5) the public announcement of regulatory decisions,
DL Capital Group, 409 F.3d at 98; and (6) an SRO's amendment of
its bylaws where the amendments are inextricable from the SRO's
role as a regulator, Standard Inv. Chartered, Inc., 637 F.3d at
116. "The common thread in these cases is that absolute
immunity attaches where the activity relates to the proper
functioning of the regulatory system." NYSE Specialists, 503

36

F.3d at 96 (internal quotation marks and citations omitted).
"Indeed, every case that has found an SRO absolutely immune from
suit has done so for activities involving an SRO's performance
of regulatory, adjudicatory, or prosecutorial duties in the
stead of the SEC." Weissman v. Nat'l Ass'n of Sec. Dealers, 500
F.3d 1293, 1296(11th Cir. 2007) (en banc) (collecting cases).

Officers and affiliates of SROs are similarly shielded
by SRO immunity depending on "the nature of the function
performed, not the identity of the actor who performed it."
Forrester, 484 U.S. at 229.  An SRO's officers are thus entitled
to absolute immunity when they are, in effect "'acting under the
aegis' of their regulatory duties."  DL Capital, 409 F.3d at 97
(finding NASDAQ's CEO Greenfield immune from plaintiff's claims
arising from the Exchange's reporting of its decision to halt
trading and cancel certain trades) (quoting Sparta Surgical, 159
F.3d at 1214).  As such, NASDAQ, NASDAQ OMX, and its officers
will be treated identically for purposes of immunity.[7]

---

[7] NASDAQ OMX and its officers are "deemed to be" officers of the SRO when
their activities are related to the Exchange's regulatory duties:

> To the extent they are related to the activities of a Self-
> Regulatory Subsidiary [including the Exchange], the books,
> records, premises, officers, Directors and employees of [NASDAQ
> OMX] shall be deemed to be the books, records, premises,
> officers, directors, and employees of such Self-Regulatory
> Subsidiary for the purposes or and subject to oversight pursuant
> to the [Exchange] Act.

NASDAQ OMX By-Law Article XII, § 12.1(c). Accordingly, NASDAQ OMX and its

## B. **SRO Protects in Part and is Inapplicable in Part to Plaintiffs' Negligence Claims**

The negligence allegations are separated between first, the design, testing and touting of NASDAQ's software, (the "technology negligence claims"), all executed prior to trading, and second, the decision not to halt trading or cancel the impacted trades (the "halting trade negligence claims"), determined during the IPO.

### 1. The Inadequate Design, Testing and Touting of NASDAQ's Software Are Not Regulatory Actions Protected by SRO Immunity

The technology negligence claims in the CAC arise out of the failure of NASDAQ's trading platforms during the IPO, which Plaintiffs contend was the foreseeable result of the inadequate testing of and design for a high volume of cancellations "in the face of projected demand."[8]   (CAC ¶ 251.)

Defendants mischaracterize the technology negligence

---

officer are liable or protected to the same extent as NASDAQ itself.
[8] As alleged, Defendants' prior testing revealed systems limitations, including design deficiencies in the IPO Cross system that threatened the reliability of the trading platforms by creating a "loop" preventing the market from opening, (CAC ¶¶ 119-125, 225-27, 230-33), and Defendants' subsequent stress tests accounted for only a small fraction of the anticipated total trading volume for the IPO.  (CAC ¶¶ 120-22, 225-28.)

claims, stating that the "negligence claims arise from the
commencement of trading in Facebook" or from "NASDAQ's decisions
to proceed with and not to halt trading in Facebook."  (MTD Br.
at 22-23.)[9]  Accordingly, Defendants cited precedent supporting
immunity involves cases where exchanges determined not to cancel
a trade, see DL Capital Group, LLC v. NASDAQ Stock Market, Inc.,
409 F.3d 93, 96 (2d Cir. 2005), were accused of self-dealing
regarding action or inaction with respect to trading on the
exchange, see NYSE Specialists, 503 F.3d at 97, and de-listed
stock and suspended trading, see Sparta Surgical, 159 F.3d at
1211, all of which Defendants correctly assert are regulatory
functions protected by immunity.   (Def. Mem. at 28.)


        None of the CAC's allegations concerning the
technology negligence claims arise from NASDAQ's commencement of
trading in Facebook, or NASDAQ's statements and actions
concerning its decision to proceed with and not halt trading

_____

[9] All of NASDAQ's citations to the CAC in this regard either fall outside
Section VII (see MTD Br. at 4, 23 (quoting CAC ¶¶ 1, 5)) or are limited to
allegations concerning NASDAQ's Cross system design, testing and
implementation.  (See MTD Br. at 22-23, 23 n.15 (quoting CAC ¶¶ 248, 355).)
Plaintiffs do allege in Section VII that "Defendants should have followed the
recent precedent and protected the integrity of the market by halting the
Facebook IPO," but do so in describing the IPO Cross process.  Whether NASDAQ
concluded that the limited circumstances in which it could halt trading under
its regulatory power as delineated in Rule 4120 were not present on May 18 is
irrelevant to the independent negligence prior to the cross.  That the
"orderly initiation of secondary market trading after an IPO is one of the
most fundamental functions" of an Exchange and is regulatory in nature, far
from "dispositive," is likewise irrelevant to the claim of technology
negligence. (See Defendant's Opposition to Plaintiff's Motion for Discovery
and to Amend ("Def. Mem."); at 24.)

during the IPO.  (See CAC ¶¶ 249-269.)  Rather, the technology

negligence claims focus solely on the design, promotion and

inadequate testing of NASDAQ's technology software prior to the

Offering.[10]  NASDAQ wished to create an IPO market for companies

to be newly listed and traded on its exchange.  In furtherance

of this venture, NASDAQ proposed, and the SEC authorized, a set

of rules for conducting an opening Cross and NASDAQ then

designed, implemented and tested electronic systems to perform

this opening Cross function.[11]  In the months preceding the

Facebook IPO, NASDAQ encouraged companies to bring new IPOs to

its exchange by publicly broadcasting the capabilities and

reliability of its technology in executing offerings, including

on NASDAQ OMX's website (CAC ¶¶ 181-83) and during NASDAQ OMX's

---

[10] The root causes of the injuries alleged by the technology negligence claims also lie in these design and inadequate testing failures, and are independent of NASDAQ's regulatory decisions made during the IPO: The claims of the Cross Buyer and Cross Seller Classes are limited to persons who placed orders that were executed or eligible for execution directly in the pre-opening period, not involving the subsequent secondary market trading or NASDAQ's messages regarding and decision to continue trading; the claims of the Market Trading Class arise from a mispricing error traceable to the pre-opening system failures; and the "stuck" orders Class were prevented from selling due to the design error, which did not generate trade confirmations (CAC ¶¶ 151-52), and led to the dissemination of inaccurate price quotes (id. ¶¶ 160-67; see also SEC Order ¶ 10 (the "design" of NASDAQ's system "created the risk that if orders continued to be cancelled during each re-calculation, a repeated cycle of validation checks and re-calculations - known as a 'loop' - would occur, preventing" normal secondary market trading).)

[11] That the SEC approved this proposed technology "does not automatically convert NASDAQ's conduct into an immunized regulatory function."  Opulent Funds, 2007 WL 3010573, at *6.  "SEC approval of a rule imposing a duty on an SRO is not the sine qua non of SRO immunity; engaging in regulatory conduct is."  Id.  A business decision regarding the suitability of operational systems to complete a pre-opening Cross, whether or not mandated in a certain way, is not the same as NASDAQ's power to regulate active, ongoing trading. Id. ("[I]mmunity protects the power to regulate, not the mandate to perform regulatory functions in a certain manner."); see also Rule 4120.

May 10, 2012 Investor Day Conference (CAC ¶¶ 184-89). These

statements were intended to "serve [NASDAQ OMX's] private

business interests, such as its efforts to increase trading

volume and company profit."[12]  Weissman, 500 F.3d at 1296-99

("NASDAQ represents no one but itself when it entices investors

to trade on its exchange.").  NASDAQ's software is an integral

part of NASDAQ's overall business package, intended to create a

market for new, revenue-producing IPO business, not in

furtherance of any purported regulatory function.  See Opulent

Fund, 2007 WL 3010573, at *5 (NASDAQ's creation and promotion of

the NASDAQ-100 Index was not immune "because it profits from

selling the market price data"[13] and because "NASDAQ's market

facilitating actions at issue . . . were non-regulatory").

There are no immunized or statutorily delegated government

---

[12] The Negligence Plaintiffs do not allege that the NASDAQ representations, in
contrast to NASDAQ's statements issued during the IPO, were false or
misleading or that the Negligence Plaintiffs have any cause of action based
on these representations.  NASDAQ's statements leading up to the IPO are
alleged in the context of negligence solely to establish NASDAQ's duty, in
the exercise of reasonable care, to verify and substantiate the veracity of
these statements to investors, who were reasonably likely to rely on these
statements and be injured by NASDAQ's failures. (See CAC ¶¶ 168-189, 225
(NASDAQ allegedly "should have designed and tested its systems to ensure they
would be able to handle the potentially unprecedented trading volume on
Facebook's opening day, including the ability of the systems to execute and
confirm the large number of trade orders and cancellations anticipated for
execution in the Cross.").)

[13] That NASDAQ happens to profit from these activities is not critical. The
immunity inquiry turns on the nature of the challenged conduct, not its
profitability: "if the action is taken under the 'aegis of the Exchanges
Act's delegated authority,' the [SRO] is protected by absolute immunity from
money damages." P'ship Exchanges Sec. Co. v. Nat'l Ass'n of Sec. Dealers,
Inc., 169 F.3d 606, 608 (9th Cir. 1999); accord DL Capital Group, LLC v.
Nasdaq Stock Mkt., Inc., 409 F.3d 93, 100 & fn. 4 (2d Cir. 2005).

powers to design exchange computer software, to appropriately test computer software, or to fix computer software when it is malfunctioning before executing an Offering after touting its competence.  The SEC has never engaged in the business aspects of facilitating and promoting IPOs or creating technology to increase trading, nor has Congress authorized it to do so.

Precedent has established that actions such as these, undertaken to "increase trading volume[,] are non-regulatory." Id. (quoting Weissman, 500 F.3d at 1296); see also Sparta Surgical, 159 F.3d at 1214 ("When conducting private business, [SROs] remain subject to liability.").  Regulatory actions, including "suspending trading, banning traders, or carrying out disciplinary actions" under mandated rule, "all involve oversight of the market to protect investors."  Opulent Funds, 2008 WL 3010573, at *6.  When there is an active trading market, any decision to halt trading or cancel trades can potentially cause loss to one or another group of market participants. In contrast, actions regarding software design before an IPO or promotion of that software before trading commences does not involve such risks.  NASDAQ's duty to adequately design and test software to initiate an unprecedentedly large IPO does not function to protect investors; NASDAQ represents no one but itself when it entices investors to trade on its exchange.

42

NASDAQ's actions functioned to create a market and increase its private trading capacities, conduct which is not protected by SRO immunity.  See, e.g., Opulent Funds, 2008 WL 3010573, at *6; Weissman, 2007 WL 2701308, at *2 ("[A]s a private corporation, NASDAQ may engage in a variety of non-governmental activities that serve its private business interests, such as its efforts to increase trading volume," which are not protected by immunity); Sparta Surgical, 159 F.3d at 1214-15 (mere market facilitation designed to increase trading volume is not regulatory conduct).

Securities markets have changed dramatically since the 1930s.  Exchanges, like NASDAQ, have converted from non-profit mutual associations owned by their members to for-profit publicly traded corporations owned by shareholders.  (See SIFMA letter to Mary Jo White, Chair, SEC, Re: Self-Regulatory Structure of the Securities Markets (July 31, 20130), Cappucci Aff. Ex. F ("[T]he interests, incentives and functions of the member-owned cooperative exchange of 1934 bear little resemblance to those of the for-profit publicly traded exchange of today.  Since the wave of demutalizations, exchanges have rightly focused their efforts on the part of their business that earns profits to maximize the return for their shareholders, and, in some cases, minimized their actual performance of

43

regulatory functions.").)  As SEC Commissioner Gallagher stated

in 2012, "the basic premises on which the self-regulatory

framework . . . [was] put into place almost eighty years ago –

private, mutualized, self-regulating exchanges and a simple

association of dealers – [are] no longer true."  Daniel M.

Gallagher, Comm's, SEC, Market 2012: "Time for a Fresh Look at

Equity Market Structure and Self-Regulation," Speech at the

SIFMA's 15th Annual Market Structure Conference (Oct. 4, 2012);

(Cappucci Aff., Ex. E.)  As exchanges have evolved into for-

profit enterprises, an irreconcilable conflict has arisen,

rendering independence unattainable in the context of an

exchange regulating its own, for-profit business conduct.


        This dual-nature of SROs, "as private companies that

carry out governmental functions," renders the distinction

between actions taken in a governmental capacity, which are

immune, and actions taken "for corporate benefit," which cannot

be, all the more critical. Opulent Fund, 2007 WL 3010573, at *6.

Allowing Exchanges to be immune from decisions about the

promotion and design of business systems implemented to increase

trading volume, particularly in such expanding international

markets, would allow unrestrained motives for profit to go

unchecked.  See Scott Patterson, Dark Pools, Cross Business New

York (2012).  As such, the regulatory functions of NASDAQ,

44

including its decisions not to halt trading or announcements of those decisions, do not cloak NASDAQ's independent negligence in failing to adequately design and test its software with retroactive immunity. Opulent Fund, 2007 WL 3010573, at *6. ("Nasdaq's pricing conduct is much less quintessentially regulatory than deciding to suspend trading.") (internal citations omitted). If that sufficed, then every time an exchange committed a negligent or unlawful act independent of its regulatory authority, it could purport to consider whether some regulatory power existed and retroactively try to immunize itself from damages for the earlier non-immune conduct. See Rohit A. Nafday, From Sense to Nonsense and Back Again: SRO Immunity, Doctrinal Bait-and-Switch, and a Call for Coherence, 77 U. Chi. L. Rev. 847, 855 (2010) ("Nafday") (Because absolute immunity frees the recipient of its protection from civil liability unconditionally, it is fraught with potential for abuse). While the doctrine of SRO must continue to ensure regulatory independence, it cannot be applied to allow blanket protection for exchanges when they fail to exercise due care in their pursuits of profit.[14] See Weissman, 500 F.3d at 1295 ("Grants of immunity must be narrowly construed" because they

---

[14] NASDAQ LLC's accommodation plan pays only limited compensation for only limited types of claims, and only to NASDAQ LLC members, not retail investors. This limitation of liability implies a lack of overall immunity as to NASDAQ's actions, and likewise prevents Plaintiffs from recovery if immunity were all encompassing.

45

deprive injured parties of remedies); see also Marbury v.
Madison, 5 U.S. 137, 147 (1803) ("It is a settled and invariable
principle, that every right, when withheld, must have a remedy,
and every injury its proper redress.").

Given that the technology negligence allegations
involve actions taken in NASDAQ's own interest as a private
entity to increase trading on its Exchange, absolute immunity
from suit ceases to obtain.  Accordingly, Plaintiffs' technology
negligence claims are not shielded by SRO immunity.[15]

### 2. The Decision Not to Halt Trading is Protected by SRO Immunity

In addition to the testing and design of NASDAQ's
software, Plaintiffs allege that NASDAQ's decision not to halt
trading during the IPO or cancel impacted trades was not a

---

[15] Defendants contend that state law claims, such as negligence, against self-
regulatory organizations are preempted by the Exchange Act.  (Def. Mem. at
20.); see also DGM Invs. V. N.Y. Futures Exch., Inc., 2002 WL 31356362, at *5
(S.D.N.Y. Oct. 17, 2002) (Sweet, J.) (a commodities trader's state law claims
for gross negligence, bad faith, and respondeat superior against the New York
Futures Exchange, its parent company, its corporate affiliate, and a
committee of the exchange and its members were preempted by the CEA because
the claims were based on allegations that the defendants "failed to fulfill
their obligation to regulate the market.").  Defendants are correct that
preemption precludes allowing state law claims that arise from actions taken
by Defendants in their regulatory capacity as agents of the government or
even actions "incident to the exercise of regulatory power." NYSE
Specialists, 503 F.3d at 98.  This does not preclude state law claims arising
from actions taken by an SRO in its capacity as a for-profit business,
including designing and testing software, for the same reasons why SRO
immunity is inapplicable to such actions.

regulatory function and subjects NASDAQ to damages for
negligence.

NASDAQ, during the Facebook IPO shortly after trading
commenced and the technology errors began, "decided that
extraordinary market activity was not occurring, and the
EVP/Transactions concluded that NASDAQ therefore did not have
the authority to halt trading" under Rule 4120[16]. (SEC Order ¶
32.)  The SEC Order also determined that NASDQ did not have
delegated authority to halt trading during the IPO because
market trading was proceeding normally and the rule's
preconditions were not satisfied.   Because the decision not to
halt trading was therefore not made pursuant to any official SEC
rule, Plaintiffs assert that the decision was not regulatory.
In addition, Plaintiffs maintain that NASDAQ treated the system
failures as business issues appropriate for discussion by
officers of the holding company, and not issues reserved for
independent decision-making by the regulatory arm of the
Exchange.  (See Exchange Registration Approval Order at *3
(NASDAQ OMX "will not itself carry out regulatory functions.").)

---

[16] Rule 4120 is a limited delegation of authority to halt trading only in
certain enumerated cases, including when "extraordinary market activity in
the security is occurring," such as the execution of a series of transactions
for a significant dollar value at prices substantially unrelated to the
current market.  (SEC Order ¶ 32, quoting NASDAQ LLC Rule 4120(a).)

The capacity to suspend trading, irrespective of the
identity of the decision-maker or the presence of an official
SEC rule, is a quintessentially regulatory function.  See, e.g.,
DL Capital, 409 F.3d at 96; NYSE Specialists, 503 F.3d at 97
(finding that the exchange had immunity given that the
underlying actions involved "NYSE's action or inaction with
respect to trading on the Exchange, which is indisputably within
the NYSE's regulatory powers"); Sparta Surgical, 159 F.3d at
1211, 1215 (finding that when NASD "acts in [its] capacity to
suspend trading" and de-list stocks, NASD is "performing a
regulatory function cloaked in immunity" as "there are few
functions more quintessentially regulatory than suspension of
trading.").   In DL Capital, the plaintiff sued NASDAQ and
Griefeld for their decision to halt trading and for failing to
announce timely that it was cancelling the trades at issue.  409
F.3d at 96.  In affirming dismissal of the complaint on grounds
of immunity, the Second Circuit confirmed that an Exchange's
decision regarding "the actual suspension or cancellation of
trades" is protected by SRO immunity.  Id. at 98.  This applies
with equal force to NASDAQ's decision not to halt or cancel
trades during the Facebook IPO.  NYSE Specialists, 503 F.3d at
97 ("The power to exercise regulatory authority necessarily
includes the power to take no affirmative action.").  If an
SRO's exercise "of a governmental power delegated to it deserves

48

absolute immunity, the SRO's nonexercise of that power also entitles it to immunity." Id. The fact that NASDAQ determined that Rule 4120 did not apply, or that the determination was made by officers of NASDAQ OMX, see infra I.(A)n.9, does not alter the nature of the underlying action. As such, Plaintiffs' negligence claims with respect to halting trading are protected by SRO immunity.

## C. SRO Immunity Protects in Part and is Inapplicable in Part to Plaintiffs' Securities Act Claims

Plaintiffs' contend that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 based on Defendants' pre-Class Period and Class Period allegedly false and misleading statements of material fact. These statements can be divided into two categories: (1) failure to update pre-Class Period statements touting the reliability and capability of NASDAQ's technology and trading platforms ("pre-Class Period Statements"); and (2) failure to speak completely and accurately in connection with disseminating "Market System Status" messages to market participants during the Class Period ("Class Period Statements").

### 1. Defendants' Omissions Relating to the pre-Class

49

Period Statements Concerning the Capabilities of
NASDAQ's Exchange Systems are not Subject to SRO
Immunity

The CAC alleges that Defendants made material
omissions in neglecting to correct false and misleading
statements of material fact leading up to the IPO (1) in
NASDAQ's 2011 Form 10-K; (2) in NASDAQ's First Quarter 2012
Financial Results; (3) on NASDAQ's website; and (4) during
NASDAQ's May 10, 2012 Investor Day Conference.  These statements
touted and detailed the purported reliability and speed of
NASDAQ's technology and trading platform capabilities.  (See,
e.g., CAC ¶ 169 ("[O]ur platforms are highly scalable with
current capacity at ten times the average daily volume"); ¶ 170
("At NASDAQ OMX, we are committed to innovation through
technology to ensure our position as a driving force in the
exchange industry and to provide the best possible trading
experience for our customers and investors"); ¶ 182 ("Our proven
delivery methodology ensures delivery on-time, on-target and
ready-to-launch.").) During the Investor Day Conference on May
10, 2012, one week prior to Facebook's IPO, NASDAQ continued to
proclaim its "technolog[ical] excellence" without correction,
even though prior testing had revealed significant systems
limitations.  (See CAC ¶ 188 ("no trading platform in the world
can operate faster or at the scale that we operate.").)

None of NASDAQ's omissions regarding these advertisements relate to its statutorily delegated responsibility to "prevent fraudulent and manipulative . . . practices," "promote just and equitable principles of trade," "remove impediments to and perfect" the free market, or "protect investors and the public interest." 15 U.S.C. § 78o-(3)(b)(6). The advertisements were in no sense mandated by, or coterminous with, any regulatory activity contemplated by the Exchange Act. Instead, as a private corporation, NASDAQ placed these advertisements to secure the Facebook IPO and, as a result, increase company profits and trading volume on the Exchange. These statements engendered "[the] trust and confidence of the investing public, including Plaintiff[s]," that when they participated in NASDAQ's IPO, NASDAQ's systems would be secure. Weissman, 500 F.3d at 1296. "Even if NASDAQ's status as a money-making entity does not foreclose absolute immunity for any number of its activities," its public announcements and advertisements touting its ability to outperform other exchanges cannot be said to directly further its regulatory interest under the Securities Exchange Act. Id. at 1311. As discussed above, in determining whether to suspend or halting trading during an IPO, NASDAQ "stands in the shoes of the SEC"; "NASDAQ represents no one but itself when it entices investors to trade on its

51

exchange." Weissman, 500 F.3d at 1296; see also Opulent Fund, 2007 WL 3010573, at *5 (because NASDAQ created and promoted the NASDAQ-100 Index "because it profits from selling the market price data," this for-profit business function rendered immunity improper).

Servicing NASDAQ's "own business, not the governments" serves to increase trading and is non-governmental conduct "unprotected by absolute immunity." Id.; see also Opulent Fund, 2007 WL 3010573, at *5 (mere "market facilitation," or the promotion thereof, is not regulatory conduct); Sparta Surgical, 159 F.3d at 1213 ("When conducting private business, [SROs] remain subject to liability."). In Opulent Funds, the court held that when conducting private business, including creating an index and disseminating price information to increase trading and profit on an exchange, NASDAQ's actions were not immune. 2007 WL 3010573, at *5. Similarly, in Weissman, the Eleventh Circuit held that NASDAQ was not immune from suit for securities fraud arising from its commercial actions taken to promote a particular security. 500 F.3d at 1297 ("Absolute immunity is not appropriate unless the relevant conduct constitutes a delegated quasi-governmental prosecutorial, regulatory, or disciplinary function," and does not apply "[w]hen an SRO is . . . acting in its own interest as a private entity . . . for [its]

52

own corporate benefit."). The same holds true where, as here, NASDAQ's commercial actions promoted its own technology to encourage increased trading volume in light of the upcoming Facebook IPO.

DL Capital, cited by Defendants, is not to the contrary.[17] 409 F.3d at 98. There, the Second Circuit held that statements made incident to an SRO's discharge of its regulatory functions are protected by immunity. Id. Because the conduct at issue, involving NASDAQ's cancellation of certain trades, was regulatory, the statements announcing that conduct were equally protected. By the same reasoning, just as the underlying conduct of testing and designing technology software to increase trading volume is not immune from liability, nor is NASDAQ's failure to correct the promotional announcements of these technology capabilities.

---

[17] Nor is Std. Inv. Chartered, Inc., 2010 WL 749844, at *1 to the contrary. In Std. Inv. Chartered, Inc., the court held that "the consolidation that transferred NASD's and NYSE's regulatory powers to the resulting FINRA is, on its face, an exercise of the SROs' delegated regulatory functions and thus entitled to absolute immunity." 2010 WL 749844, at *1. The court rejected Plaintiff's attempt "to separate 'financially—related' statements from 'regulatory—related' statements [a]s artificial and unconvincing," given that "amendment of the by—laws itself falls within the parameters of NASD's statutory rulemaking authority." Id. (citing 15 U.S.C. § 78s(b))). The fact that the amendment of the by—laws encompassed a financial component was irrelevant, just as is whether the actions at issue here resulted in profit. Instead, the issue turns on whether the underlying nature of the action to which the statements pertain involves a regulatory function. Promoting and enticing investors to trade on NASDAQ's exchange does not constitute such a regulatory function.

Because NASDAQ's conduct is non-regulatory "when it
engages in advertising activity unsuited to a government actor
like the Securities and Exchange Commission," NASDAQ's omissions
relating to its pre-Class Period statements are not immune.  Id.

### 2. Class Period Statements were Incidental to NASDAQ's Regulatory Functions and are Subject to SRO Immunity

During the Facebook IPO, Plaintiffs contend that
Defendants concealed the known technological errors NASDAQ was
experiencing in its Market System Status Messages, including
encouraging members to proceed with submission of pre-market
orders despite knowledge of a breakdown in the system and
failing to disclose the magnitude of the problems NASDAQ was
experiencing despite knowledge that orders were getting
"stuck."[18]  In addition, NASDAQ announced at 1:57:57 p.m. that

---

[18] NASDAQ's Market System Status Messages included the following: (1) "NASDAQ
is experiencing a delay in delivering the opening print in Facebook, Inc.
(FB).  NASDAQ will advise." (CAC ¶¶ 196-197 (statement between 11:13:50 a.m.
and 11:30:09 a.m.)); (2) "The first print in FB will open at approximately
11:30 ET.  Trading will commence at that time" (CAC ¶ 199 (statement made at
11:28:50 a.m.)); (3) "NASDAQ is investigating an issue in delivering trade
execution messages from the IPO Cross in symbol FB.  NASDAQ is working to
deliver these executions back to customers as soon as possible.  NASDAQ will
advise" (CAC ¶ 203 (statement at 11:59:39 a.m.)); (4) "NASDAQ is working to
deliver pending trade execution status messages from the Facebook, Inc. (FB)
IPO Cross.  NASDAQ anticipates providing a manual report to participants
containing this information shortly.  To be later followed with the
electronic message summary.  NASDAQ will provide additional information when
available" (CAC ¶ 204 (statement at 1:05:30 p.m.)); "NASDAQ expects to
electronically deliver all executions from the Facebook, Inc. (FB) IPO Cross
at approximately 13:50 ET.  NASDAQ Will advise when this is complete" (CAC ¶
207 (statement at 1:47:16 p.m.)); "Trade execution messages for the Facebook

all systems were "operating normally," and any problems would be resolved in an "offline matching process," despite knowledge that only orders received prior to 11:11 a.m. participated in the Cross and all orders between 11:11 a.m. and 11:30 a.m. were not properly executed.  (CAC ¶¶ 209-210; 216.)  The offline matching process did not execute any orders, and Plaintiffs were unable to close positions until trading began the following Monday at inferior prices. (CAC ¶ 216 ("The offline matching process for orders entered in FB between 11:11 and 11:30 AM resulted in nothing done. . . .").)

The Class Period statements involve real time announcements of NASDAQ's decisions regarding its regulatory decisions to suspend, resume or cancel trading.  In DL Capital, the plaintiffs claimed that immunity was inappropriate because plaintiffs were challenging not NASDAQ's regulatory decisions to suspend, resume or cancel trading, but rather the manner in which NASDAQ publicly announced those decisions.  409 F.3d at 98.  The Second Circuit held that SRO immunity still applied to those statements made incidental to an SRO's discharge of its

---

Inc. (FB) IPO cross have been electronically disseminated.  All NASDAQ systems are operating normally." (CAC ¶ 208 (statement at 1:57:57 p.m.)); "For firms that entered orders in Facebook between 11:11 and 11:30 AM and have questions regarding their executions, you must call NASDAQ . . . by 5:00 pm with order information if you would like to be included in the resolution of any questions.  Our intention is to reach resolution of those trades today through an offline matching process . . . ." (CAC ¶ 213 (statement at 4:23:51 p.m.)).

regulatory functions because "[a]nnouncing the suspension or
cancellation of trades is as much a part of defendants'
regulatory duties as is the actual suspension or cancellation of
trades."  Id.; see also NYSE Specialsits, 503 F.3d at 100 (SRO
immune from liability for the timing and method of announcing
official investigations because those actions were "central to
effectuating the [Exchange's] regulatory decisionmaking").  As
such, just as NASDAQ's underlying decision not to halt or
suspend trading is protected by immunity, so too are NASDAQ's
Class Period statements announcing these decisions.   See DL
Capital, 409 F.3d at 98 ("Announcing the suspension or
cancellation of trades is as much a part of defendants'
regulatory duties as is the actual suspension or cancellation of
trades.").


          Because NASDAQ's statements during the IPO generated
profit and advanced its business interest, Plaintiffs maintain
that they cannot be protected as regulatory functions.  However,
as Opulent Fund explains, whether or not a statement made by an
SRO is used to derive profit is not the determinative inquiry,
the underlying nature of the conduct is.  2007 WL 3010573, at *5
n.1 ("[T]he immunity inquiry turns on the nature of the
challenged conduct, not its profitability.").   The court in
Opulent Fund looked not to whether "NASDAQ happen[ed] to profit

56

from its activities," but at the fact that pricing an index is

not a "regulatory function," unlike the decision to suspend

trading. Id. Similarly, the court in Weissman denied NASDAQ

immunity for false statements involved in the marketing,

advertising and promoting WorldCom, not because of the

profitability of the ads, but because the statements were "in no

sense coterminous with the regulatory activity contemplated by

the Exchange Act." 500 F.3d at 1299. Weissman affirmed that,

in contrast, immunity was required for decisions by an SRO to

suspend or halt trading and any announcements concerning such

decisions. See Weissman, 500 F.3d at 1296 (citing DL Capital

Group, 409 F.3d at 97-100 (decision to suspend trading of a

security, to cancel certain trades, and to announce these

actions was immune) and Sparta Surgical, 159 F.3d at 1213-15

(decision to suspend trading and delist shares of a company was

immune).)


        Plaintiffs' allegations as to the impropriety of these

statements, though essential for pleading securities fraud, are

equally irrelevant to the immunity inquiry. Plaintiffs' cited

precedent involves cases holding defendants responsible for

failing to speak truthfully and completely, or for neglecting a

duty to disclose material information, but in none of these

cases was the defendant protected by SRO immunity for the

statements at issue.  (See, e.g., Mem. at 42-43.)   "Immunity
depends only on *whether* specific acts and forbearances were
incident to the exercise of regulatory power, and not on the
propriety of those actions or inactions." NYSE Specialists, 503
F.3d at 98 (emphasis in original).  Allowing Plaintiffs'
allegations because they involve the fraudulent nature of these
statements would import a "bad faith" or "bad motive" element to
absolute immunity, which is incompatible with the doctrine's
purpose and would allow plaintiffs to circumvent the immunity
bar simply by recasting claims involving protected SRO conduct
as arising from fraudulent behavior.  See DL Capital, 409 F.3d
at 99 (if such exceptions to absolute immunity existed, a
plaintiff would "concoct some claim of fraud in order to
circumvent the absolute immunity doctrine"); see also Shmueli,
424 F.3d at 237 (absolute immunity "is such that it accords
protection from . . . any judicial scrutiny of the motive for
and reasonableness of official action") (internal quotation
marks omitted); Bernard, 356 F.3d at 503 (absolute immunity
applies even where the challenged conduct was motivated by a
wrongful motive as such intent is irrelevant).

"The results of any immunity rule may be harsh," but
Congress nevertheless saw fit to delegate to SROs certain
regulatory powers for which they "enjoy freedom from civil

liability when they act[ ] in their regulatory capacity," even where the SROs "act[ ] in a capricious, even tartuffian manner which cause[s] . . . enormous damage." <u>Sparta Surgical</u>, 159 F.3d at 1215.  Accordingly, Defendants conduct as alleged in Plaintiff's federal securities allegations regarding the Class Period statements are shielded by SRO immunity.  (<u>See</u> CAC ¶¶ 190-218.)

## II.  Defendants' Motion to Dismiss is Granted in Part and Denied in Part

### A. The Applicable Standard

In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court construes the complaint liberally, accepting all factual allegations as true and drawing all reasonable inferences in the plaintiff's favor.  <u>Mills v. Polar Molecular Corp.</u>, 12 F.3d 1170, 1174 (2d Cir. 1993).  The issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." <u>Villager Pond, Inc. v. Town of Darien</u>, 56 F.3d 375, 378 (2d Cir. 1995) (quoting <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 235-36, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)).

To survive dismissal, "a complaint must contain

59

sufficient factual matter, accepted as true, to 'state a claim
to relief that is plausible on its face.'"  Ashcroft v. Iqbal,
556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)
(quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.
Ct. 1955, 167 L. Ed. 2d 929 (2007)).  Plaintiffs must allege
sufficient facts to "nudge[ ] their claims across the line from
conceivable to plausible."  Twombly, 550 U.S. at 570.  "The
plausibility standard is not akin to a 'probability
requirement,' but it asks for more than a sheer possibility that
a defendant has acted unlawfully."  Cohen v. Stevanovich, 772 F.
Supp. 2d 416, 423 (S.D.N.Y. 2010).  Though the court must accept
the factual allegations of a complaint as true, it is "not bound
to accept as true a legal conclusion couched as a factual
allegation."  Iqbal, 556 U.S. at 678. (quoting Twombly, 550 U.S.
at 555).

B. **Defendants' Motion to Dismiss Plaintiffs' Negligence
   Claims is Granted in Part and Denied in Part**

In Counts III through X of the Complaint, Plaintiffs
allege claims against NASDAQ for "ordinary negligence" and
"negligence: res ipsa loquitur" on behalf of each of four
classes or subclasses of Facebook investors who claim to have
suffered economic harm as a result of the systems issues
experienced by NASDAQ in the Facebook IPO.  As found above,

60

these claims can be separated between the negligence technology claims, and NASDAQ's decision not to halt trading during the IPO.

### 1. The Applicable Standard

Under New York law, to sustain a claim for negligence, a plaintiff must show that the defendant owed the plaintiff a cognizable duty of care, that the defendant breached that duty, and that the plaintiff suffered damages as proximate result of that breach.  King v. Crossland Sav. Bank, 111 F.3d 251, 255 (2d Cir. 1997).

Though members of the Exchange have an established duty of care based on their status, non-members must plead a recognized duty of care owed by Defendants to establish negligence.  See, e.g., Hamilton v. Beretta U.S.A. Corp., 750 N.E.2d 1055, 1060 (N.Y. 2001); 532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc., 750 N.E.2d 1097, 1101 (N.Y. 2001) (internal citations omitted) (duty determined "by balancing factors, including the reasonable expectations of parties and society generally, the proliferation of claims . . . and public policies affecting the expansion or limitation of new channels of liability.").  However, Defendants are correct that the

61

negligence claims of NASDAQ member First New York are barred by NASDQ Rule 4626, which unequivocally provides that "NASDAQ and its affiliates shall not be liable for any losses, damages, or other claims arising out of the NASDQ Market Center or its use."[19]

### 2. Defendants' Motion to Dismiss Plaintiffs' Negligence Claims Pertaining to the Design, Testing and Touting of NASDAQ's Systems is Denied

In the exercise of reasonable care, Plaintiffs contend that NASDAQ, given its statements touting its capability and reliability, should have designed and tested its systems to ensure that they would be able to handle the predicted trading volume on Facebook's opening day, including the ability of the systems to execute and confirm the large number of trade orders and cancellations anticipated for execution in the Cross.  (CAC ¶¶ 249-53.)  NASDAQ's failure in fulfilling this duty proximately caused the injuries alleged by the various subclasses of negligence Plaintiffs.

Defendants do not dispute this causation, but instead assert that Plaintiffs' claims are barred by the economic loss

---

[19] Plaintiffs maintain that First New York only brings securities claims, and Rule 4626 is inapplicable to those claims arising out of material omissions concerning NASDAQ's known system failures, and not out of the use of the NASDAQ Market Center. For the sake of clarity, First New York is barred from asserting negligence claims against NASDAQ.

doctrine, under which a plaintiff cannot recover in tort for purely economic losses caused by the negligence of a defendant with whom the plaintiff had no contractual privity.  See Schiavone Constr., 436 N.E.2d at 1323 (adopting economic loss doctrine); see also 16 N.Y. Prac., Torts § 21:13:10 ("Pursuant to the 'economic loss rule,' there can be no recovery in tort when the only damages alleged are for economic loss.") .

Though New York courts have not specifically addressed the applicability of the economic loss doctrine in the context of negligence claims asserted against a securities exchange by members of the investing public, the Court of Appeals has instituted a "duty analysis" to determine whether a "plaintiff's negligence claims based on economic loss alone fall beyond the scope of the duty owed them by defendants." Finlandia, 750 N.E.2d at 1101; see also King County v. IKB Deutsche Industriebank AG, 863 F. Supp. 2d 288 (S.D.N.Y. 2012) (adopting the duty analysis, or whether defendant had a duty to protect the plaintiff, in determining the applicability of the economic loss doctrine).  In employing this "duty analysis," it is not required that the defendant know the identity of each particular plaintiff, or that a contractual relationship existed, so long as the plaintiffs are a "settled and particularized class" with a relationship "so close as to approach that of privity," or

that the defendant has a created a duty to protect the
plaintiff.  Abu Dhabi, 2013 WL 837536, at *3.

          Plaintiffs' allegations satisfy this focused duty
standard for recovery.  NASDAQ had a "duty to protect"
Plaintiffs against economic losses for orders entered into
NASDAQ's systems, which NASDAQ improperly processed.  King
Cnty., 863 F. Supp. 2d at 302.  NASDAQ was aware of, promoted,
and profited from the widespread public interest in the Facebook
IPO and accepted the trade orders for processing and execution.
Indeed, "[w]hen initiating an IPO, an exchange has an obligation
to ensure that its systems, processes and contingency planning
are robust and adequate to manage the IPO without disruption to
the market." (SEC Order ¶ 2.)  This created a "relationship so
close as to approach that of privity."  Abu Dhabi, 2013 WL
837536, at *3; see also Sommer v. Federal Signal Corp., 79
N.Y.2d 540, 552-53 (N.Y. 1992) (sustaining a negligence claim
for economic loss and noting that the company's duty of care was
"not only a function of private contract" but also from "the
nature of its services . . . affected with a significant public
interest.").  That brokers directly placed the orders does not
eliminate this special relationship; brokers act merely as
agents of their customers, who are the real parties in interest
and assume the full risk of economic loss from any system

                              64

failures. See Conway v. Icahn & Co., 16 F.3d 504, 510 (2d Cir.
1994). Further, unlike the cases cited by Defendants, see,
e.g., Travelers, 734 F. Supp. 2d at 379 (applying the economic
loss doctrine where the "economic loss" was difficult to
quantify and would result in "crushing exposure" by "countless
parties"), Plaintiffs' alleged losses are determinate and
identifiable, each with a separate, carefully defined claim, and
each comprising a specified group of Facebook IPO retail
investors on a single day.[20] (See CAC ¶¶ 360-75 (Cross Buyer
Confirmation Class); CAC ¶¶ 376-91 (Cross Execution Class); CAC
¶¶ 392-407 (Market Trading Class).)


        In addition, courts have "reasoned that the extent of
liability and the degree of foreseeability stand in direct
proportion to one another: the more particular the
foreseeability that economic loss would be suffered as a result
of the defendant's negligence, the more just that liability be
imposed and recovery permitted." 532 Madison, 750 N.E.2d at
1103 (citing People Express Airlines v. Consolidated Rail Corp.,
495 A.2d 107 (N.J. 1985)). Here, it is alleged that "NASDAQ had

---

[20] The Accommodation Order, instituted by NASDAQ, confirms the ability to
calculate these losses. The criteria in the order create a framework that
seeks to replicate what the expected execution prices of orders would have
been had NASDAQ not experienced systems issues, on the assumption that
members would exercise reasonable diligence to mitigate losses once made
aware that their Cross orders had not executed, or had executed at unexpected
prices. See id.; see also Accommodation Proposal, 77 Fed. Reg. at 45, 710-11.

knowledge of potentially significant problems with its IPO
software in the days leading up to the Facebook IPO, but failed
to take adequate precautions to ensure that its software
functioned properly."  (CAC ¶ 257.) Plaintiffs' subsequent
monetary losses resulting from these previously detected flaws
were the foreseeable result of NASDAQ's failings.  A failure of
exchange systems to handle investor trade orders "carefully and
competently" has obvious "catastrophic consequences." Sommer,
79 N.Y.2d at 552-53 (sustaining a negligence claim for economic
loss against a fire alarm company in part because the failure to
construct the alarm "carefully and competently can have
catastrophic consequences").

Based on this precedent and the relationships
involved, as well as the definite and foreseeable nature of
Plaintiffs' losses by NASDAQ, the economic loss doctrine is not
applicable and Defendants' motion to dismiss the technology
negligence claims is denied.[21]

### 3. Motion to Dismiss Plaintiffs' Negligence Claims Pertaining to NASDAQ's Decision not to Halt Trading is Granted

---

[21] NASDAQ does not dispute that Plaintiffs adequately allege the remaining
elements of the negligence claims, including that NASDAQ breached its
purported duty and this breach proximately caused damages.  (See generally
MTD Br.)  As such, these elements are accepted as adequately pled for the
purposes of the instant motion.

Though Plaintiffs' negligence claims are not barred by the economic loss doctrine, the underlying actions by Defendants to not halt trading or cancel impacted trades are protected by SRO immunity as discussed above.  These claims are therefore dismissed on grounds of immunity, and no other arguments are reached.  See Standard Inv. Chartered, Inc., 2010 WL 749844, at *1 (because the court dismissed on grounds of immunity, "the [c]ourt [did] not reach the defendants' other arguments.").

**C. Defendants' Motion to Dismiss Plaintiffs' Securities Act Claims is Granted in Part and Denied in Part**

In Counts I and II of the CAC, Plaintiffs allege that they were defrauded into purchasing shares of Facebook in reliance upon allegedly misleading material statements and omissions made by NASDAQ about the qualities and status of NASDAQ's systems.  These material statements or omissions, as described above, can be divided into two categories: (1) the pre-Class Period statements; and (2) the Class Period statements.

1. The Applicable Standard

"The 'fundamental purpose' of the securities laws is 'to substitute a philosophy of full disclosure for the philosophy of caveat emptor[.]'" In re Initial Pub. Offering Sec. Litig. (IPO), 241 F. Supp. 2d 281, 382 (S.D.N.Y. 2003) (citing SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 186 (1963)). To that end, issuers of public statements are subject to liability under Section 10(b) when they either: "use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance." 15 U.S.C. § 78j(b); see IPO, 241 F. Supp. 2d at 381 (citing Glazer v. Formica Corp., 964 F.2d 149, 156 (2d Cir. 1992)). Rule 10b-5 forbids, in relevant part, making "any untrue statement of a material fact" or omitting "a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5.

Whether a statement or omission is material turns on whether "there is a substantial likelihood" that: (i) "a reasonable shareholder would consider it important in deciding how to [act]"; or (ii) "the disclosure of the omitted fact would have been viewed by the reasonable investor as having

68

significantly altered the 'total mix' of information made
available." Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)
(quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449
(1976)); see also In re Salomon Analyst Metromedia Litig., 544
F.3d 474, 482 (2d Cir. 2008), abrogated on other grounds by
Amgen v. Conn. Ret. Plans & Trust, 133 S.Ct. 1184 (2013).
Material facts include those that "may affect the desire of
investors to buy, sell, or hold the company's securities."
Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 180 (2d Cir.
2001) (citing SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849
(2d Cir. 1968)). Moreover, the "materiality of a statement or
omission cannot be determined in a vacuum," Cyber Media Grp.,
Inc. v. Island Mortg. Network, Inc., 183 F. Supp. 2d 559, 570
(E.D.N.Y. 2002), because materiality "necessarily depends on all
relevant circumstances." ECA, Local 134 IBEW Joint Pension Trust
v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009).  "At
the pleading stage, a plaintiff satisfies the materiality
requirement of Rule 10b-5 by alleging a statement or omission
that a reasonable investor would have considered significant in
making investment decisions." Ganino v. Citizens Utils. Co., 228
F.3d 154, 161 (2d Cir. 2000).

>    2. Defendants' Motion to Dismiss Plaintiffs'
>       Allegations Based on Material Omissions Surrounding
>       the Pre-Class Period Statements is Denied

Plaintiffs allege that Defendants' failure to update pre-Class Period statements touting the reliability and capability of NASDAQ's technology and trading platforms violated Section 10(b)-5 of the Exchange Act.  To sustain such a claim, Plaintiffs must prove that Defendants (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury. See In re Time Warner Inc. Secs. Litig., 9 F.3d 259, 264 (2d Cir. 1993); Burke v. Jacoby, 981 F.2d 1372, 1378 (2d Cir. 1992).

First, Plaintiffs allege that Defendants' failure to update the following statements by the time of the Facebook IPO was a material omission of fact in light of NASDAQ's direct evidence or reckless indifference to the contrary:

- NASDAQ is "always committed to working with regulators, exchanges and market participants to ensure transparent trading and a fair and orderly market **for the benefit of investors.**" (CAC at ¶ 172 (citing 2011 Form 10-K));

- "[NASDAQ] provides technology to customers with the speed, scale and reliability required **to meet the specific needs of their markets**" (Id. at ¶ 169 (citing 2011 Form 10-K));

70

- "[O]ur platforms are highly scalable with current capacity at ten times the average daily volume allowing significantly higher transaction volume to be handled at low incremental cost." (Id.)

-  "Our platform continues to stand out as a reliable, flexible, and high capacity system **delivering high levels of execution quality and speed under even extremely demanding market conditions.**" (Id. at ¶ 173 (citing 2011 Form 10-K));

- NASDAQ's "continued investment in technology to meet customers' demands for speed, capacity, and reliability as markets adapt to a global financial industry, as increasing numbers of new companies are created, and as emerging countries show ongoing interest in developing their financial markets." (Id. at ¶ 180 (citing First Quarter 2012 Form 10- Q));

- "No trading platform on the planet **is faster or more scalable.**" (Id. at ¶ 186 (citing May 11, 2012 Investor Day Conference)); "Our technology can help trade and clear any and every financial instrument on the planet." (Id.);

- "We have unique capabilities unmatched by any exchange in the world." (Id.); "[NASDAQ] delivers innovative products and services **that provide transparency to institutional, retail and individual investors**" (Id.); "[W]e're well known for our technology, **no trading platform in the world can operate faster or at the scale that we operate.** . . . [O]ur technology can trade and clear really any instrument on the planet." (Id. at ¶ 188 (citing May 11, 2012 Investor Day Conference));

- "We process billions of transactions in a day at sub-microsecond speeds to millions of customers. And as much as that's table stakes, that's hard work just to make sure you have that reliability and capability." (Id.)

- "Our proven delivery methodology ensures delivery on-time, on-target and ready-to-launch." (Id. at ¶ 183.)

Defendants contend that these statements are inactionable as pre-Class Period statements, or alternatively as mere "puffery" incapable of "objective verification" imposing liability. In re Tower Automotive Sec. Litlig., 483 F. Supp. 2d 327, 336 (S.D.N.Y. 2007).

Defendants are correct that the Second Circuit has found pre-Class Period statements to be inactionable. See In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 643 (S.D.N.Y. 2007) ("[a] defendant . . . is liable only for those statements made during the class period."); In re IBM Secs. Litig., 163 F.3d at 107 (accord). However, Defendants still have a duty to correct "statements that are false at the time they were made, when [a Defendant] learn[s] that its prior statement . . . [i]s untrue." In re J.P. Jeanneret Assoc., Inc., 769 F. Supp. 2d 340, 375 (S.D.N.Y. 2011) (having represented an enterprise as legitimate, defendant had a continuing obligation to apprise the class of information that rendered its assessment incorrect); see also In re Beacon Assoc. Litig., 745 F. Supp. 2d 386, 410 (S.D.N.Y. 2010) (defendant had a "continuing duty to update or correct past statements when they became known to be misleading"); In re NovaGold Res. Inc. Sec. Litig., 629 F. Supp. 2d 272, 301 (S.D.N.Y. 2009) ("duty to update applies to 'a statement made misleading by intervening events, even if the

statement was true when made.'") (citing Overton v. Todman &
Co., 478 F.3d 479, 487 (2d Cir. 2007)); In re Time Warner Inc.
Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993) (noting that in
certain circumstances, an issuer may have "a duty to update
opinions and projections . . . if the original opinions or
projections have become misleading as the result of intervening
events"); In re Quintel Entm't Inc. Sec. Litig., 72 F. Supp. 2d
283, 292 (S.D.N.Y. 1999) (same); (CAC ¶ 190). Here, Plaintiffs'
allegations rest not on pre-Class Period statements, but rather
on Defendants' failure, or material omission, in correcting
these statements by the time of the Facebook IPO, given that
NASDAQ had concrete information from the testing of its systems
that these statements were no longer accurate. (CAC ¶¶ 119-125,
225-27, 230-33.)

Statements that are opinions or predictions are not
per se inactionable under the securities laws, and may be
actionable if they are worded as guarantees or are supported by
specific statements of fact, see Raab v. General Physics Corp.,
4 F.3d 286, 290 (4th Cir. 1993), or if the speaker does not
genuinely or reasonably believe them, see Time Warner, 9 F.3d at
266; see also In re Donald Trump Casino Secs. Litig., 7 F.3d
357, 368 (3d Cir. 1993); In re IBM Sec. Litig., 163 F.3d 102,
107 (2d Cir. 1998) (citing Time Warner, 9 F.3d at 266). Here,

73

Defendants made specific statements leading up to the Facebook
IPO ensuring "on-time, on-target and ready-to-launch"
technology, that was "faster" than any Exchange in the world and
could operate under "even extremely demanding market
conditions." (CAC ¶¶ 173; 183; 188.)  These were not vague,
forward-looking statements of optimism, but "involved the
representation of existing facts" concerning NASDAQ's capability
and reliability to carry out enormous volumes of orders at sub-
microsecond speeds, which were readily capable of verification.[22]
See, e.g.,  In re Quintel Entm't Inc. Sec. Litig., 72 F. Supp.
2d 283, 291-92 (S.D.N.Y. 1999) ("Defendants' statements in the
Form 10-Q filed on July 15, 1997 were not forward-looking [or
puffery] because they involved the representation of existing
facts concerning the number of chargebacks and the value of the
AT & T partnership"); Time Warner, 9 F.3d at 268 (where
Defendant "publicly hyped strategic alliances" as a way to raise

---

[22] Defendants contend that optimistic statements not capable of objective
verification are non-actionable "puffery." (MTD Br. at 48-49.)  The CAC
alleges that Defendants did, in fact, objectively verify that NASDAQ's
systems were experiencing significant issues in the days leading up to the
Facebook IPO.  (CAC ¶¶ 1, 17, 22-26, 122-24, 184-85, 333.) Regardless,
disputes over the materiality of allegedly false or misleading statements are
generally reserved for the trier of fact.  See Basic, 485 U.S. at 236;
Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002)
("Recognizing that the materiality of an omission is a mixed question of law
and fact, courts often will not dismiss a securities fraud complaint at the
pleading stage of the proceedings, unless reasonable minds could not differ
on the importance of the omission."); cf. Escott v. BarChris Constr. Corp.,
283 F. Supp. 643, 682 (S.D.N.Y. 1968) ("Since no one knows what moves or does
not move the mythical 'average prudent investor,' it comes down to a question
of judgment, to be exercised by the trier of the fact as best he can in light
of all circumstances.").

capital and failed to correct this, statements were not "puffery" and were actionable under 10b-5).

Because NASDAQ's statements were material, Defendants had a duty to correct and update them once they were found to be untrue. Defendants "knew or should have known [that] their statements became misleading" well before the Facebook IPO: As alleged, NASDAQ was aware through testing of its systems of potential deficiencies in the system; NASDAQ did not test how to correct these deficiencies, and its "stress tests" accounted for only a small fraction of the anticipated total trading volume for the IPO. (CAC ¶¶ 119-125, 225-27, 230-33; see also SEC Order ¶¶ 12; 20; 23.); see, e.g., In re Quintel Entm't Inc. Sec. Litig., 72 F. Supp. 2d 283, 291-92 (S.D.N.Y. 1999). Once this testing revealed inadequacies and flaws in light of the upcoming largest IPO in NASDAQ history, NASDAQ had a duty to correct its prior statements as to its capabilities. See, e.g., Oran v. Stafford, 226 F.3d 275, 286 (3d Cir. 2000) (a duty to disclose arises when prior statements "become misleading when viewed in the context of subsequent events"); Casella v. Webb, 883 F.2d 805, 808 (9th Cir. 1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such representation.");

75

Scritchfield v. Paolo, 274 F. Supp. 2d 163, 175-76 (D.R.I. 2003)
(stressing that "a company's statements that it is 'premier,'
'dominant,' or 'leading' must not be assessed in a vacuum (i.e.,
by plucking the statements out of their context to determine
whether the words, taken per se, are sufficiently 'vague' so as
to constitute puffery")); Manavazian v. Atec Grp., Inc., 160 F.
Supp. 2d 468, 480-81 (E.D.N.Y. 2001) (company's "extremely
positive" statements about its current and future performance
were actionable as defendants failed to disclose materially
misleading adverse business trends); In re Computer Assocs.
Class Action Sec. Litig., 75 F. Supp. 2d 68, 73(E.D.N.Y. 1999)
(statements that company's "business is stronger than ever,"
that there was "strong worldwide demand" for its products, and
that company's "business fundamentals are strong" were non-
puffery, actionable statements).  Instead of revealing these
flaws, far from ensuring "transparent trading and a fair and
orderly market for the benefit of investors" (CAC ¶ 172), NASDAQ
continued making untrue statements amount its capabilities and
omitted all information as to its system failures,
"significantly alter[ing] the total mix of information available
to Class Members." Time Warner, 9 F.3d 267-78.  Just as a
misstatement about a company's primary product affects an
investors decision to purchase that stock, NASDAQ's failure to
correct flawed information about its technology capabilities

could have impacted Plaintiffs' decision to participate in
Facebook's Offering and ability to trade during that Offering.
See Basic, 485 U.S. at 231-32 (1988); Kronfeld v. Trans World
Airlines, Inc., 832 F.2d 726, 732 (2d Cir. 1987) (material facts
include those facts "which may affect the desire of investors to
buy, sell, or hold the company's securities"); In re Regeneron
Pharm., Inc. Sec. Litig., 2005 WL 225288, at *21 ("[I]t would be
a sad day when [a] court could determine that misstatements
about whether a company's primary product worked did not alter
the total mix of information available to the market) (citation
omitted); cf. Milman v. Box Hill Sys. Corp., 72 F. Supp. 2d 220,
230 (S.D.N.Y. 1999) ("Reasonable investors might certainly
consider data from the initial market tests of an important new
product line to be significant in their evaluation of the firm's
prospects.").[23]  This failure thus constituted a material
omission under federal securities laws.   See, e.g., Time
Warner, 9 F.3d at 268 (where Defendant "publicly hyped strategic
alliances" as a way to raise capital and failed to correct this,
statements were not "puffery" and were actionable under 10b-5.);
McMahan, 900 F.2d at 579 ("[T]he disclosure required by the
securities laws is measured not by literal truth, but by the

---

[23] NASDAQ's general disclaimers of "unanticipated disruptions in service" or
that "markets have experienced occasional system failures" (NASDAQ OMX Annual
Report (Form 10-K) at 25-26) in its annual report does not remove its
liability when it statements directly touted the reliability and capability
of handling trade volume as fast as possible in light of the upcoming IPO,
despite knowledge of its inadequacies.  (See MTD Br. at 28.)

ability of the material to accurately inform rather than mislead

prospective buyers."); Fogarazzo v. Leghman Bros., Inc., 341 F.

Supp. 2d 274, 294 (S.D.N.Y. 2004) ("A statement can also be

misleading, though not technically false, if it amounts to a

half-truth by omitting some material fact."); cf. TSC Indus.,

426 U.S. at 450 (plaintiffs need not show that the omission

would have been outcome determinative).


Second, Plaintiffs allege that Defendants were

consciously aware or recklessly acted with scienter in that they

knew or recklessly disregarded that the public statements and

documents issued and disseminated in NASDAQ's name were

materially false and misleading and/or became materially false

and misleading due to subsequent events. (CAC ¶ 219.)


The PSLRA requires that to support scienter a

complaint must plead facts sufficient to show a strong inference

that a defendant acted with an intent to "deceive, manipulate,

or defraud. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551

U.S. 308, 319 (2007); see also Novak v. Kasaks, 216 F.3d 300,

307-08 (2d Cir. 2000) (same). In applying this standard, courts

must "accept all factual allegations in the complaint as true"

and determine "whether all of the facts alleged, taken

collectively, give rise to a strong inference of scienter, not

78

whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, 551 U.S. at 323 (emphasis in original).  The "inference that the defendant acted with scienter need not be irrefutable . . . or even the most plausible of competing inferences." Id. at 324 (internal citations omitted).  Rather, the inference need only be at least as compelling as any plausible opposing inference from the facts, and if they are equally likely, the action should be permitted to move forward. Id. at 324 n.5; see also In re Top Tankers, Inc. Sec. Litig., 528 F. Supp. 2d 408, 413-14 (S.D.N.Y. 2007).

Plaintiffs can establish an inference of scienter by alleging facts showing either (a) Defendants' "motive and opportunity" to commit the alleged fraud, or (b) strong circumstantial evidence of conscious misbehavior or recklessness. ATSI, 493 F.3d at 99. Courts have determined that a "strong inference of scienter" exists when the facts demonstrate that defendants: (i) benefitted in a "concrete and personal way" from the alleged fraud; (ii) engaged in "deliberately illegal" behavior; (iii) "knew facts or had access to information suggesting that their public statements were

not accurate"; or (iv) failed to verify information that Defendants had a duty to monitor. See Novak, 216 F.3d at 311. Plaintiffs adequately allege both (iii) and (iv).

As alleged in the CAC (See CAC ¶¶ 23-24; 121-24; 219-33.), NASDAQ began testing the design of its systems in the days and weeks leading up to the Facebook IPO, which revealed unresolved technical issues undermining the reliability of NASDAQ in executing the anticipated trade volume for the Offering and which were not corrected before the IPO commenced. (CAC ¶¶ 119, 225; see also CAC ¶ 224 (Business Insider interviewed hedge fund manager who described how NASDAQ "knew its systems were broken before the Facebook IPO".).) These allegations (CAC ¶¶ 119, 224-25), which include purported knowledge of an insider individual (see CAC ¶ 224), adequately demonstrate that Defendants knew or should have known of contemporaneous conditions making their omission to correct prior statements touting NASDAQ's software systems materially misleading.[24]  See, e.g., In re New Century, 588 F. Supp. 2d

---

[24] Defendants cited precedent is inapposite.  In Campo v. Sears Holdings Corp., 371 F. App'x 212 (2d Cir. 2010), the Second Circuit noted that press speculation concerning opinions held by a defendant several years prior did not constitute "admissions" of an intent to defraud by that defendant. Id. at 215. In Rosenzweig v. Azurix Corp., 332 F.3d 854 (5th Cir. 2003) the Fifth Circuit, in affirming the district court's denial of leave to amend the complaint, noted that news articles plaintiffs cited in their motion for leave to amend simply reiterated defendant's "well-documented woes [already alleged in original complaint]." Id. at 865. In Stern v. Leucadia Nat'l Corp., 844 F.2d 997 (2d Cir. 1988), the Second Circuit noted that the press

1206, 1228 n.21 (C.D. Cal. 2008) (scienter properly pled based
upon allegations that senior management knew of "contemporaneous
conditions . . . crucial to the core operations of the company"
contrary to what their statements conveyed); In re Check Point
Software Tech. Ltd. Sec. Litig., No. 03 Civ. 6594 (KMB), 2006 WL
1116699, at *4 (S.D.N.Y. Apr. 26, 2006) (misstatements and
omissions concerning the "core operations of the company
support[] the inference that the defendant knew or should have
known the statements were false when made"); In re Atlas Air
Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 489
(S.D.N.Y. 2004) (same).  Scienter based upon recklessness –
i.e., "an extreme departure from the standards of ordinary care
to the extent that the danger was either known to the defendant
or so obvious that the defendant must have been aware of it," is
a "sufficiently culpable mental state for securities fraud."  JP
Morgan, 553 F.3d at 198 (quoting South Cherry Street, LLC v.
Hennessee Group LLC, 573 F.3d 98, 109 (2d Cir. 2009)).

---

reports relied on by plaintiffs focused on defendant allegedly engaging in
misconduct in other merger deals, instead of the deal at issue.  Here,
Plaintiffs' well-pleaded allegations, which must be accepted as true at this
stage, include allegations by an individual allegedly aware of the design
failures at the time. (CAC ¶ 249.) Further, these allegations have been
supported by the SEC Order relating to the FB IPO.  The fact that the media
reports may or may not constitute "hearsay" (see MTD Br. at 53 n.30) is
similarly misplaced; allegations in a complaint are not tested against the
rules of evidence. See, e.g., Castro v. Covenant Aviation Sec., LLC, No. 12
Civ. 3037 (PAC), 2013 WL 3811474, at *2 (S.D.N.Y. Jul. 22, 2013) (noting
that, prior to answer or discovery "the Federal Rules of Evidence are
inapposite," because, "[a]t this stage, . . . 'the court . . . has only
allegations and no evidence before it.'") (citing D.H. Blair & Co., v.
Gottdiener, 462 F.3d 95, 107 (2d Cir. 2006)).

In addition, courts "have found allegations of
recklessness to be sufficient where plaintiffs alleged facts
demonstrating that defendants failed to review or check
information that they had a duty to monitor, or ignored obvious
signs of fraud." Goldman v. Belden, 754 F.2d 1059, 1070 (2d Cir.
1985).   In the weeks preceding the public offering, NASDAQ
continued to publicly state its unparalleled capacity to handle
trading at the "fastest" speeds with a "proven . . . on-time,
on-target" delivery method.   (CAC ¶ 173; 183.)   Yet, despite
awareness of the anticipated trading volume of the Facebook IPO
and flaws revealed in its technology during initial testing,
NASDAQ's volume testing in the week leading up to the IPO only
simulated one twelfth of the actual anticipated trading. (CAC ¶¶
12-22, 225-28 (NASDAQ's volume testing simulated 6 to 53 million
shares and replicated only 40,000 pre-market orders whereas 80
million shares traded in the first 30 seconds of trading with
total trading volume at 567 million shares); see also SEC Order
¶ 1.)   Defendants' failure to adequately test and monitor their
systems, in light of the anticipated trade volumes and their
statements claiming ensured reliability, constitutes scienter.
See Rolf v. Blyth, Eastman Dillon & Co., Inc., 570 F.2d 38, 47
(2d Cir. 1978) (plaintiff's allegations that defendant, his
broker, consistently reassured the plaintiff that the investment
advisor responsible for the plaintiff's portfolio "knew what he

82

was doing" but never actually investigated the advisor's

decisions to determine "whether there was a basis for the

[defendant's] assertions" constituted scienter); SEC v. McNulty,

137 F.3d 732, 741 (2d Cir. 1998) (pleading standard for scienter

met where the defendant allegedly included false statements in

SEC filings despite "the obviously evasive and suspicious

statements made to him" by the corporate officials upon whom he

was relying for this information and despite outside counsel's

recommendation that these statements not be included).


As such, the allegations in Plaintiffs' CAC are

sufficient to support a strong inference of scienter at this

stage.  See, e.g., Goldman, 754 F.2d at 1070 (pleading standard

was met where the plaintiffs alleged that the defendants

released to the investing public several highly positive

predictions about the marketing prospects of a computer system

to record hotel guests' long-distance telephone calls when they

knew or should have known several facts about the system and its

consumers that revealed "grave uncertainties and problems

concerning future sales of" the system); Heller v. Goldin

Restructuring Fund, L.P., 590 F. Supp. 2d 603, 622 (S.D.N.Y.

2008) (allegations that "defendants had knowledge of facts . . .

that explicitly contracted their public statements . . . alone

are enough to satisfy the pleading requirement for scienter");

<u>Nathel v. Siegal</u>, 592 F. Supp. 2d 452, 465 (S.D.N.Y. 2008)
(allegations gave rise to strong inference of scienter where
defendants had access to internal documents that contradicted
their public statements); <u>Novak</u>, 216 F.3d at 308 ("[S]ecurities
fraud claims typically have sufficed to state a claim based on
recklessness when they have specifically alleged defendants'
knowledge of facts or access to information contradicting their
public statements.").

Third, Plaintiffs allege that a presumption of
reliance is appropriate.

Reliance is presumed in securities actions "involving
primarily a failure to disclose," <u>see</u> <u>Affiliated Ute Citizens of
Utah v. United States</u>, 406 U.S. 128, 153 (1972), and may be
presumed where plaintiffs plead "an omission of a material fact
by one with a duty to disclose."  <u>Stoneridge Inv. Partners, LLC
v. Scientific-Atlanta, Inc.</u>, 552 U.S. 148, 159 (2008); <u>see also</u>
<u>Wilson v. Comtech Telecomms. Corp.</u>, 648 F.2d 88, 93 (recognizing
<u>Affiliated Ute</u> presumption of reliance applies in situations
where the gravamen of a complaint's allegations concern material
omissions because "reliance as a practical matter is impossible
to prove."); <u>Joseph v. Wiles</u>, 223 F.3d 1155, 1162 (10th Cir.
2000)("Requiring a plaintiff to show a speculative set of facts,

84

i.e., how he would have behaved if omitted material information had been disclosed, places an unrealistic evidentiary burden on the 10(b) plaintiff"). The CAC's federal securities allegations are based not on Defendants' pre-Class Period statements, as discussed above, but on the material omissions concerning NASDAQ's known system problems, which Defendants had a duty to disclose. The affirmative statements are identified in order to demonstrate that Defendants had a duty to correct or update these material statements in the days leading up to the Facebook IPO. (See CAC ¶¶ 168-94 (alleging Defendants had a duty to update various statements touting the reliability of NASDAQ's trading technology once it became clear that these statements were no longer true).) Because the CAC allegations involve "primarily a failure to disclose" that presents a situation where "reliance as a practical matter is impossible to prove," reliance may be presumed under the Affiliated Ute doctrine. See Wilson, 648 F.2d at 93 (presumption of reliance applies where the complaint does not "rest[] primarily on affirmative statements" but on material omissions, upon which "reliance as a practical matter is impossible to prove"); see also Smith Barney, 290 F.R.D. at 47 (same).

Finally, Plaintiffs allege that their damages were foreseeable and directly caused by the materialization of the

85

concealed risks by Defendants; namely, NASDAQ's technical
limitations, including the breakdown of its IPO Cross system,
and Defendants' failure to properly test or announce these
concerns with NASDAQ's systems prior to the IPO.  (CAC ¶ 238.)

Loss causation is governed by the Rule 8 notice
pleading standard, and can be pled by alleging "the
materialization of a concealed risk that causes a stock price to
decline."  In re Am. Int'l Grp., Inc. 2008 Sec. Litig., 741 F.
Supp. 2d 511, 534 (S.D.N.Y. 2010); see also Wallace v.
IntraLinks, No. 11 CV 8861, 2013 WL 1907685, at *9 (S.D.N.Y. May
8, 2013) (pleading loss causation "is governed by Rule 8 notice
pleading, and therefore a complaint only needs to provide some
indication of the loss and the causal connection that the
plaintiff has in mind."); Lentell, 396 F.3d at 172-73 (proximate
cause shown where "the risk that caused the loss was within the
zone of risk concealed by the [] omissions alleged."); 15 U.S.C.
§ 78u- 4(b)(4) ("to state a claim for securities fraud, a
plaintiff must allege "that the act or omission of defendant . .
. caused the loss for which the plaintiff seeks to recover
damages.").  "Where some or all of the risk is concealed by the
defendant's misrepresentation or omissions, . . . loss causation
[is] sufficiently pled." AIG, 741 F. Supp. 2d at 534 (quoting
Nathel, 592 F. Supp. 2d at 467).

The CAC adequately details that the Defendants'
material omissions concealed NASDAQ's technology and trading
platform risks, and that the materialization of these risks
occurred during the IPO and directly caused their losses by: (i)
causing erroneous and failed trade executions; (ii) blinding
Class Members for as to their then-current positions in Facebook
stock due to late and/or missing trade confirmations; (iii)
preventing Class Members from executing orders at the National
Best Bid/Offer ("NBBO") prices for Facebook stock as required by
SEC Reg. NMS; and (iv) exposing Class Members to related
failures of the NASDAQ trading platform, resulting in, among
other things, an artificial downward pressure on the price of
Facebook's stock. (See CAC ¶¶ 237; 238; 139-59 (materialization
of the risks resulted in (1) failure to properly execute Class
Members' buy and sell orders and (2) untimely delivery
confirmations of pre-market orders).)  Plaintiffs' damages,
caused by their inability to trade on a fair and functioning
system, were therefore within the "zone of risk concealed" by
Defendants.  See Lentell, 396 F.3d at 173; AIG, 741 F. Supp. 2d
at 534.

Defendants contend that the CAC fails to plead
causation because Plaintiffs have not specifically linked any

87

decline in the Facebook stock price shares with a particular

misstatement or omission.  Plaintiffs' alleged loss is not in

the value of the Facebook stock, but rather in Plaintiffs'

ability to trade on NASDAQ's flawed technology, which prevented

Plaintiffs from properly executing and selling their stock.

Pleading loss causation does not equate with proving total

damages; the latter requires a fact-intensive analysis after

discovery, inappropriate for adjudication at the motion to

dismiss stage.  In re Clearly Canadian Secs. Litig., 875 F.

Supp. at 1420 ("Plaintiffs will later have to come forward with

evidence on this point, but that is an issue more properly

addressed in a motion for summary judgment.").  Based on the

CAC's allegations, "it is not unreasonable to assume at this

stage in the litigation that [P]laintiffs may be able to

demonstrate that but for" Defendants' material omissions,

Plaintiffs may not have placed orders on the Exchange, or that

the design flaws and delays did not impact Plaintiffs' ability

to functionally execute their orders during the IPO.[25]  In re

_____

[25] In any event, the system errors may have some impact on the stock price.
The Cross is designed to identify a single price for the opening of trading
in a security that is the subject of an IPO. The price is determined based on
supply and demand as represented by orders submitted before the execution of
the Cross. (CAC ¶ 134; see also NASDAQ Rules 4120 & 4753.)  If certain orders
are "stuck" or not canceled or executed as appropriate, this flaw can
reasonably affect the stock price or cause an artificial downward pressure on
the stock.  And while Defendants suggest that the decline in Facebook's stock
price is attributable to factors other than the materialization of the NASDAQ
systems issues, "the existence of intervening events that break the chain of
causation, such as a general fall in the price of stocks in a certain sector,
is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion

<u>Clearly Canadian Secs. Litig.</u>, 875 F.Supp. 1410, 1420
(N.D.Cal.1995) ("In an omissions case" it is "hardly surprising"
not to have concrete proof of losses at the pre-discovery
phase); (<u>see also</u> CAC ¶ 237-38.) Loss causation has therefore
been adequately pled.

Accordingly, for the reasons set forth above, the CAC
sufficiently alleges all elements of Plaintiffs' pre-Class
Period securities act claims and Defendants' motion to dismiss
these claims is denied.

### 3. <u>Plaintiffs' Class Period Material Statements under 10b-5 are Dismissed on Grounds of Immunity</u>

Whether or not Plaintiffs' Class Period statements
relating to trading give rise to a securities claim is
irrelevant given that the statements themselves are protected by
SRO immunity.  These claims are therefore dismissed on grounds
of immunity, and no other arguments are reached.  <u>See</u> <u>Standard</u>
<u>Inv. Chartered, Inc.</u>, 2010 WL 749844, at *1 (because the court
dismissed on grounds of immunity, "the [c]ourt [did] not reach
the defendants' other arguments.").

---

to dismiss."[25] <u>AIG</u>, 741 F. Supp. 2d at 534 (whether a stock continued to fall
after the incident in question is of no moment at the Rule 12(b)(6) stage
without the benefit of any discovery) (quoting <u>Nathel</u>, 592 F. Supp. 2d at
467); <u>see also</u> <u>Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.</u>, 343
F.2d 189, 197 (2d Cir. 2003) (same).

III. **Plaintiffs' Motion to Partially Lift the PSLRA Discovery
Stay is Rendered Moot**

### A. The Applicable Standard

Statute 15 U.S.C. § 78u-4(b)(3)(B) allows the Court to
lift a PSLRA discovery stay under appropriate circumstances
including:

> In any private action arising under this chapter, all
> discovery and other proceedings shall be stayed during
> the pendency of any motion to dismiss, unless the
> court finds upon the motion of any party that
> particularized discovery is necessary to preserve
> evidence or to prevent undue prejudice to that party.

15 U.S.C. § 78u-4(b)(3)(B) (emphasis added). In re Bank of Am.
Corp. Sec., Derivative, and Emp't Ret. Income Sec. Act (ERISA)
Litig., No. 09 MDL 2058 (DC), 2009 WL 4796169, at *1 (S.D.N.Y.
Nov. 16, 2009) (noting that courts have modified the PSLRA
discovery stay when doing so would not frustrate Congress's
purposes in enacting the statute); In re Grand Casinos, Inc.
Sec. Litig., 988 F. Supp. 1270, 1272 (D. Minn. 1997) ("If . . .
Congress had intended an absolute stay on discovery, then
Congress would not have authorized a judicial reprieve from such
a stay, when a reprieve is needed.").

90

B. **Plaintiffs' Motion to Partially Lift the PSLRA Discover Stay is Rendered Moot by the Motion to Dismiss**

The SEC Order published on May 29, 2013, is based in large part on internal documents and reports that NASDAQ produced to the SEC in connection with the SEC's investigation of the Facebook IPO.  Though the SEC Order is public, these underlying documents are not.  Plaintiffs request that the PSLRA discovery stay be partially lifted to require NASDAQ to produce these underlying documents.  In the event that discovery not be granted, Plaintiffs request 30 days after the denial of this application to file their Second Consolidated Amended Class Action Complaint ("SCAC") based on the new information contained in the SEC Order, which was only released one month after the filing of Plaintiffs' CAC.

To prevent discovery until a court has deemed a securities fraud complaint sufficient, the PSLRA imposes a stay of all discovery "during the pendency of any motion to dismiss." 15 U.S.C. § 78u-4(b)(3)(B).  This stay operates against all parties, including both plaintiffs and defendants.  15 U.S.C. § 78u-4(b)(3)(D).  Because this Court has determined that Plaintiffs' complaint sufficiently alleges a claim for securities fraud, Plaintiffs' request to lift the PSLRA is no

91

longer relevant.  As such, discovery may proceed within the
confines of this Court's ruling on Defendants' motion to
dismiss.

## IV.  Plaintiff's Request for Leave to Amend the CAC is Granted in Part and Denied in Part

### A. The Applicable Standard

     Rule 15 of the Federal Rules of Civil Procedure
governs the right to amend pleadings, and states that "leave
shall be freely given when justice so requires." Fed. R. Civ. P.
15(a)(2).  The Supreme Court has stated that absent undue delay,
bad faith, undue prejudice, or futility, the "mandate" under
Rule 15(a)(2) to freely grant leave to amend "is to be heeded."
Foman v. Davis, 371 U.S. 178, 182 (1962); see also AEP Energy
Servs. Gas Holding Co. v. Bank of Am. N.A., 626 F.3d 699, 725
(2d Cir. 2010) ("'The rule in this Circuit has been to allow a
party to amend its pleadings in the absence of a showing by the
nonmovant of prejudice or bad faith.'") (quoting Block v. First
Blood Assocs., 988 F.2d 344, 350 (2d Cir.1993)). Generally,
amendments are favored because they "tend to facilitate a proper
decision on the merits." Sokolski v. Trans Union Corp., 178
F.R.D. 393, 396 (E.D.N.Y. 1998) (internal quotation marks)
(citations omitted).  In instances where plaintiffs discover new

facts relating to and supporting claims asserted in an earlier
pleading, courts routinely permit amendment on the basis of this
new information. See, e.g., Phillips v. Kidder, Peabody & Co.,
No. 87 Civ. 4936 (DLC), 1994 WL 570072, at *4 (S.D.N.Y. Oct. 13,
1994) ("[C]ourts consistently grant motions to amend where it
appears that the new facts and allegations are developed during
discovery, are closely related to the original claim, and are
foreshadowed in earlier pleadings.") (citing cases).


### B. **Plaintiffs May Amend The CAC with Respect to Only Those Claims Not Protected by SRO Immunity**

Plaintiffs request an amendment of the CAC to include
the findings of the SEC, and the documents based upon those
findings, in their operative pleading. (Stay Mem. at 20.)  The
SEC Order contains new factual findings, released one month
after Plaintiffs filed their CAC, which are directly relevant to
and supportive of Plaintiffs' claims.  There is no evidence of
bad faith as Plaintiffs did not have access to these findings
when the CAC was filed, and Defendants do not allege any
prejudice resulting from such an amendment.

Instead, Defendants maintain that an amendment would
be futile because no newly pled facts overcome Defendants'
threshold legal defenses, namely, SRO immunity, the economic

93

loss doctrine, Rule 4626 and Plaintiffs' failure to plead the
necessary elements of their 10b-5 claims. As determined above,
Plaintiffs have sufficiently alleged their technology negligence
and securities claims with respect to the pre-Class Period
omissions. As such, Plaintiffs may amend the CAC to include the
findings in the SEC Order and further discovery with respect to
these allegations. See, e.g., Phillips v. Kidder, Peabody &
Co., No. 87 Civ. 4936 (DLC), 1994 WL 570072, at *4 (S.D.N.Y.
Oct. 13, 1994) ("[C]ourts consistently grant motions to amend
where it appears that the new facts and allegations are
developed during discovery, are closely related to the original
claim, and are foreshadowed in earlier pleadings.") (citing
cases).

Plaintiffs' remaining claims, namely the negligence
claims relating to NASDAQ's decision not to halt trading and the
security claims relating to the Class Period statements during
the IPO, are protected by and dismissed on grounds of immunity.
Any amendment of Plaintiffs' CAC with respect to these claims
would not change the underlying regulatory nature of Defendants'
actions, which entitles them to immunity. Plaintiffs' request
to amend these claims is therefore denied as futile, see
Billhoffer v. Flamel Tech., S.A., No. 07-9920, 2012 WL 3079186,
at *3 (S.D.N.Y. July 30, 2012) ("[A] motion to amend a complaint

94

may be denied as futile when the proposed amendment fails to state a claim or would be subject to a successful motion to dismiss."), and such determination is appropriate at this stage. See, e.g., Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (holding that because immunity affords protection "from suit rather than a mere defense to liability, . . . the denial of a substantial claim of absolute immunity is an order appealable before final judgment, for the essence of absolute immunity is its possessor's entitlement not to have to answer for his conduct in a civil damages action"); X-Men Sec., Inc. v. Pataki, 196 F.3d 56, 65 (2d Cir. 1999) ("The immunity protects the official not just from liability but also from suit on such claims, thereby sparing him the necessity of defending by submitting to discovery on the merits or undergoing a trial."); Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 75 (2d Cir. 1998) ("[It is] well established that an affirmative defense of official immunity should be resolved as early as possible by the court.").

**Conclusion**

Based upon the conclusions set forth above, (1) Defendants' motion to dismiss is denied in part and granted in part; (2) Plaintiffs' request to lift the PSLRA discovery stay

is rendered moot; and (3) Plaintiff's motion to amend is granted
in part and denied in part.

     The parties will meet and confer upon the schedule for
further proceedings which will be the subject of a pretrial
conference at 10 a.m. February 3, 2014, or at such other time as
determined by counsel and the Court.

     It is so ordered.

**New York, NY**
**December *11*, 2013**

ROBERT W. SWEET
U.S.D.J.

96