UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------X

IN RE FACEBOOK, INC., IPO SECURITIES AND
DERIVATIVE LITIGATION,
OPINION & ORDER
MDL No. 12-2389

-----------------------------------------X

A P P E A R A N C E S:

Attorneys for Co-Lead Plaintiffs and the Class

BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP
1285 Avenue of the Americas
New York, NY 10019
By:  Max W. Berger, Esq.
     Steven B. Singer, Esq.
     John J. Rizio-Hamilton, Esq.
     Catherine E. McCaw, Esq.



LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
By:  Thomas A. Dubbs, Esq.
     James W. Johnson, Esq.
     Louis Gottlieb, Esq.
     Thomas G. Hoffman, Jr., Esq.

Additional Counsel for Co-Lead Plaintiff
Banyan Capital Master Fund

KESSLER TOPAZ MELTZER & CHECK LLP
280 King of Prussia Road
Radnor, Pennsylvania 19087
By:  David Kessler, Esq.
     Darren J. Check, Esq.

1

Additional Counsel for Named Plaintiffs
Jose G. Galvan and Mary Jane Lule Galvan

LIEFF CABRASER HEIMANN & BERNSTEIN
250 Hudson Street, 8th Floor
New York, NY 10013
By:  Steven E. Fineman, Esq.
     Daniel P. Chiplock, Esq.

Attorneys for Facebook, Inc. and
Individual Facebook Defendants

KIRLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
By:  Andrew B. Clubok, Esq.
     Brant W. Bishop, Esq.

KIRLAND & ELLIS LLP
655 Fifteenth St. NW
Washington, DC 20005
By:  Susan E. Engel, Esq.
     Kellen S. Dwyer, Esq.
     Bob Allen, Esq.

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
By:  Tariq Mundiya, Esq.
     Todd G. Cosenza, Esq.
     Sameer Advani, Esq.

WILLKIE FARR & GALLAGHER LLP
1875 K Street, NW
Washington, DC 20006
By:  Richard D. Bernstein, Esq.
     Elizabeth J. Bower, Esq.

Attorneys for Underwriter Defendants

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
By:  James P. Rouhandeh, Esq.
     Charles S. Duggan, Esq.
     Andrew Ditchfield, Esq.

**Sweet, D.J.**

Pursuant to the transfer order from the United States Judicial Panel on Multidistrict Litigation (the "MDL Panel"), entered on October 4, 2012, 41 actions stemming from the May 18, 2012 initial public offering ("IPO") of Facebook, Inc. ("Facebook" or the "Company") are presently before this Court.

The instant motion relates to Plaintiffs North Carolina Department of State Treasurer on behalf of the North Carolina Retirement Systems; Banyan Capital Master Fund Ltd.; Arkansas Teacher Retirement System; and the Fresno County Employees' Retirement Association; and the Named Plaintiffs' Jose G. Galvan and Mary Jane Lule Galvan (collectively, "Lead Plaintiffs" or "Plaintiffs") consolidated class action complaint (the "Consolidated Class Action Complaint" or "CAC") alleging federal securities claims (the "Securities Actions") against the Defendants Facebook, certain Facebook directors and officers (the "Individual Defendants"),[1] and underwriters of the initial public offering ("IPO") of Facebook (the "Underwriter

---

[1] The Individual Defendants include Mark Zuckerberg ("Zuckerberg"); Sheryl K. Sandberg ("Sandberg"); David A. Ebersman ("Ebersman"); David M. Spillane ("Spillane"); Marc L. Andreessen ("Andreessen"); Erskine B. Bowles ("Bowles"); James B. Breyer ("Breyer"); Donald E. Graham ("Graham"); Reed Hastings ("Hastings"); and Peter A. Thiel ("Thiel").

Defendants")[2]   (collectively,   "Defendants"   or   "Facebook Defendants").   The Defendants have moved to dismiss the Class Action Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) for failure to state a claim.   Based on the conclusions set forth below, Defendants' motion to dismiss is denied.

## I.   Prior Proceedings

On September 20, 2012, the MDL Panel held a hearing to determine whether the pending 41 filed actions should be transferred to the Southern District of New York.   On October 4, 2012, the MDL Panel issued a transfer order, finding that the "Southern District of New York is an appropriate transferee district for pretrial proceedings in this litigation," reasoning that "[m]uch of the relevant discovery will be located in New York . . . ."   In re Facebook. IPO Secs. & Derivative Litig., MDL No. 2389, 2012 WL 4748325, at *3 (Oct. 4, 2012).   The cases

---

[2]   The Underwriter Defendants include Morgan Stanley & Co. LLC ("Morgan Stanley"); J.P. Morgan Securities LLC ("J.P. Morgan"); Goldman, Sachs & Co. ("Goldman Sachs"); Allen & Company LLC; Barclays Capital Inc.; Blaylock Robert Van LLC; BMO Capital Markets Corp.; C.L. King & Associates, Inc.; Cabrera Capital Markets, LLC; CastleOak Securities, L.P.; Citigroup Global Markets, Inc.; Cowen and Company, LLC; Credit Suisse Securities (USA) LLC; Deutsche Bank Securities Inc.; E*TRADE Securities LLC; Itaú BBA USA Securities, Inc.; Lazard Capital Markets LLC; Lebenthal & Co., LLC; Loop Capital Markets LLC; M.R. Beal & Company; Macquarie Capital (USA) Inc.; Merrill Lynch, Pierce, Fenner & Smith Incorporated; Muriel Siebert & Co., Inc.; Oppenheimer & Co. Inc.; Pacific Crest Securities LLC; Piper Jaffray & Co.; Raymond James & Associates, Inc.; RBC Capital Markets, LLC; Samuel A. Ramirez & Company, Inc.; Stifel, Nicolaus & Company, Incorporated; Wells Fargo Securities, LLC; The Williams Capital Group, L.P; and William Blair & Company, L.L.C.

were assigned to this Court for coordination or consolidation of the pretrial proceedings.  Id.

Of the 41 actions presently before the Court due to the MDL Panel's transfer order, 30 of these actions allege violations of the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act") against movants and various underwriter defendants.  On December 6, 2012, this Court issued an opinion, In re Facebook. IPO Sec. & Derivative Litig., 288 F.R.D. 26 (S.D.N.Y. 2012) (the "December 6, 2012 Opinion"), which consolidated the actions alleging violations of the Securities Act and Exchange Act into the Securities Actions and Lead Plaintiffs were appointed.[3]  The

---

[3] The Securities Actions include: Brian Roffe Profit Sharing Plan v. Facebook, Inc., No. 12-cv-4081 (filed 5/23/12); Twining v. Facebook, Inc., No. 12-cv-4099 (filed 5/23/12); Goldrich Cousins P.C. 401(k) Profit Sharing Plan & Trust v. Facebook, Inc., No. 12-cv-04131 (filed 5/23/12); Braun v. Facebook, Inc., No. 12-cv-4150 (filed 5/24/12); Alexander v. Facebook, Inc., No. 12-cv-4157 (filed 5/24/12); Lightman v. Facebook, Inc., No. 12-cv-4184 (filed 5/25/12); Reichenbaum v. Facebook, Inc., No. 12-cv-4194 (filed 5/25/12); Lazard v. Facebook, Inc., No. 12-cv-4252 (filed 5/30/12); Gregorczyk v. Facebook, Inc., No. 12-cv-4291 (filed 5/31/12); Brinckerhoff v. Facebook, Inc., No. 12-cv-4312 (filed 6/1/12); Goldberg v. Facebook, Inc., No. 12-cv-4332 (filed 6/1/12); Eannarino v. Facebook, Inc., No. 12-cv-4360 (filed 6/4/12); Mamula v. Facebook, Inc., No. 12-cv-4362 (filed 6/4/12); Leitner v. Facebook, Inc., No. 12-cv-4551 (filed 6/11/12); Savitt v. Facebook, Inc., No. 12-cv-4648 (filed 6/13/12); Sexton v. Facebook, No. 12-cv-4777 (filed 6/19/12); and Loomis v. Facebook, Inc., No. 12-cv-5511 (filed 7/17/12), which were filed in this District.  The Securities Actions also include: Spatz v. Facebook, Inc., No. 12-cv-2662; Chang v. Facebook, Inc., No. 12-cv-2680; Gregory v. Facebook, Inc., No. 12-cv-2815; Lapin v. Facebook, Inc., No. 12-cv-3195; DeMois, Jr. v. Facebook, Inc., No. 12 cv-3196; Lazar v. Facebook, Inc., No. 12-cv-3199; Shierry v. Facebook, Inc., No. 12-cv-3200; Cuker v. Facebook, Inc., No. 12-cv-3201; Lieber v. Facebook, Inc., No. 12-cv-3202; Stokes v. Facebook, Inc., No. 12-cv-3203; Ahrendtsen v. Facebook, Inc., No. 12-cv-3212; and Ilicks v. Facebook, Inc., No. 12-cv-3353, which were filed in the Northern District of California and transferred to this District.  In

class actions against the NASDAQ OMX Group Inc. and The NASDAQ Stock Market LLC (collectively "NASDAQ") alleging federal securities (the "NASDAQ Securities Actions") and negligence claims (the "NASDAQ Negligence Actions") (collectively, the NASDAQ Actions") were also consolidated. The cases alleging derivative claims (the "Derivative Actions") are currently not consolidated, with individual plaintiffs in the Derivative Actions having brought forth separate actions.

Lead Plaintiffs for the Securities Actions filed the Consolidated Class Action Complaint on February 28, 2013. The CAC alleges violations of Sections 11, 12(a)(2) and 15 of the Securities Act.

The Defendants filed the instant motion to dismiss the Securities Actions on April 30, 2013. Oral arguments were held, and the motion was marked fully submitted, on October 8, 2013.

## II.  Allegations of the Consolidated Class Action Complaint

Alleged facts and prior proceedings underlying this

---

addition, actions by plaintiffs Lawrence Corneck and Eugene Stricker under the Exchange Act include: Corneck v. Morgan Stanley & Co. LLC, J.P. Morgan Securities LLC, and Goldman Sachs & Co., No. 12-cv-4215 (filed 5/25/12); Eugene Stricker v. Morgan Stanley & Co LLC, J.P. Morgan Securities LLC, and Goldman Sachs & Co., No. 12-cv-4763 (filed 6/18/12).

opinion are set out in the December 6, 2012 Opinion. Accordingly, only facts relevant to this motion will be provided below. Because this is a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the following facts, which this Court assumes to be true, are drawn from the CAC. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) ("[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true.").

The CAC refers to the events surrounding and arising out of Facebook's May 18, 2012 IPO.[4] Facebook is a worldwide online social networking company that (i) builds tools that enable users to connect, share, discover and communicate with each other; (ii) enables developers to build social applications of Facebook or to integrate their websites with Facebook; and (iii) offers products that enable advertisers and marketers to engage with its users. Facebook is currently the world's largest social network. (CAC ¶ 84.) As of March 31, 2012, Facebook reported that 901 million "active users" accessed its website each month, nearly half the people who use the Internet

---

[4] Information from Securities and Exchange Commission ("SEC") filings by Facebook, in particular its Form S-1 Registration Statement and amended Form S-1/A Registration Statements are noted where relevant.

and approximately 13% of the world's population. (Id.)
Facebook generally does not charge its users for any of the
social networking services it provides. Instead, Facebook's
business model depends almost entirely on selling space on its
network to companies that want to reach Facebook's user base via
advertisements displayed to Facebook members. The Company's
advertising revenue accounted for 98%, 95% and 85% of the
Company's revenues in 2009, 2010, and 2011 respectively. (Id.
¶ 91.)

In 2011, Facebook began to explore engaging in an IPO
to compete with other rival cash-rich technology companies. The
Company's shares were traded on private exchanges, but accessing
the public markets through an IPO would provide the Company with
large amounts of cash, create a highly liquid market for its
stock and had the potential to significantly increase the
Company's value, among other benefits. (Id. ¶ 85.)

On February 1, 2012, Facebook publicly filed its
initial registration statement with the SEC[5] (the "Feb. 1
Registration Statement").[6] (CAC ¶ 89.) The Feb. 1 Registration

---

[5] All of Facebook's Form S-1 Disclosures, including amendments, and the SEC's
declaration of effectiveness are searchable on the SEC's EDGAR search
platform at http://www.sec.gov/edgar/searchedgar/webusers.htm.

[6] Facebook subsequently amended its registration statement several times
before filing their final Form S-1/A on May 16, 2012 (the "Registration

Statement contained historical data about Facebook's performance and a description of risks associated with the company. It stated that, "[s]ince January 2011, Facebook.com has been the number one website worldwide," with more than 845 million "monthly active users" as of December 31, 2011, who collectively spent on average "9.7 billion minutes per day on Facebook." Feb. 1 Registration Statement, at 79. It further stated that the Company has consistently "experienced rapid growth in the number of users and their engagement." Id., at 1. Facebook's advertising and total revenue grew from approximately $153 million to $3.2 billion from 2007 to 2011, a growth of more than twenty times in four years. (CAC ¶ 92.) During this time period, Facebook's annual revenue grew from $153 million to more than $3.7 billion. (Id.)

Facebook ascribed its financial results to several factors. The first and principal factor was the growing usage of Facebook on mobile devices, as opposed to the use of Facebook through traditional, stationary desktop computers. (CAC ¶ 95.) A second factor was the Company's "product decisions," decisions Facebook made concerning the design and features of its website, the type of advertising it displayed and the price of the advertisements. (CAC ¶ 96.)

Statement").

9

The usage of Facebook on mobile devices was critical to Facebook's financial performance for several reasons.  First, Facebook's mobile market was extremely large: approximately half of Facebook's monthly users accessed the website through their mobile devices, either as a supplement to their use of Facebook through desktop computers or as their only means of accessing Facebook. Second, the Company's mobile users were growing more rapidly than the rest of the Company's user base.  Facebook anticipated the growth rate of its mobile users to exceed the growth rate of their overall member base for the foreseeable future.   Third, while Facebook showed large volumes of advertising to users who accessed its website through desktop computers, it did not yet show advertising to its mobile users. Mobile users were, at that time, an unmonetized resource and an important factor for Facebook's future growth.  (CAC ¶ 94.)  The Feb. 1 Registration Statement emphasized that the mobile market was a "critical" area of "growth" and a "significant opportunity" that the Company was actively developing products to capitalize on.  Feb. 1 Registration Statement, at 4.

The Feb. 1 Registration Statement also included warnings of risk factors to potential investors.  These warnings included specific disclosures on the impact of mobile usage and

10

that Facebook's ability to tap into this potential revenue
stream could have an effect on the Company's revenues:

- "Growth in use of Facebook through our mobile products,
  where we do not currently display ads, as a substitute
  for use on personal computers may negatively affect our
  revenue and financial results."  Feb. 1 Registration
  Statement, at 5.

- "Our advertising revenue could be adversely affected by a
  number of other factors, including: . . . increased user
  access to and engagement with Facebook through our mobile
  products, where we do not currently directly generate
  meaningful revenue, particularly to the extent that
  mobile engagement is substituted for engagement with
  Facebook on personal computers where we monetize usage by
  displaying ads and other commercial content." Feb. 1
  Registration Statement, at 12; <u>accord</u> Registration
  Statement, at 13.

- "We had more than 425 million MAUs [monthly active users]
  who used Facebook mobile products in December 2011.  We
  anticipate that the rate of growth in mobile users will
  continue to exceed the growth rate of our overall MAUs
  for the foreseeable future, in part due to our focus on
  developing mobile products to encourage mobile usage of
  Facebook.  Although the substantial majority of our
  mobile users also access and engage with Facebook on
  personal computers where we display advertising, our
  users could decide to increasingly access our products
  primarily through mobile devices.  We do not currently
  directly generate any meaningful revenue from the use of
  Facebook mobile products, and our ability to do so
  successfully is unproven.  Accordingly, if users continue
  to increasingly access Facebook mobile products as a
  substitute for access through personal computers, and if
  we are unable to successfully implement monetization
  strategies for our mobile users, our revenue and
  financial results may be negatively affected."  Feb. 1
  Registration Statement, at 13; <u>accord</u> Registration

Statement, at 14.

- "We believe that our ability to compete effectively depends upon . . . our ability to successfully monetize mobile usage."  Feb. 1 Registration Statement, at 14; accord Registration Statement, at 15-16.

- "We do not currently display ads to users who access Facebook via mobile apps or our mobile website.  To the extent that increasing usage of Facebook through mobile apps or our mobile website substitutes for the use of Facebook through personal computers where we do show ads, the number of ads that we deliver to users and our revenue may be negatively affected unless and until we include ads or sponsored stories on our mobile apps and mobile website.  We believe that people around the world will continue to increase their use of Facebook from mobile devices, and that some of this mobile usage has been and will continue to be a substitute for use of Facebook through personal computers."  Feb. 1 Registration Statement, at 46; accord Registration Statement, at 51.

- "We do not show ads or directly generate any meaningful revenue from users accessing Facebook through our mobile products . . . ."  Feb. 1 Registration Statement, at 79; accord Registration Statement, at 93.

- "We believe that mobile usage of Facebook is critical to maintaining user growth and engagement over the long term, and we are actively seeking to grow mobile usage, although such usage does not currently directly generate any meaningful revenue."  Feb. 1 Registration Statement, at 81; accord Registration Statement, at 94.

The Feb. 1 Registration Statement also noted that Facebook "prioritizes user engagement over short-term financial

12

results," and thus "frequently make[s] product decisions that may reduce our short term revenue." Feb. 1 Registration Statement, at 17. It also explained its revenue trends:

> Our revenue trends are also affected by ad inventory management changes affecting the number, size, or prominence of ads we display. For example, in the fourth quarter of 2010, we significantly increased the number of ads on many Facebook pages. As another example, in the fourth quarter of 2011, we increased the reserve price (i.e., the minimum price threshold) in our advertising auction system in order to reduce the frequency with which low quality ads are displayed to users. This change caused a reduction in the overall number of ads shown and increased the average price per ad as a result of factors including the removal of ads with bids that were below the reserve price and some advertisers raising their bids in response to this change. For this particular change, we estimate that the decrease in the number of ads displayed and the increase in average price per ad approximately offset each other such that the impact on total revenue was minimal.

Id. at 46-47; accord Registration Statement, at 53.


The market reacted positively to the disclosures in the Feb. 1 Registration Statement, including the Company's position on capitalizing the mobile market. (CAC ¶ 97.) Bloomberg reported that Facebook expected its "next 1 billion users to come mainly from mobile devices," and was therefore "increasing its focus on mobile technology to take advantage of

the shift to smartphones and tablets."[7] Similarly, The New York Times reported that "the filing shed some light on how [Facebook's] meteoric run has turned the upstart into a formidable money maker. . . . [M]any analysts believe Facebook's fortunes will rapidly multiply as advertisers direct more and more capital to the Web's social hive."[8]

On February 28, 2012, the Securities and Exchange Commission (the "SEC") sent Facebook a "comment letter" concerning certain of the Company's disclosures in the Feb. 1 Registration Statement (the "SEC Letter"). (CAC ¶ 98.) In the SEC Letter, the SEC made note that the Feb. 1 Registration Statement stated "that users 'could decide' to increasingly access your products primarily through mobile devices . . . ." Letter from SEC to Facebook, at 3 (Feb. 28, 2012). The SEC instructed Facebook to "ensure that your disclosure fully addresses the potential consequences to your revenue and financial results rather than just stating that they 'may be negatively affected'" assuming that Facebook's mobile monetization efforts were unsuccessful. Id. The SEC further

---

[7] Brian Womack & Ari Levy, Facebook Seeks to Raise Up to $5 Billion in Biggest Internet IPO on Record, BLOOMBERG, Feb. 2, 2012, http://www.bloomberg.com/news/2012-02-01/facebook-files-to-raise-up-to-5-billion-in-ipo-of-social-networking-site.html.

[8] Evelyn Rusli, Facebook Files for an I.P.O., N.Y. TIMES, Feb. 1, 2012, http://dealbook.nytimes.com/2012/02/01/facebook-files-for-an-i-p-o/?_r=0.

instructed Facebook to "describe any known trends or uncertainties that have had, or that you reasonably expect will have, a material favorable or unfavorable impact on sales or results of operations." Id. at 5.[9]

On March 7, 2012, Facebook responded to the SEC's comment letter. In its response, Facebook stated that it could not disclose the potential impact of mobile usage on its revenue because it was unable to determine that impact. (CAC ¶ 102.) Facebook asserted that because many of its mobile users also continued to access Facebook through their desktop computers, the Company "cannot specifically determine how mobile use is a substitute for, rather than incremental to, use on personal computers." Thus, Facebook stated that it was unable to "specifically assess the impact of increasing mobile use on its revenue and financial results" at that time. (Id.)

Facebook subsequently revised its Registration Statement to include more specific information about the trend of increasing mobile usage:

---

[9] According to the Lead Plaintiffs, the SEC makes comment letters public "no earlier than 20 business days after it has . . . declared a registration statement effective." (Pl. Op., at 9 n.3.) The SEC Letter was made public by the SEC on or around June 15, 2012, after the date of Facebook's IPO. (Id.)

- "Increasing Mobile Usage.  Increasing use of Facebook on mobile devices will also affect our performance, particularly if mobile use substitutes for use on personal computers.  Historically, we have not shown ads to users accessing Facebook through mobile apps or our mobile website and we cannot be certain that our mobile monetization approaches will be successful in generating meaningful revenue.  We cannot quantify the extent to which mobile usage of Facebook is substituting for, rather than incremental to, usage of Facebook through personal computers, but we generally expect mobile usage to increase at a faster rate than usage through personal computers for the foreseeable future."  See Registration Statement, Mar. 7, 2012, at 51 ("Mar. 7 Registration Statement"); accord Registration Statement, at 53.

- "We had 432 million MAUs who used Facebook mobile products in December 2011.  While most of our mobile users also access Facebook through personal computers, we anticipate that the rate of growth in mobile usage will exceed the growth in usage through personal computers for the foreseeable future . . . . [W]e do not currently directly generate any meaningful revenue from the use of Facebook mobile products, and our ability to do so successfully is unproven.  Accordingly, if users increasingly access Facebook mobile products as a substitute for access through personal computers, and if we are unable to successfully implement monetization strategies for our mobile users, or if we incur excessive expenses in this effort, our financial performance and ability to grow revenue would be negatively affected." Mar. 7 Registration Statement, at 14; accord Registration Statement, at 14.

- "We had 488 million MAUs who used Facebook mobile products in March 2012.  While most of our mobile users also access Facebook through personal computers, we anticipate that the rate of growth in mobile usage will exceed the growth in usage through personal computers for the foreseeable future . . . . [W]e do not currently directly generate any meaningful revenue from the use of Facebook mobile products, and our ability to do so successfully is unproven."  Registration Statement, April

16

23, 2012, at 14 ("April 23 Registration Statement"); see also Registration Statement, at 14 (adding additional disclosure based on information from the second quarter that "We believe this increased usage of Facebook on mobile devices has contributed to the recent trend of our daily active users (DAUs) increasing more rapidly than the increase in the number of ads delivered").

Facebook also included positive statements regarding mobile usage:

> We experienced growth in DAUs [daily active users] across major markets including the United States, Brazil, and India. Increased mobile usage was a key contributor to this growth. DAUs as a percentage of MAUs [monthly active users] increased from 55% in March 2011 to 58% in March 2012, which we believe was driven entirely by increased mobile usage of Facebook. We believe that increases in DAUs and in DAUs as a percentage of MAUs generally positively affect our revenue because increases in user engagement may enable us to deliver more relevant commercial content to our users and may provide us with more opportunities for monetization.

Registration Statement, at 50.

In March and April 2012, Facebook began to prepare for its "roadshow." (CAC ¶ 103.) Roadshows are a series of meetings around the country, primarily with groups of institutional investors, where a company makes presentations and answers investor questions regarding its upcoming IPO. The roadshow is an important part of the IPO process as it directly

17

markets an IPO to institutional investors and generates interest in the IPO. (Id.) As part of this process, companies will typically provide its underwriters with the company's projections, and underwriters will typically use these projections to create their own analysis and provide their own projections.

Defendant Ebersman and Facebook's Treasurer, Cipora Herman ("Herman"), were the Facebook executives who had principal responsibility for managing the Company's roadshow. (CAC ¶ 105.) The Lead Underwriters built the "book" of orders for the IPO during the roadshow, which contained the number of shares each institutional investor wanted to purchase, as well as the price that each investor was willing to pay for the stock. Facebook and the Lead Underwriters then used the orders in the book to determine how many shares to sell in the IPO and the price per share. (Id.)

In the time leading up to the roadshow, Facebook continued to make positive public statements emphasizing its growth. (CAC ¶ 110.) These comments included positive remarks on Facebook's ability to monetize the mobile market. In the March 7, 2012 amendment to the Registration Statement, Facebook stated that it was beginning to display one of its principal

18

advertising products to mobile users.  See Mar. 7 Registration Statement, at 14 ("In February 2012, we announced plans to include sponsored stories in users' mobile News Feeds."). Facebook also noted that the number of users who accessed its website through mobile products had grown to 488 million as of March 31, 2012, an increase of 15% over such users as of December 2011, in the Company's April 23, 2012 amended Registration Statement.  April 23 Registration Statement, at 1.

On April 16, 2012, the Company's Chief Financial Officer ("CFO"), Defendant Ebersman, provided revenue guidance to the analysts from the investment banks that were underwriting the IPO (the "Syndicate Analysts").  (CAC ¶ 116.)  This presentation included Facebook's estimated revenues for the second quarter of 2012 and the full year.  This information allowed the Syndicate Analysts to generate estimates of the Company's revenues and financial results, which would then be incorporated into an "institutional selling memoranda" that the Underwriter Defendants would use to market the IPO to institutional investors.  (Id.)

At the meeting, Ebersman informed the Syndicate Analysts that Facebook believed it would report revenues of as much as $1.2 billion for the second quarter of 2012 and $5

billion for the full 2012 year.  These figures translated into year-over-year growth rates of as much as 34% for the second quarter and 35% for the year.  (CAC ¶ 107.)  The Syndicate Analysts incorporated the Company's internal estimates into their financial models and virtually mirrored Facebook's projections:  The Syndicate Analysts' predictions translated into expected year-over-year growth rates of up to 35% for the second quarter and 39% for the year.  The Syndicate Analysts' estimates were then incorporated into the institutional selling memoranda that the Underwriter Defendants used to market the IPO to investors.  (Id. ¶¶ 108-09.)

On May 3, 2012, Facebook filed an amended Registration Statement (the "May 3 Registration Statement") announcing that it was planning to sell more than 337 million shares in the IPO at a price between $28 and $35 per share.  (CAC ¶ 113.)  On the same day, Facebook posted its roadshow video presentation on its website, which featured Defendant Chief Operating Officer Sandberg stating that the mobile market was "a key area of growth for Facebook" and that Facebook was not experiencing challenges in the mobile market:  "For most companies, the mobile environment is a challenge, because it's so small it requires new ad formats, but that's not the case for Facebook." Sandberg noted that Facebook had "just introduced [one of its

20

principal advertising products] . . . on mobile devices" and that these advertisements had "become a really natural part of the Facebook mobile experience." (Id. ¶ 114.)

The market interest for Facebook shares during this time was extremely high. Investor demand to attend the roadshow was huge, and many projected the IPO to be one of the largest IPOs in history. The New York Times reported on May 3, 2012:

> Facebook, which plans to make a market debut this month that could value it at $86 billion, is the stock that everyone seems to want. . . . The excitement over Facebook has come on the back of its rapid growth. For many, Facebook is the Internet. After a flurry of eye-popping market debuts by other Internet start-ups, . . . Facebook's will be the biggest yet. . . . Demand to attend the Facebook [roadshow] presentations has been extraordinarily high, with underwriters already drawing up waiting lists for the meetings[.][10]

Similarly, Reuters quoted an analyst from the research firm IPO Boutique as stating that "I have not seen as broad based interest in an IPO since Google. Investor demand is immense. . . . I expect a roadshow that will rival all roadshows where investors will be turned away at the door."[11]

---

[10] Susanne Craig & Evelyn Rusli, Small Investors May Get to Own a Bit of Facebook, N.Y. Times, May 3, 2012, http://dealbook.nytimes.com/2012/05/03/small-investors-may-get-to-own-a-bit-of-facebook/.

[11] Alistair Barr & Alexei Oreskovic, Facebook's IPO show to hit the road May 7: source, Reuters, May 2, 2012, http://www.reuters.com/article/2012/05/02/us-facebook-ipo-idUSBRE8401PD20120502.

Facebook held its first live roadshow presentation on May 7, 2012.  (CAC ¶ 118.)  Based on the roadshow presentation and the Registration Statement, analysts widely recommended that investors buy Facebook stock.  Analysts also widely reported that, for the second quarter and year-end 2012, Facebook would experience revenue growth rates of at least 35% year-over-year, based in part on the Company's ability to make money from its mobile users.  (Id. ¶¶ 120-21.)  Analysts did not appear worried about the monetization issues associated with mobile usage.  A Sterne Agee report recommended a "buy" of Facebook stock, noting that Facebook had a strong position in the mobile market "[w]ith 488 million MAUs [monthly active users] using Facebook mobile products in the month of March 2012, [Facebook] clearly has the reach on mobile platforms . . . ."  (Id. ¶ 121.)  Sterne Agee concluded that "mobile monetization [is] a significant long-term growth opportunity for [Facebook]."  (Id.)

However, on May 7, 2012, hours after its first roadshow presentation, Facebook's management determined that the Company was facing difficulty in meeting its previous revenue projections for the second quarter of 2012 and the full year. (CAC ¶ 122.)  Two developments were causing the change in analysis:  First, during the second quarter of 2012, Facebook's

22

users increasingly migrated from desktop computers, where the Company displayed large amounts of ads, to mobile devices, where the Company displayed much less advertising.  As such, Facebook was generating less advertising revenue than projected.  Second, the Company had made certain product decisions in the second quarter of 2012 that reduced the average amount of advertisements displayed to users on some pages, which exacerbated the deterioration in its advertising revenues caused by increasing mobile usage.  (Id.)

On the evening of May 7, 2012, Ebersman approached the lead Morgan Stanley banker on the IPO, Michael Grimes ("Grimes"), and informed him that, based on second quarter data received to date, Ebersman was no longer confident that Facebook would meet its internal revenue estimates.  (Id. ¶ 123.) Ebersman informed Grimes that, "based upon their experience in Q2 to date, [Ebersman] was less confident in his financial projections – in reaching or exceeding his financial projections than previously [sic]."  (Id.)  Ebersman further informed Grimes that two developments had caused the deterioration in Facebook's revenues:  increasing mobile usage and the Company's product decisions.  (Id.)

By May 8, 2012, Facebook had cut its projected revenue

23

figures for the second quarter of 2012 by $100 million, or more than 8.3%, and for the year by $175 million, or 3.5%. (CAC ¶ 124.)   Facebook determined that its revenue for the second quarter would be as low as $1.1 billion, or 8.3% below the top of its prior range, and its revenue for 2012 would be between $4.825 billion and $4.85 billion, or as much as $175 million less than previously estimated, a decline of up to 3.5%.   The revised revenue estimates translated into sharply lower year-over-year revenue growth rates of as little as 23% for the second quarter and 30% for the year, as compared to growth rates of as much as 34% for the second quarter and 35% for the year based on the Company's prior estimates.   (Id.)   These figures were far below the Syndicate Analysts' estimates.   (Id. ¶ 126.)

On May 8, 2012, Facebook's most senior executives determined that the change was so significant that it warranted disclosure to the Syndicate Analysts.   (Id. ¶ 125.)   Facebook's Treasurer, Herman, sent an email to employees in the finance department with the subject line: "Q2 estimates from analysts IMPORTANT PLS THIS MORNING."   (Id. (emphasis in original)).   Herman wrote that Facebook had "updated our forecast and we're trying to gauge how far off our new forecast is from where the analysts are coming out."   (Id.)   Herman stated that she and Morgan Stanley bankers immediately needed to see "the q2-q4 by

quarter revenue estimates from the analysts for whom we have detailed models," and that she was "[c]opying [a Morgan Stanley banker] on this so we can get some efficiency – I don't want to be the bottleneck in getting the info to MS."   (Id.)   After Morgan Stanley bankers had compared Facebook's revenue figures with the Syndicate Analysts' estimates, Grimes advised Ebersman that Facebook should immediately provide its new revenue figures to the Syndicate Analysts so that they could revise their models based on this new information and provide it to the Company's largest potential investors.   (Id. ¶ 126.)

The next day, May 9, 2012, Facebook filed a Free Writing Prospectus (the "FWP") and an Amended Registration Statement ("May 9 Registration Statement").   (CAC ¶ 128.)   The May 9 Registration Statement and FWP both stated:

> Based upon our experience in the second quarter of 2012 to date, the trend we saw in the first quarter of DAUs [daily active users] increasing more rapidly than the increase in number of ads delivered has continued. We believe this trend is driven in part by increased usage of Facebook on mobile devices where we have only recently begun showing an immaterial number of sponsored stories in News Feed, and in part due to certain pages having fewer ads per page as a result of product decisions.

May 9 Registration Statement, at 57; FWP.

25

The FWP and May 9 Registration Statement led to some media reports on Facebook's issues with mobile monetization.[12] These stories reported that the migration of Facebook users to its mobile platform was compromising the Company's ability to generate ad revenue.   One report went so far as to warn that there was a possibility Facebook may miss its second quarter projections.[13]

On May 9, 10 and 15, after filing the FWP and the May 9 Registration Statement, Herman, Facebook's Treasurer, made nineteen scripted calls with the Syndicate Analysts (the "Herman

---

[12] See, e.g., April Dembosky, Facebook Admits To Mobile Weakness, FIN. TIMES, May 9, 2012, http://blogs.ft.com/tech-blog/2012/05/facebook-admits-to-mobile-weakness/ ("Facebook said the migration of its users to mobile platforms is compromising its ability to make money from them."); Henry Blodget, Facebook Is "Muppet Bait," BUS. INSIDER, May 10, 2012, http://www.businessinsider.com/facebook-muppet-bait-2012-5 (writing that the disclosures revealed that the company "is unlikely to be able to generate as much revenue per user from mobile as it does from the web," and that this concern, combined with the fact that "Facebook's growth is decelerating," make the offering "muppet bait"); Facebook Admits Mobile Shift Damaging Business Faster Than Expected In New SEC Filing; Will Miss Q2 Projections, PRIVCO, May 9, 2012, http://www.privco.com/breaking-news-facebooks-admits-mobile-shift-damaging-business-faster-than-expected (writing that the FWP "reveals fast erosion in [its] core advertising business," offers "a stunning preview of a lower than expected Q2 as a result of the shift to mobile devices," and "Effectively Warns Investors That Facebook Will Miss Its Second-Quarter Projections"); Jennifer Van Grove, Facebook's Mobile Risk by the Big, Bad Numbers, VENTUREBEAT, May 13, 2012, http://venturebeat.com/2012/05/13/facebook-mobile-numbers/ ("Mobile is Facebook's advertising Achilles' heel, a fact the social network was not only quick to point out to investors in the first S-1, but also anxious to emphasize in the latest prospectus amendment.").

[13] Facebook Admits Mobile Shift Damaging Business Faster Than Expected In New SEC Filing; Will Miss Q2 Projections, PRIVCO, May 9, 2012, http://www.privco.com/breaking-news-facebooks-admits-mobile-shift-damaging-business-faster-than-expected.

Calls").  (CAC ¶ 132.)  During these calls, Herman told the

Syndicate Analysts that Facebook had sharply reduced the revenue

figures that the Company had provided to them three weeks

earlier.  The script for the Herman Calls stated as follows:

> I wanted to make sure you saw the disclosure we made
> in our amended filing.  The upshot of this is that we
> believe we are going to come in [on] the lower end of
> our $1.1 to $1.2 bn range for Q2 based upon the trends
> we described in the disclosure.  A lot of investors
> have been focused on whether the trend of ad
> impressions per user declining (primarily as a result
> of mobile) was a one-time, or continuing, occurrence.
> As you can see from our disclosure, the trend is
> continuing.  You can decide what you want to do with
> your estimates, our long term conviction is unchanged,
> but in the near term we see these trends continuing,
> hence our being at the low end of the $1,100 + $1,200
> range.

(Id. ¶ 133.)


The Syndicate Analysts revised their financial models

to reflect Facebook's reduction in its revenue projections:

estimates of the Company's second quarter revenue were cut by as

much at 7% and annual revenue as much as 6%.  (Id. ¶¶ 135-36.)

The Syndicate Analysts immediately provided this new information

to some of Facebook's most important potential investors.[14]  (Id.

---

[14]  Reuters would later report that certain institutions described the
Syndicate Analysts' decision to reduce their revenue estimates during the
time period when the roadshow was occurring as "a big shock," "very, very
unusual," a "bombshell," and something that they had "never before seen . . .

¶ 137.) The lowered revenue figures raised "a significant red flag" to those investors who received them. (Id. ¶ 139.) Indeed, one hedge fund that was warned by an Underwriter Defendant, Capital Research & Management, concluded that the IPO price of $38 per share was too high. (Id.)

Select Syndicate Analysts' projections were revised for the second quarter as follows:

| Syndicate Analyst | Pre-May 9 Estimate | Post-May 9 Revised Estimate | Percent Change |
|---|---|---|---|
| Goldman Sachs | $1.207 billion | $1.125 billion | -6.79% |
| J.P. Morgan | $1.182 billion | $1.096 billion | -7.27% |
| Morgan Stanley | $1.175 billion | $1.111 billion | -5.45% |
| Bank of America | $1.166 billion | $1.100 billion | -5.66% |

(CAC ¶¶ 108, 136.)

Similarly, the projections for the year-end 2012 were

in 10 years." Alistair Barr, Insight: Morgan Stanley cut Facebook estimates just before IPO, REUTERS, May 22, 2012, http://www.reuters.com/article/2012/05/22/us-facebook-forecasts-idUSBRE84L06920120522; (CAC ¶¶ 14, 138, 166.) Business Insider similarly wrote that the reduction in revenue estimates during the roadshow was "highly unusual" and something that they never saw "during 20 years in and around the tech IPO business." Henry Blodget, BOMBSHELL: Facebook Bankers Secretly Cut Forecasts For Company In Middle Of IPO Roadshow, Bus. Insider, May 22, 2012, http://www.businessinsider.com/facebook-bankers-earnings-forecasts-2012-5#ixzz2mRSwyuUN; (Id. ¶ 167.)

revised as follows:

| Syndicate Analyst | Pre-May 9 Estimate | Post-May 9 Revised Estimate | Percent Change |
|---|---|---|---|
| **Goldman Sachs** | $5.169 billion | $4.852 billion | -6.13% |
| **J.P. Morgan** | $5.044 billion | $4.839 billion | -4.06% |
| **Morgan Stanley** | $5.036 billion | $4.854 billion | -3.61% |
| **Bank of America** | $5.040 billion | $4.815 billion | -4.46% |

(Id.)

Facebook's reduction in its projections was reported by the media prior to the IPO.[15] Several of these reports only noted that Facebook's revenue "could be harmed" or that the migration to mobile "may negatively affect" financial results. (CAC ¶¶ 140-41.) However, analysts other than the Syndicate

---

[15] See, e.g., Serena Saitto et al., Facebook IPO Said to Get Weaker-Than Forecast Demand, BLOOMBERG, May 11, 2012, http://www.bloomberg.com/news/2012-05-10/facebook-ipo-said-to-meet-weaker-than-expected-investor-demand.html (reporting that Facebook was "telling analysts that sales may not meet their most optimistic projections"); Henry Blodget, UH OH: Facebook IPO Seeing 'Weak Demand', BUS. INSIDER, May 10, 2012, http://www.businessinsider.com/facebook-ipo-weak-demand-2012-5 (Facebook is "said to have told investors that it won't meet their most optimistic projections"); Facebook IPO: Expectations on Facebook are way too high, WASH. POST, May 11, 2012, http://articles.washingtonpost.com/2012-05-11/business/35454711_1_facebook-ipo-social-network-facebook-common-stock (same); Kim Peterson, Is Facebook IPO Hot or Not?, MSN MONEY, May 11, 2012, http://money.msn.com/technology-investment/article.aspx?post=769ce83c-2bef-4231-b384-957272a1aa25 (same); Cory Willard, Is the J.P. Morgan bombshell a one-day event?, WALL ST. J. MARKETWATCH, May 11, 2012 (linking to the Serena Saitto Bloomberg article as one that "every investor should be thinking about into this weekend").

Analysts, who had not been called by Facebook, continued to widely expect Facebook to report revenues in line with Facebook's original guidance given in April. (Id. ¶ 142.) The consensus estimates for those analysts were for Facebook to report revenues of more than $1.2 billion for the second quarter and $5 billion for the year: a level at or slightly above Facebook's original guidance. (Id.)

The demand for Facebook stock remained high after Facebook released the FWP and May 9 Registration Statement. The high demand allowed Facebook to significantly increase both the size and price of the IPO in the week before the IPO. (CAC ¶ 143-44.) Raising both the price and size of an IPO is a rare occurrence: it has occurred in only 3.4% of all IPOs since 1995. (Id. ¶ 144.) On May 15, 2012, Facebook announced that it was increasing the price range for its stock from a range of $28 to $35 to a new range of $34 to $38. (Id. ¶ 145.) Bloomberg reported that Facebook was able to significantly raise the IPO price because it had succeeded in "convincing investors that [it] can make money from mobile users."[16] (Id. ¶ 146.) On May 16, 2012, Facebook increased the size of the IPO by nearly 25%,

---

[16] Douglas MacMillan, et al., Facebook CEO Focuses on Mobile Strategy as IPO Nears, Bloomberg, May 14, 2012, http://www.bloomberg.com/news/2012-05-14/facebook-ceo-focuses-investors-on-mobile-strategy-as-ipo-nears.html.

or 84 million shares.  (Id. ¶¶ 147-48.)

Facebook completed the IPO as scheduled after the close of market on May 17, 2012.  (CAC ¶¶ 16, 149.)  Defendants sold more than 421 million Facebook IPO shares to the investing public at $38 per share, reaping more than $16 billion in proceeds, making the IPO one of the largest initial public offerings in history.  (Id. ¶¶ 4, 150.)  Financial news analysts reported that the underwriters were releasing significantly more shares to retail investors than previously expected.  (Id. ¶ 148.)

Facebook stock began publicly trading on May 18, 2012. In the days leading up to the IPO, numerous market commentators predicted that Facebook would experience a large increase in share price on the first day of trading due to large demand. (CAC ¶ 152.)  Initially, Facebook's price did surge as expected, with an opening share price at $42.05.  (Id. ¶ 156.)  However, soon after investors began to sell, which caused Facebook's share price to drop close to its $38 IPO price within fifteen minutes of opening.  (Id. ¶ 157.)  The large drop in Facebook share price forced the Underwriter Defendants to step in and buy millions of shares at $38 a share to ensure that the stock never dipped below that line.  (Id. ¶¶ 157-59.)  Facebook's stock

closed at $38.23.   (Id. ¶ 159.)   Facebook's stock prices fell even further on the next trading day, May 21, 2012.   On extremely high trading volume, Facebook stock opened sharply down and closed at $34.03.   (Id. ¶¶ 163-64.)   Facebook's stock price dropped again on May 22, closing at $31 per share.   (Id. ¶ 20.)   This represented a drop of 18% from Facebook's initial IPO stock price.   (Id.)

The slide in share price may have been caused by news reports on Facebook's adjusted financial projections.   On the night of May 18, 2012, Reuters reported that "Facebook [] altered its guidance for research earnings last week, during the road show, a rare and disruptive move."[17]   Following the Reuters report, other financial press reported that the information was highly material and that it fundamentally affected the value of Facebook's stock.   (CAC ¶ 161.)   On May 19, 2012, Business Insider noted that for Facebook to reduce its projection guidance "mid-way through a series of meetings designed for the sole purpose of selling the stock" was "highly material information" and that:

[S]uch a late change in guidance would mean that

---

[17] Nadia Damouni & Olivia Oran, Morgan Stanley made big bet on Facebook, REUTERS, May 18, 2012, http://www.reuters.com/article/2012/05/19/facebook-morgan-stanley-idUSL1E8GIER020120519.

> Facebook's business was deteriorating rapidly -
> between the start of the roadshow and the middle of
> the roadshow.     Any time a business outlook
> deteriorates that rapidly, alarm bells start going off
> on Wall Street, and stocks plunge.[18]

On May 22, 2012, <u>Reuters</u> further reported that the lead underwriters, Morgan Stanley, J.P.Morgan and Goldman Sachs, all had significantly cut their revenue figures for Facebook while the IPO roadshow was underway, a highly unusual move, but only told a few major clients about their adjustment.[19]   (CAC ¶ 165.) It is highly unusual for the lead underwriters to significantly cut their revenue figures in the midst of a roadshow.  (<u>Id.</u> ¶¶ 166-68.)

The CAC alleges that Facebook failed to disclose material information in Facebook's Registration Statement and other disclosures and the Registration Statement made materially untrue and misleading statements and omissions.   Lead Plaintiffs offer two primary theories of liability:  (i) Facebook's failure to disclose whether increasing mobile usage and Facebook's

---

[18] Henry Blodget, <u>If This Really Happened During The Facebook IPO, Buyers Should Be Mad As Hell..</u>, Bus. Insider, May 19, 2012, http://www.businessinsider.com/facebook-earnings-guidance-2012-5.

[19] Felix Salmon, <u>The Facebook earnings-forecast scandal</u>, Reuters, May 22, 2012, http://blogs.reuters.com/felix-salmon/2012/05/22/the-facebook-earnings-forecast-scandal/ ("[H]ere's a material nonpublic fact about Facebook, which retail investors and everybody else in the deal deserved to know: all three underwriters cut their estimates simultaneously, in response to some very minor changes in the revised IPO prospectus.").

product decisions had or were reasonably expected to have a material unfavorable impact on revenues and to what extent these trends had or were reasonably expected to impact Facebook's revenues were omissions or falsities of information required for disclosure by Item 303 of Regulation S—K; and (ii) the Company's "may" and "if" statements regarding the impact of the increasing mobile usage and the Company's product decisions on Facebook's revenues represented affirmative material misrepresentations.

## II.  **Discussion**

Standard of Review

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), all factual allegations in the complaint are accepted as true, and all inferences are drawn in favor of the pleader. Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993).  "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  County of Suffolk, N.Y. v. First Am. Real Estate Solutions, 261 F.3d 179, 187 (2d Cir. 2001) (quoting Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995), cert. denied, 519 U.S. 808, 117 S. Ct. 50, 136 L. Ed. 2d 14 (1996)).

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663, 129 S. Ct. 1937, 1940, 173 L. Ed. 2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). This is not intended to be an onerous burden, as plaintiffs need only allege facts sufficient in order to "nudge[] their claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570.

Plaintiffs allege that Defendants violated Sections 11, 12 and 15 of the Securities Act. Section 11 imposes strict liability on issuers and signatories, and negligence liability on underwriters, where "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 12(a)(2) imposes liability under similar circumstances for misstatements or omissions in a prospectus, on "[a]ny person who . . . offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material

fact or omits to state a material fact necessary in order to make the statements . . . not misleading." 15 U.S.C. § 77l(a)(2). Section 15 of the Securities Act makes a "control person" liable for causing violations of Sections 11 and 12. 15 U.S.C. § 77o; see also Panther Partners v. Ikanos Commc'ns, Inc., 681 F.3d 114, 120 (2d Cir. 2012).

The CAC does not allege fraud; Lead Plaintiffs instead allege that Facebook acted negligently in preparing its Registration Statement. Neither scienter, reliance nor loss causation is an element of Section 11 or Section 12(a)(2) claims. Id. Section 11 requires only "ordinary notice pleading . . . subject only to the 'short and plain statement' requirements of Federal Rule of Civil Procedure 8(a)." Litwin v. Blackstone Group, L.P., 634 F.3d 706, 715 (2d Cir. 2011). Section 11 and 12(a)(2) claims that do not sound in fraud need not satisfy the heightened particularity requirements of Federal Rules of Civil Procedure 9(b). See In re Morgan Stanley Info. Fund Secs. Litig., 592 F.3d 347, 359 (2d Cir. 2010). Accordingly, the heightened pleading standards of the Private Securities Litigation Reform Act do not apply to the CAC. See 15 U.S.C. § 78u-4(b)(1)-(2); see also Litwin, 634 F.3d at 715. To survive the motion to dismiss, Plaintiffs need only show negligence under Section 11 or Section 12(a)(2). Id.

36

"Collectively, the language of [S]ections 11 and 12(a)(2) creates three potential bases for liability . . . (1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure obligation; and (3) an omission of information that is necessary to prevent existing disclosures from being misleading." In re Morgan Stanley, 592 F.3d at 360. Where such a misrepresentation or omission is identified, the court must then determine whether it is material. See id.

The Registration Statement Omitted Material Information

The Class Action Complaint alleges that Defendants violated Sections 11 and 12 of the Securities Act by, among other things, failing to disclose the information required by Item 303 of Regulation S-K.  (CAC ¶¶ 188(c), 197-201.) Plaintiffs allege that Defendants were required to disclose: (i) whether increasing mobile usage and the Company's product decisions had or were reasonably expected to have a material unfavorable impact on revenues; and (ii) to what extent those trends had impacted or were reasonably expected to impact Facebook's revenue.  (Id. ¶ 201.)  Defendants have challenged the materiality of this information and contend that the Company did disclose this information in the Registration Statement and

37

FWP.

Item 303 requires the disclosure of all "known trends . . . that have had or that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues." Regulation S-K, Item 303, 17 C.F.R. § 229.303(a)(3)(ii). According to the SEC's interpretive release regarding Item 303, "A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation." Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 6835, 54 Fed. Reg. 22427, 22429 (May 18, 1989) ("1989 SEC Release"). "Several specific provisions in Item 303 require disclosure of forward-looking information," including "where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." Id. at 22429; see also Panther Partners, 681 F.3d at 120 (same).[20] Whether a disclosure is required "is based on currently known trends, events, and

---

[20] Item 303 establishes a safe harbor for "forward-looking information" made by issuers "pursuant to paragraphs (a)(4) and (5) of this Item" but not subsection(a)(3). 17 C.F.R. § 229.303(c).

uncertainties that are reasonably expected to have material effects . . . [i]n contrast, optional forward-looking disclosure involves anticipating a future trend or event or anticipating a less predictable impact of a known event, trend or uncertainty." 54 Fed. Reg. at 22429.

Internal forecasts are generally considered "not material facts that are require[d] to be disclosed' in a registration statement." In re Facebook, Inc., IPO Secs. And Derivative Litig., 922 F. Supp. 2d 445, 472 ("Derivative Opinion" or "Derivative Op.") (internal quotation marks omitted) (quoting Sheppard v. TCW/DW Term Trust 2000, 938 F. Supp. 171, 177-78 (S.D.N.Y. 1996)); see also In re N. Telecom Ltd. Secs. Litig., 116 F. Supp. 2d 446, 458 (S.D.N.Y. 2000) ("The federal securities laws do not obligate companies to disclose their internal forecasts."); Rubke v. Capital Bancorp Ltd., 551 F.3d 1156, 1163 (9th Cir. 2009)(("[T]here is no duty to disclose income projections in a prospectus."); In re Burlington Coat Factory Secs. Litig., 114 F.3d 1410, 1432 (3d Cir. 1997) ("Companies are not obligated either to produce or disclose internal forecasts . . . ."); Glassman v. Computervision Corp., 90 F.3d 617, 631 (1st Cir. 1996) ("The federal securities laws impose no obligation upon an issuer to disclose forward-looking information such as internal projections, estimates of future

39

performance, forecasts, budgets, and similar data.") (quoting Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1209 (1st Cir. 1996)); Krim v. BancTexas Group, Inc., 989 F.2d 1435, 1446 (5th Cir. 1993) ("[A]n issuer . . . has no generalized duty to volunteer an economic forecast.") (internal quotation marks omitted); In re Salesforce.com Secs. Litig., No. C 04-03009 JSW, 2005 WL 6327481, at *5 (N.D. Cal. 2005) ("The law imposes no duty to disclose internal forecasts in the context of an initial public offering."); In re Donna Karan Int'l Secs. Litig., No. 97-CV-2011 CBA, 1998 WL 637547, at *12 & n.13 (E.D.N.Y. 1998)("[P]laintiffs essentially seek to hold [the issuer] liable for failing to make projections concerning post-IPO . . . costs. Sections 11 and 12(a)(2) do not require such forward-looking disclosures.").   The SEC has not required a general duty to disclose future performance projections and internal valuations because of concerns that such information can be unreliable and misinterpreted by investors.  In re Ivan F. Boesky Secs. Litig., 825 F. Supp. 623, 635 (S.D.N.Y. 1993).[21]

---

[21] Defendants argue that the SEC has even discouraged issuers from disclosing projections in advance of an IPO by not applying a safe harbor provision to IPOs. (See Def. Mem., at 30.)  The SEC concluded that the safe harbor should not apply because companies engaging in IPOs are "generally untested" and thus especially likely to produce uncertain projections.   Sec. Offering Reform, Securities Act Release No. 8591, 70 Fed. Reg. 44722, 44739 (Aug. 3, 2005) (the "2005 SEC Release"); accord Letter of Mary L. Schapiro, SEC Chair to Comm. On Oversight and Gov't Reform, U.S. House of Rep., at 23 (August 23, 2012).

Item 303 similarly does not obligate companies to disclose their internal forecasts. See, e.g., In re Authentidate Holding Corp. Secs. Litig., 2009 WL 755360, at *3 (S.D.N.Y. 2009), aff'd in relevant part, 369 F. App'x 260, 265-66 (2d Cir. 2010) (no duty under Item 303 to disclose that revenue would likely fail to meet nonpublic revenue targets); In re Donna Karan, 1998 WL 637547, at *10-12 & n.12 (company was not required "to make projections concerning post-IPO . . . costs," despite allegation that "a negative costs-sales trend," under Item 303, "existed at the time of the IPO"). Nor does a company have a general duty to disclose changes to internal projections. See, e.g., In re Worlds of Wonder Secs. Litig., 35 F.3d 1407, 1419 (9th Cir. 1994) (rejecting Section 11 claim based on the failure "to disclose the extent to which first quarter sales lagged behind . . . internal projections"); Glassman v. Formica Corp., 90 F.3d 617, 631 (1st Cir. 1996) ("Plaintiffs' nondisclosure claims fail because they base their allegations solely on discrepancies between actual (but undisclosed) intra-quarterly information and [the company's] undisclosed internal projections."); Steckman v. Hart Brewing, Inc., Civil No. 96-1077-K, 1996 WL 881659, at *4 (S.D. Cal. 1996) ("[C]ompanies have no duty to disclose intraquarter results, even if those results are lower than the company's internal projections."), aff'd, 143 F.3d 1293 (9th Cir. 1998).

41

However, Plaintiffs do not allege that Defendants were required to disclose their internal projections or numerical estimates. Instead, Plaintiffs contend that the Company's registration statements used language that only suggested there was a possibility that Facebook would have difficulty in the mobile market and that Facebook's mobile user base was growing faster than its desktop user base when, in reality, these two trends were occurring and affecting Facebook's advertising revenues. Plaintiffs posit that the loss of revenues caused by the increasing mobile usage was a trend known by Facebook that the Company had a duty to disclose.[22]

The SEC requires "material forward-looking information regarding known material trends and uncertainties . . . to be disclosed as part of the required discussion of those matters and the analysis of their effects." Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 33-8350, 68 Fed. Reg. 75,056, 75,062 (Dec. 29, 2003). "Materiality is an 'inherently fact-specific finding,' . . . that is satisfied when a plaintiff alleges 'a statement or

---

[22] Plaintiffs contend that Facebook knew of the issues relating to mobile usage, the Company's product decisions and the potential impact the two could and did have on the Company's revenues. Facebook's statements in its Registration Statements, FWP and the Herman Calls support this allegation.

omission that a reasonable investor would have considered significant in making investment decisions' . . . ." Litwin, 634 F.3d at 716-17 (quoting Basic Inc. v. Levinson, 485 U.S. 224, 236, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988); Ganino v. Citizens Utils. Co., 228 F.3d 154, 161-62 (2d Cir. 2000)). "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id. at 717 (quoting Ganino, 228 F.3d at 162).

The Second Circuit recently decided two cases, Litwin and Panther Partners, that provide further illumination on the disclosure obligations under Item 303. Plaintiffs in Litwin alleged that defendant Blackstone violated Sections 11 and 12 of the Securities Act because the registration statement and prospectus for its IPO failed to disclose that (and the extent to which) its future revenues were expected to be impacted by certain developments concerning its business, including: (i) downward trends in the real estate market; (ii) a shift towards a more risky strategy by a subsidiary company, FGIC, which insured mortgage-backed securities; and (iii) another subsidiary, Freescale, had lost its biggest customer. See 634 F.3d at 718-19.

43

The Second Circuit upheld the plaintiffs' claims and held that Item 303 required more than the mere identification of trends that were occurring in the defendant's business. The court noted that "the relevant question under Item 303 is whether [the company] reasonably expects the impact to be material." Litwin, 634 F.3d at 719.

> [T]he key information that plaintiffs assert should have been disclosed is whether, and to what extent, the particular known trend, event, or uncertainty might have been reasonably expected to materially affect Blackstone's investments. And this potential future impact was certainly not public knowledge . . . and thus cannot be considered part of the "total mix" of information already available to investors. Again, the focus of plaintiffs' claims is the required disclosures under Item 303—plaintiffs are not seeking the disclosure of the mere fact of Blackstone's investment in FGIC, of the downward trend in the real estate market, or of Freescale's loss of its exclusive contract with Motorola. Rather, plaintiffs claim that Blackstone was required to disclose the manner in which those then-known trends, events, or uncertainties might reasonably be expected to materially impact Blackstone's future revenues.

Id. at 718-19.

In holding for the plaintiff, the court emphasized that Blackstone's real estate segment played a "significant role" in Blackstone's business and that the alleged

44

misstatements and omissions regarding Blackstone's real estate "were qualitatively material because they masked a potential change in earnings or other trends." Id. at 722. "[A]ll Item 303 requires in order to trigger a disclosure obligation [is] a known trend that [defendant] reasonably expected would materially affect its investments and revenues." Litwin, 634 F.3d at 721.

Approximately one year later, the Second Circuit upheld the Litwin panel's decision in Panther Partners. In Panther Partners, the plaintiffs alleged that the defendants failed to disclose the extent of the impact of known product defects on the company's financial results in advance of a secondary offering. See 681 F.3d at 114-16. The defendants contended that they had satisfied Item 303 by disclosing the fact that issuer's products "frequently contain defects and bugs;" that "[i]n the past we have experienced, and may in the future experience, defects and bugs in our products;" and that "[i]f any of our products contains defects [that] could harm our ability to retain existing customers and attract new customers." See id. at 117.

In holding that the plaintiffs did adequately plead a violation of Item 303's disclosure obligations, the Second

45

Circuit looked not just at the omission alleged by plaintiffs but also at the circumstances surrounding the omission:

> We believe that, viewed in the context of Item 303's disclosure obligations, the defect rate [the alleged omission], in a vacuum, is not what is at issue. Rather, it is the manner in which uncertainty surrounding that defect rate, generated by an increasing flow of highly negative information from key customers, might reasonably be expected to have a material impact on future revenues.

Id. at 120.

In its analysis, the Court noted that "the [r]egistration [s]tatement's generic cautionary language . . . was incomplete and, consequently, did not fulfill [the issuer's] duty to inform the investing public of the particular, factually-based uncertainties of which it was aware of in the weeks leading up to the [s]econdary [o]ffering."  Id. at 122. The court noted that the "known uncertainties" related to the defects could have materially impacted revenues:   The company's representation that the product "'frequently contain defects and bugs' was incomplete and . . . did not fulfill [the company's] duty to inform the investing public of the particular, factually-based uncertainties of which it was aware in the weeks leading up to the Secondary Offering." Id.

46

In deciding for plaintiffs in Litwin and Panther Partners, the Second Circuit emphasized the issuer's knowledge of both the trend and uncertainties surrounding the issue disclosed in its registration statement. The operative failure by the issuer in Panther Partners was not its omission of the possibility of the defects and bugs in its products but the omission of the company's knowledge regarding the uncertainty of the issue. See id. at 121-22 (noting that the issuer "was aware of the 'uncertainty'" of possible returns related to its product's defects and that such "'known uncertainties' could materially impact revenues").

Taking Litwin and Panther Partners together, an issuer has a duty to disclose any trend, event or uncertainty that is "known and existing at the time of the IPO" that "was reasonably likely to have a material impact" on the issuer's financial condition. Panther Partners, 681 F.3d at 121 (quoting Litwin, 634 F.3d at 716). Moreover, an issuer also has a duty to disclose "whether, and to what extent" that known trend, event or uncertainty that "might reasonably be expected to materially impact . . . future revenues." Panther Partners, 681 F.3d at 121 (quoting Litwin, 634 F.3d at 716).

47

The SEC's commentary on Item 303 further supports this reading of Litwin and Panther Partners. In its 1989 SEC Release, the SEC stated that if "[m]anagement is unable to determine that a material effect . . . is not reasonably likely to occur," then "MD&A disclosure of the effects of [the known trend, development or uncertainty], quantified to the extent reasonably practicable, would be required." 54 Fed. Reg. at 22,430; see also 2003 SEC Release, 68 Fed. Reg. at 75,062 ("Quantitative disclosure . . . may be required to the extent material if quantitative information is reasonably available."). The "required disclosure regarding the future impact of presently known trends, events or uncertainties [under Item 303] may involve some prediction or projection." 1989 SEC Release, 54 Fed. Reg. at 22,429; see also 2003 SEC Release, 68 Fed. Reg. at 75,059 ("In addressing prospective financial condition and operating performance, there are circumstances, particularly regarding known material trends and uncertainties, where forward-looking information is required to be disclosed."). Thus, the mere identification of a trend is, in some cases, not sufficient disclosure.

Facebook's Registration Statement did note the Company's potential issues with mobile users and advertisements. The FWP noted that daily active users were increasing more

48

rapidly than the increase in number of ads delivered, that this trend was likely caused by increased usage of Facebook on mobile devices and that growth in use of Facebook through mobile products "may" negatively affect the Company's revenues.   See FWP;  see also  Registration Statement, at  5.    Facebook's disclosures denoted a trend, the increase of mobile users, and the uncertainty surrounding the trend, that the increase of mobile users may affect the Company's revenues.   However, two issues arise with the Company's disclosures in the Registration Statement.

First, Facebook used generalized and indefinite terms in the Registration Statement and FWP when describing the impact the increase of mobile users and product decisions could have had on the Company's revenues and financial results.   Such terms fail to constitute sufficient disclosure where Facebook knew of the certainty of the trends in mobile usage.   See Panther Partners, 681 F.3d at 117 (discussing the issuer's registration statement that cautioned in "generalized terms").   The impact of the increase in mobile users on revenues was not alleged to be a mere uncertainty, but a trend Facebook knew was affecting its business revenues.   (CAC ¶¶ 122-24); see also, Panther Partners, 681 F.3d at 121; Litwin, 634 F.3d at 718-19.

49

Second, Facebook's warnings also noted that the
increase in mobile users was not the sole variable that could
have affected Facebook's revenues at the time of the IPO. The
Registration Statement noted that Facebook's "revenue trends are
also affected by ad inventory management changes affecting the
number, size, or prominence of ads we display," Registration
Statement, at 52, and decreasing the number of ads displayed to
users did not necessarily lead to a decrease in revenue. The
Company, for example, was able to increase the reserve price (or
the minimum price threshold) in Facebook's advertising auction
system which reduced the frequency of low quality ads displayed.
This caused a reduction in the overall number of ads shown but
increased the average price per ad in a way that "the impact on
total revenue was minimal." Registration Statement, at 53. The
Registration Statement portrayed Facebook's product decisions as
having an impact on revenue, and an investor could reasonably
conclude that an increase in mobile users will not necessarily
negatively affect Facebook's revenues since the Company's
product decisions could offset any lost revenue. Thus, the
Registration Statement did not provide the extent increasing
mobile users would affect the Company's overall revenues at a
time this trend was already affecting the Company's revenues as
a result of the Company's product decisions. Facebook should

have disclosed more of this relationship to investors.[23]

Thus, while Facebook made significant disclosures, including that it "[does] not currently directly generate any meaningful revenue from the use of Facebook mobile products, and our ability to do so successfully is unproven . . . . [and] if users continue to increasingly access Facebook mobile products as a substitute for access through personal computers, and if we are unable to successfully implement monetization strategies for our mobile users, our revenue and financial results may be negatively affected," Registration Statement, at 14, these disclosures satisfy only part of Defendants' Item 303 obligations.

Identification of a past trend does not satisfy a company's disclosure obligations under Item 303; Item 303 require specifics disclosure of whether, and to what extent a material trend has impacted or is expected to impact future revenues. See Litwin, 634 F.3d at 718-19 ("[T]he key information that plaintiffs assert should have been disclosed is whether, and to what extent, the particular known trend, event,

---

[23] Although Facebook made numerous disclosures and identified many risk factors to potential investors, such disclosures do not shelter Defendants from liability under the "bespeaks caution" doctrine. See Iowa Pub. Emps. Ret. Sys. v. MF Global, Ltd., 620 F.3d 137, 142 (2d Cir. 2010) (emphasizing that the "bespeaks caution" doctrine cannot apply to "alleged omissions of information concerning existing financial and operational difficulties").

or uncertainty might have been reasonably expected to materially affect Blackstone's investments."); Panther Partners, 681 F.3d at 121 (same). Facebook's disclosures did not denote the extent the increased mobile usage seen by the Company was already affecting Facebook's revenues.

Changes in the number of Daily Active Users who were using Facebook's desktop website, how much time, on average, each user was spending on the desktop website and Facebook's pricing for each of its ads at that time and Facebook's own product decisions all could have affected Facebook's revenues and an investor's reading of the disclosures. However, Facebook knew that increasing mobile usage and the Company's product decisions were impacting the Company's revenues for the second quarter and the year, as evidenced by the Company's second quarter internal projections, but did not disclose these trends or the impact on the Company's revenue. Because of these variables, investors reading Facebook's disclosures had no way of knowing what effect on revenue, if any, the Company was currently experiencing as a result of the mobile usage trend.[24]

---

[24] While this Court previously ruled that Facebook "repeatedly made express and extensive warnings in the Company's Registration Statement, drafts of the Registration Statement and in its final Offering Documents about the trend of increased use of mobile applications" in the Derivative Actions, Derivative Op., 922 F. Supp. 2d at 469, the allegations analyzed by the Court in the Derivative Opinion are different from the allegations set forth in the CAC. "[T]he essence of the Derivative Plaintiffs' complaints is that the Board allowed Facebook to file a Registration Statement that did not disclose its

The Defendants did not violate Item 303 when it decided not to disclose its updated second quarter and yearly internal projections. However, the Company's changes in its internal projections and subsequent calls to the Syndicate Analysts establish that the Company had identified a trend leading up to its IPO alleged to be material. Item 303 does require the disclosure of a company's analysis of the future impact of a material trend or the impact such trend currently has on an issuer. See 2003 SEC Release, 68 Fed. Reg. at 75,059 ("In addressing prospective financial condition and operating performance, there are circumstances, particularly regarding known material trends and uncertainties, where forward-looking information is required to be disclosed.").[25]   The absence of a

---

internal revenue projections." Id. at 472.  This is not the "essence" of the Lead Plaintiffs' complaint.  The parties in the Derivative Actions did not raise the issue of Facebook's disclosure duties under Item 303 with the Court on Defendants' motion to dismiss or any claims under federal securities laws. Instead, the Derivative Actions alleged claims for breach of fiduciary duty of loyalty.  See id. at 468.  The complaint at issue in the Derivative Opinion also did not contain the same fact allegations as the CAC.

[25] As noted by the SEC, "[u]ntil the early 1970s, the [SEC] prohibited disclosure of forward-looking information . . . based primarily on [its] perception that such information was inherently unreliable, and that unsophisticated investors would place undue emphasis on the information in making investment decisions." Safe Harbor For Forward-Looking Statements, 59 Fed. Reg. 52723, 52723-24 (Oct. 19, 1994).  When the SEC modified its rules in 1978, it stated only that companies may "voluntarily . . . disclose management projections in their filings with the [SEC]."  Guides for Disclosure of Projections of Future Economic Performance, 43 Fed. Reg. 53246, 53247 (Nov. 15, 1978).  In 2005, the SEC expressly rejected a rule that would have "require[d] projections or other forward-looking information to be included in [IPO] registration statements."  2005 SEC Release, Fed. Reg. at 44739.  However, "[s]ince the 1980's, [the SEC has] encouraged issuers to disclose forward-looking information and, in some situations . . . required

general duty to disclose projections does not mean that IPO registrants are exempt from disclosing the analysis and trends underlying their internal projections if a disclosure obligation arises.

Similarly, a company has no general "obligation to disclose the results of a quarter in progress." Arfa v. Mecox Lane Ltd., No. 10 Civ. 9053, 2012 WL 697155, at *12 (S.D.N.Y. March 5, 2012), aff'd, 504 F. App'x 14 (2d Cir. 2012); see also In re Focus Media Ltd. Litig., 701 F. Supp. 2d 534, 539 (S.D.N.Y. 2010) (rejecting effort "to hold Defendants liable for [their] failure to disclose financial information about the third quarter before that quarter had concluded"); Schoenhaut v. Am. Sensors, Inc., 986 F. Supp. 785, 793 (S.D.N.Y. 1997) (no duty to disclose reduction in current volume of sales to largest customer). However, "intra-quarter updates may be required[] if intervening events trigger a duty to disclose." In re Bank of Am. Sec. Corp. Derivative & ERISA Litig., 757 F. Supp. 2d 260, 304 (S.D.N.Y. 2010); see also Milman v. Box Hill Sys. Corp., 72 F. Supp. 2d 220, 231 (S.D.N.Y. 1999) (rejecting the defendants' argument that "the securities laws do not require a company to disclose information regarding sales results for a quarter in progress" where the plaintiffs alleged that, prior to the

them to do so." Id. at 44736.

issuer's initial public offering, the defendants had knowledge of a trend that had already had a material negative impact on the issuer's net sales).[26]  Moreover, disclosures under Item 303 were required to be accurate and complete as of the time Registration Statement became effective.  Defendants' duty under Item 303 was triggered before the Registration Statement became effective:  Facebook was aware of the material negative impact on Facebook's revenues the Company had suffered as a result of increasing mobile usage and the Company's product decisions ten days before the IPO.  That Facebook identified the trend intra-quarter is of no issue; under Item 303, Defendants were required to disclose the issues even though it arose intra-quarter.[27]

Facebook's choice to make the Herman Calls to a select group of investors just a few days before its IPO does not, by

---

[26] While the SEC does not require disclosure of revenue data from a quarter that is completed up to a month and a half before an IPO, see Regulation S-X, 17 C.F.R. § 210.3-12(a) (mandating that registration statements contain financial statements that are no more than 135 days old), Regulation S-X is not the only operative SEC regulation setting forth Defendants' disclosure duties.  See DeMaria v. Andersen, 318 F.3d 170, 180 (2d Cir. 2003) (rejecting the argument that an issuer is required to disclose only the financial information required by Regulation S-X, noting that defendants would have a "duty to disclose interim financial information in the prospectus" if such disclosure were required by any other SEC rule or regulations).

[27] Facebook's eventual post-IPO result from its completed second quarter showed a revenue increase of almost 12% over the first quarter of 2012 and 32% from the second quarter in the previous year.  As noted above, Facebook's Item 303 disclosure duties were triggered before the completion of the second quarter, when Defendants determined that the Company was facing a material negative impact on Facebook's projected revenues.  See Litwin, 634 F.3d at 716 (Item 303's disclosure requirements are triggered whenever the impact of a known trend is expected to be "material").

itself, trigger a disclosure obligation.  Although sharing projections with underwriters and institutional investors might be "industry practice" in an IPO, a fact-intensive issue that the Court declines to resolve at this current stage of the litigation, Shah v. Wilco Sys., Inc., 76 F. App'x 383, 385 (2d Cir. 2003), performance of a recognized industry practice does not absolve a company of its disclosure duties when a duty arises. The Herman Calls establish that the Company knew the trend was sufficiently material to warrant emergency calls to the Syndicate Analysts.

Defendants cite to Sheppard, 938 F. Supp. 171, In re N. Telecom Ltd. Sec. Litig., 116 F. Supp. 2d 446, Rubke, 551 F.3d 1156, In re Lyondell Petrochemical Co. Sec. Litig., 984 F.2d 1050 (9th Cir. 1993), and Glassman, 90 F.3d 617, asserting that the Company had no Item 303 disclosure obligation.  The cases Defendants rely are inapposite to the instant situation. Sheppard, 938 F. Supp. 171, did not concern alleged violations of Item 303.  The court reasoned that "plaintiffs do not allege that defendants' internal calculations were belied by defendants' actual knowledge of contradictory facts at the time it was made" but only that defendants "fail[ed] to predict a rise in interest rates," different claims from those asserted by Lead Plaintiffs.  Id. at 178.  In re N. Telecom Ltd. Sec.

Litig., 116 F. Supp. 2d 446, is a summary judgment case that did not involve an IPO. In that case, the company did publicly disclose that its annual earnings were going to be lower than the prior year, and plaintiffs merely contended that this disclosure should have been made earlier. Id. at 458. Facebook, in contrast, never disclosed the trend required by Item 303. Rubke, 551 F.3d 1156, did not involve alleged violations of Item 303 or an IPO. The plaintiffs alleged merely that defendants' statement that they "believe[] that [the bank's] profitability will increase" was misleading because it failed to state that they believed the bank's profitability will "dramatically" increase - a mere "squabble about the adverbs used." Id. at 1163 (internal quotation marks omitted). Moreover, while Rubke quoted Lyondell, 984 F.2d 1050, for the proposition that "there is no duty to disclose income projections in a prospectus," Rubke, 551 F.3d at 1163, the Lyondell court recognized that "[t]he outcome of the present case would be entirely different had Plaintiffs alleged Lyondell's internal predictions were based on existing negative factors known only to the company." 984 F.2d at 1053. Glassman, 90 F.3d 617, concerned an alleged failure to disclose that the company was supposedly lagging behind its internal forecasts by "less than 1% of the budgeted revenues for that quarter," not a claim that the company failed to disclose that known trends had

57

materially impaired its ability to generate revenue for the quarter and the year. See id. at 630-31, 632 n.22 ("[M]ere fact that intra-quarterly results lagged behind internal projections does not, without more, require disclosure."). Moreover, all of these cases predate the Second Circuit's Litwin and Panther Partners decisions.

Given the reasoning above, Plaintiffs have sufficiently pleaded that Facebook omitted material information in violation of Item 303 of Regulation S-K in the Company's Registration Statement.

The Registration Statement Did Contain
Material Misrepresentations

Plaintiffs also allege that Defendants violated Sections 11 and 12 of the Securities Act by making material misrepresentations in the Registration Statement concerning the impact of increasing mobile usage and the Company's product decisions on Facebook's revenues. (CAC ¶¶ 188-96.) Plaintiffs contend that Facebook misled investors because the statements warned that increased mobile usage and product decisions "may negatively affect [Facebook's] revenue" when, in fact, these factors allegedly already "had negatively impacted [the

Company's] revenue." (Id. ¶ 11 (emphasis in CAC).) Plaintiffs contend that the Company's purported risk warnings misleadingly represented that this negative impact was merely possible, when in fact, it had already materialized before the IPO. (See id. ¶¶ 188(a) and (b), 189, 191, 193.) On the other hand, Defendants assert that "a warning that increased mobile usage 'may' harm future revenue does not tell investors . . . that increased mobile usage had not already affected revenue growth." (Def. Mem., at 16-17.) Defendants contend that the Registration Statement made it clear that increased mobile usage was affecting revenue growth due to Facebook's inability to generate any meaningful revenue from mobile usage. (Id., at 17.)

"Whether or not a statement is materially misleading is a 'fact-specific' inquiry." In re Noah Educ. Holdings, Ltd. Sec. Litig., No. 08 Civ. 9203 (RJS), 2010 WL 1372709, at *7 (S.D.N.Y. Mar. 31, 2010); see also Basic, 485 U.S. at 240, 108 S. Ct. at 988, 99 L. Ed. 2d 194. The fact-specific inquiry should not focus solely on particular statements which, taken separately, is literally true, but on "whether defendants' representations, taken together and in context, would have mislead a reasonable investor about the nature of the [securities]." McMahan & Co. v. Wherehouse Entm't, Inc., 900 F.2d 576, 579 (2d Cir. 1990); see also Olkey v. Hyperion 1999

Term Trust, Inc., 98 F.3d 2, 5 (2d Cir. 1996) ("[P]rospectuses must be read as a whole.") (internal quotation marks omitted).

Cautionary language may protect an issuer from liability; however, "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." Wilson v. Merrill Lynch & Co., Inc., 671 F.3d 120, 130 (2d Cir. 2011) (quoting Rombach v. Chang, 355 F.3d 164, 173 (2d Cir. 2004)). "To be 'meaningful,' a 'cautionary statement must discredit the alleged misrepresentations to such an extent that the 'risk of real deception drops to nil.'" In re Bear Stearns Cos., Inc. Secs., Derivative, & ERISA Litig., 763 F. Supp. 2d 423, 495 (S.D.N.Y. 2011) (quoting In re Immune Response Secs. Litig., 375 F. Supp. 2d 983, 1033 (S.D. Cal. 2005)). "[T]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." In re Van der Moolen Holding N.V. Secs. Litig., 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005); but cf. Noah Educ. Holdings, 2010 WL 1372709, at *8 ("[A] lengthy, forward-looking recitation of risks facing [the defendant] did not imply that none of these risks, at least to some extent, would affect [defendant's] most recent fiscal quarter."); In re FBR Inc. Secs. Litig., 544 F. Supp. 2d 346, 362 (S.D.N.Y. 2008)

("[D]efendants' boilerplate description of its regulatory risks could not have been misleading to a reasonable investor as the description said nothing company-specific, . . . no reasonable investor would infer anything about the state of [the company's regulatory] compliance" from defendant's 10-K filings and "defendants never claimed that the company was in full compliance with all regulations, or that it had no outstanding regulatory issues") (internal quotation marks omitted); In re Leapfrog Enters., Inc. Secs. Litig., 527 F. Supp. 2d 1033, 1048-49 (N.D. Cal. 2007) (rejecting claim that "defendants should have stated that the adverse factors 'are' affecting financial results rather than 'may' affect financial results").  "The law is well settled . . . that so-called 'half-truths'—literally true statements that create a materially misleading impression—will support claims for securities fraud." Wilson, 671 F.3d at 130 (quoting SEC v. Gabelli, 653 F.3d 49, 57 (2d Cir. 2011)).

At the same time, "[d]isclosure is not a rite of confession or exercise of common law pleading." Wilson, 671 F.3d at 131 (quoting In re Morgan Stanley Info. Fund Secs. Litig., 592 F.3d 347, 365 (2d Cir. 2010)).  There are limits as to what a company must disclose in order to avoid liability. "It would be as serious an infringement of [SEC] regulations to overstate the definiteness of the plans as to understate them."

61

Id. (quoting Elec. Specialty Co. v. Int'l Controls Corp., 409
F.2d 937, 948 (2d Cir. 1969)).


    Courts in this Circuit have held that a company's
purported risk disclosures are misleading where the company
warns only that a risk may impact its business when that risk
has already materialized.  "[E]ven apparently specific risk
disclosures like those in [a defendant company's] prospectus are
misleading if the risks are professionally stamped in internal
undisclosed analyses . . . as significantly greater or more
certain than those portrayed in the prospectus."  In re
Prudential Secs. Inc. Ltd. P'ship Litig., 930 F. Supp. 68, 72
(S.D.N.Y. 1996); see also In re Van der Moolen, 405 F. Supp. 2d
at 400, 415 (statements purporting to warn that a company's
business "could" be negatively impacted "if" it failed to comply
with industry regulations were materially misleading where the
company was violating industry regulations at the time it issued
those purported warnings); Dodona I, LLC v. Goldman, Sachs &
Co., 847 F. Supp. 2d 624, 646 (S.D.N.Y. 2012) ("Since the
Offering Circulars contained affirmative representations
regarding the risks of investing, . . . Defendants had a duty to
ensure that those statements were accurate and complete.").
"[G]eneric risk disclosures are inadequate to shield defendants
from liability for failing to disclose known specific risks.  In

re Am. Int'l Grp., Inc. 2008 Secs. Litig., 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010).

As noted above, Facebook's Registration Statement did not disclose that increased mobile usage and the Company's product decisions had already had a negative impact on the Company's revenues and revenue growth. The Company's purported risk warnings misleadingly represented that this revenue cut was merely possible when, in fact, it had already materialized. The warnings only warned what might occur if certain contingencies were met; the disclosures did not make clear that such contingencies had, in fact, already occurred.

Indeed, the Registration Statement included language that created ambiguity as to whether the Company's risk warnings regarding mobile use would have an impact on the Company's revenues. Facebook specifically informed investors that "the substantial majority of our mobile users also access and engage with Facebook on personal computers where we display advertising." February 1 Registration Statement, at 13. Facebook also told investors that it could not determine the degree to which mobile use was substituting for desktop use. Registration Statement, at 53 ("We cannot quantify the extent to which mobile usage of Facebook is substituting for, rather than

incremental to, usage of Facebook through personal computers
. . . ."). Although the Registration Statement disclosed that
the Company did not "directly generate any meaningful revenue
from the use of Facebook mobile products," Registration
Statement, at 14, this disclosure is not adequate to disclose
that mobile usage and product decisions were harming Facebook's
revenues. Facebook did not discuss whether revenue from use of
Facebook on personal computers or other Company product
decisions could offset the loss caused by the increase in mobile
usage. Investors had no way of knowing if this was occurring or
not from the information provided by the Company.

        The Registration Statement even contained positive
statements concerning the impact of mobile usage on Facebook's
financial prospects: Facebook repeatedly underscored that it
was actively taking steps to capitalize on its mobile users,
including that it had introduced paid advertisements on mobile
weeks before the IPO, thus opening up a potentially significant
mobile revenue stream. (CAC ¶¶ 95, 110-11); Registration
Statement, at 14 ("In March 2012, we began to include sponsored
stories in users' mobile News Feeds."). The Registration
Statement further represented that increased mobile usage would
have a "generally positive" effect on the Company's revenues.
Registration Statement, at 50 ("We experienced growth in DAUs

[daily active users] across major markets . . . . Increased
mobile usage was a key contributor to this growth.  DAUs as a
percentage of MAUs [monthly active users] increased from 55% in
March 2011 to 58% in March 2012, which we believe was driven
entirely by increased mobile usage of Facebook.  We believe that
increases in DAUs and in DAUs as a percentage of MAUs generally
positively affect our revenue because increases in user
engagement may enable us to deliver more relevant commercial
content to our users and may provide us with more opportunities
for monetization.").  Since "[a] statement is misleading if a
reasonable investor would have received a false impression from
the statement," Freudenberg v. E*Trade Fin. Corp., 712 F. Supp.
2d 171, 180 (S.D.N.Y. 2010), the Registration Statement, read as
a whole, and despite its warnings regarding mobile usage, did
constitute a misrepresentation.

     The Plaintiffs' allegations regarding the events after
the Company filed the May 9 Registration Statement support a
finding that Facebook did not disclose the fact that mobile
usage was already affecting revenue growth.  Plaintiffs allege
that Facebook's Treasurer Herman made nineteen phone calls to
the Syndicate Analysts beginning only minutes after filing the
May 9 amendment to the Registration Statement to tell them of
the Company's revenue cuts.    (CAC ¶ 132.)    The Syndicate

Analysts then privately contacted certain preferred investors to inform them of their reduced estimates.

Further, market commentators specifically reported that Facebook had not previously disclosed its projected revenue cuts prior to the alleged May 21 and 22 disclosures that revealed the cuts.  (CAC ¶¶ 173-74.)  Plaintiffs contend that investors reacted with "shock" and "anger" to the post-IPO revelation of the Company's cuts, and that the Company's stock price collapsed after this reveal.  (Pl. Op., at 40.)  These allegations, along with the language in the Registration Statement, constitute adequate allegations that the Company did materially misrepresent to investors the impact increasing mobile usage was having on the Company's revenues.

While Facebook used "may" statements in its Registration Statement, construing its warnings as mere "opinions" about the future does not preclude a Securities Act violation.  "[M]isstatements of belief and opinion" can give rise to liability only "to the extent that the [belief or opinion] was both objectively false and disbelieved by the defendant at the time it was expressed." Friedus v. Barclays Bank PLC, 734 F.3d 132, 141 (2d Cir. 2013) (quoting Fait v. Regions Fin. Corp., 655 F.3d 105, 110 (2d Cir. 2011)).  "[T]he

66

pleading required for beliefs and opinions 'does not amount to requirement of scienter.'" Id. (quoting Fait, 655 F.3d at 112 n.5). The CAC alleges that Facebook discovered that mobile usage was impacting its revenues before its IPO, cut its revenue projections and the Defendants knew that increasing mobile usage and the Company's product decisions had materially impacted its revenues as of the time of the IPO from the Herman Call. Plaintiffs have adequately pleaded that the Registration Statements contained "false" information that was "disbelieved" by Defendants at the time it was filed. But cf., Freeman Grp. V. RBS Grp., No. 12-3642-cv, 2013 WL 5340476, at *2-3 (2d Cir. Sept. 25, 2013) (finding that company's assurances of efficacy qualified as opinion statements that did not violate the Securities Act since plaintiffs only pleaded that defendants did not have a "reasonable basis" for believing the statements at issue where reports at the time supported the statements).

Moreover, Facebook's risk warnings are alleged to be more than mere opinions, they were misstatements of present fact, warning that something "may" occur when that event "had" already occurred, and not mere opinions of future possibilities.[28]

---

[28] That Facebook ultimately reported revenues in line with its original estimates does not change the Court's analysis. "The truth of a statement made in the registration statement is judged by the facts as they existed

While In re Noah and In re FBR found defendants not liable for its cautionary statements in its security disclosures, the facts in those cases are distinct from those in the instant action. Unlike in In re Noah, 2010 WL 1372709, at *7-8 (finding that a "lengthy, forward-looking recitation of risks facing [the defendant] did not imply that none of these risks, at least to some extent, would affect [defendant's] most recent fiscal quarter"), the Registration Statements included statements regarding mobile usage and revenue, including positive statements, that clashed with the Company's risk warnings on the same issues. See supra. Thus, the "central issue . . . is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misl[ed] a reasonable investor about the nature of the [securities]." Olkey, 98 F.3d at 5 (quoting McMahan, 900 F.2d at 579). The company in Noah warned in its registration statement that increases in the cost of raw materials "could" cause a drop in the company's gross margin when, at the time of the IPO, a spike in the cost of raw material had already affected the company's gross margin. In re Noah, 2010 WL

when the registration statement became effective." In re IPO Sec. Litig., 358 F. Supp. 2d 189, 205 (S.D.N.Y. 2004). Defendants' hindsight defense does not render them innocent.

68

1372709, at *7.  The company in Noah did not state that there were other variables which could mitigate the effects of increasing cost of raw materials.  By contrast, the Registration Statement suggested that the Company's product decisions and ads on personal computers could militate revenue cuts caused by mobile usage.

Similarly, the regulatory filings and risk factor warnings at issue in In re FBR Inc. Sec. Litig., 544 F. Supp. 2d 346, "said nothing company-specific," and the Court reasoned that "no reasonable investor would infer anything about the state of [the company's regulatory] compliance" from the specifics-less warning.  Id. at 362.  In contrast, Facebook's Registration Statement did contain specific representations regarding mobile usage risks that construed a present certainty as a future possibility.

Reading the Registration Statement as a whole and taking the events alleged by Plaintiffs surrounding Facebook's IPO into context, Plaintiffs have sufficiently pleaded material misrepresentation by Defendants in violation of Sections 11 and 12 of the Securities Act by making misrepresentations in its Registration Statement that could have and did mislead investors regarding the Company's future and current revenues.

69

The Allegations of Materiality Are Adequately Pled

Materiality is sufficiently pled "by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." Ganino, 228 F.3d at 161. A statement or omission is considered material if "viewed by a reasonable investor as having significantly altered the 'total mix' of information made available. TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S. Ct. 2126, 2132, 48 L. Ed. 2d 757 (1976). "Material facts include . . . facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities." Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d 171, 181 (S.D.N.Y. 2010).

"Where the principal issue is materiality, an inherently fact-specific finding, the burden on plaintiffs to state a claim is even lower" than the "relatively minimal burden" applicable to other elements of their claims under Rule 8 of the Federal Rules of Civil Procedure." Litwin, 634 F.3d at 718. A "complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a

70

reasonable investor that reasonable minds could not differ on the question of their importance." Ganino, 228 F.3d at 162; see also Freudenberg, 712 F. Supp. 2d at 181 ("[T]he trier of fact usually decides the issue of materiality.").

Facebook reduced its revenue figures for the second quarter of 2012 in its internal projections from $1.1 - $1.2 billion range to $1.1 billion. This was a more than 8.3% downward shift from its initial estimate; the Company also cut its revenue figures for the year by as much as $175 million, or 3.5%. The Syndicate Analysts also made significant cuts to its own projections for the second quarter by as much at 7% and annual revenue as much as 6%. Such reductions have been found to be sufficiently material in this Circuit. See Litwin, 634 F.3d at 713, 713 n.8, 717-22 (write-down equal to nearly 4% of annual revenue material); Ganino, 228 F.3d at 162-66 (1.7% decrease in annual revenue was material when viewed in context); but cf. In re Turkcell Iletisim Hizmetler A.S. Sec. Litig., 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001) (finding 9% drop in operating income from first to second quarter not sufficient to warrant disclosure).[29]

---

[29] Defendants note that in Glassman and In re Turkcell, the courts treated comparable variances in actual results as immaterial as a matter of law. See Glassman, 90 F.3d at 633 n.26 (explaining that deviations of 3% to 9% were not material). The 3% to 9% deviations at issue in Glassman were with regards to the company's backlogs. Glassman, 90 F.3d at 632-34. The alleged

Further, the Registration Statement repeatedly highlighted that Facebook's revenue and advertising revenue was Facebook's most significant financial metric. (CAC ¶¶ 88-97, 185.) "[O]ne factor affecting . . . materiality is whether the misstatement or omission relates to a segment that plays a 'significant role' in the registrant's business." Litwin, 634 F.3d at 720. The declines in advertising revenue were driven by a trend, increasing mobile usage, that the Registration Statement stated was "critical" to Facebook's business. (CAC ¶ 185.)

The Defendants' actions once Facebook revised its second quarter projections establish the significance of the cuts and the connection between mobile usage and revenues. Immediately after determining that its revenues for the quarter and the year were being negatively impacted by shifting mobile usage, Facebook and Morgan Stanley both determined that the information had to be disclosed to the Syndicate Analysts who were considering the price and quantity of the shares to be offered. Herman made the initial scripted phone calls to the Syndicate Analysts minutes after Facebook filed its May 9

---

nondisclosures related to the company's internal forecasts was for "less than 1% of the budgeted revenues for that quarter." Id. at 630-31, 632 n.22.

Registration Statement solely to inform them of the revenue projection cuts and continuing trend of declining ad impressions per user. The Syndicate Analysts then held a series of calls with a select group of the Company's potential investors and informed them of their reduced estimates. Defendants' actions to disclose the nonpublic information to IPO-critical parties undermine their contention that the information was not material. See, e.g., SEC v. Wyly, 788 F. Supp. 2d 92, 123 (S.D.N.Y. 2011) ("[T]he [defendants] themselves demonstrated the importance they attached to [the information] by acting on that nonpublic information in short order" and, "[g]iven the importance that the [defendants] attached to this information, it is hard for them now to protest at the motion to dismiss stage that no reasonable investor could have found it material."); Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp., 875 F. Supp. 2d 359, 368 (S.D.N.Y. 2012) (reasoning that the reactions of securities analysts supported an inference of materiality at the motion to dismiss stage).[30]

---

[30] Defendants contend that it followed industry custom in providing its original and revised projections to the Syndicate Analysts. (See Def. Mem., at 43). However, when the revised projections were disclosed, highly experienced industry participants stated that what Facebook did was "very, very unusual," "rare," and something they had "never seen [] during 20 years in and around the tech IPO business. (CAC ¶¶ 161, 166-67.) As discussed above, industry custom, whatever it may be established to be, does not justify dismissal on the grounds of materiality at the motion to dismiss stage.

The market reaction to the revenue projections also supports the adequacy of the materiality allegations. In the week before the IPO, investor demand for Facebook shares was reported to be at high levels. The financial press reported that the revenue cuts were a "big shock" to the investors who learned of them, raised "a significant red flag" about Facebook's financial condition and that the "declaration" in Facebook's revenues "freaked a lot of people out." (CAC ¶¶ 138-39, 180); see also SEC v. Mayhew, 121 F.3d 44, 52 (2d Cir. 1997) ("[A] major factor in determining whether information was material is the importance attached to it by those who knew about it."); Lilly v. State Teachers Ret. Sys. of Ohio Pension Fund, 608 F.2d 55, 58 (2d Cir. 1979) ("[T]he manner in which the information was regarded by those privy to it and the importance attached to the information by the recipients . . . were entirely consistent with a conclusion that the information was material information.").[31]

---

[31] At the motion to dismiss stage, allegation of sharply negative market reaction can be used to support other allegations of materiality. See Rules and Regulations, Securities Exchange Commission, 64 Fed. Reg. 45,150, 45,152 (Aug. 19, 1999) ("Considerations of potential market reaction to disclosure of a misstatement is by itself too blunt an instrument to be depended on in considering whether a fact is material."); see also New Orleans Emps. Ret. Sys. v. Celestica, Inc., 455 F. App'x 10, 16 (2d Cir. 2011) (allegations of a "precipitous decrease in share price that occurred after [the issuer] disclosed the tru[th]" support an inference of materiality at the motion to dismiss stage); Pontiac Gen. Emps. Ret. Sys., 875 F. Supp. 2d at 368 (alleged misstatements were not immaterial as a matter of law where, inter alia, the issuer's "share price declined by almost 10%" after the alleged corrective disclosure).

This Court in the Derivative Opinion has previously stated:

> [Facebook] repeatedly made express and extensive warnings in the Company's Registration Statement, drafts of the Registration Statement and in its final Offering Documents about the trend of increased use of mobile applications. Thus, even if internal projections could be consider material to the IPO, [] Plaintiffs have not demonstrated that the Facebook projections would have significantly altered the total mix of information in the marketplace, considering that these disclosures were publicly disseminated.

Derivative Op., 922 F. Supp. 2d at 469.

The Derivative Opinion's dicta does not change the analysis here. In the Derivative Opinion, the Court applied a different standard that does not govern Securities Act claims. Id. Securities Act claims need only satisfy a burden that is "even lower" than the "relatively minimal burden" imposed by Fed. R. Civ. P. 8 to plead materiality. Litwin, 634 F.3d at 718.

Furthermore, the facts alleged in the CAC are different from the facts alleged in the Derivative Actions: the Derivative Plaintiffs did not assert any particularized facts establishing materiality. Derivative Op., 922 F. Supp. 2d at

75

469 ("Derivative Plaintiffs have not alleged particularized facts that support an inference that the Board possessed information that was materially different from what existed in the marketplace."). The complaints filed in the Derivative Actions contained only conclusory materiality allegations. See, e.g., Complaint, Levy v. Zuckerberg, No. 12-CV-7815, ¶ 40 (asserting that "a reduction in earnings guidance is plainly material information that must be, and was not, shared with all of the public"). In contrast, Lead Plaintiffs have pled with far more particularity. (See CAC ¶¶ 177-85). The "essence" of the derivative complaint this Court reviewed in the Derivative Opinion was that Facebook failed to "disclose its internal revenue projections." Derivative Op. 922 F. Supp. 2d at 472. In contrast, the CAC alleges that Defendants failed to disclose that known trends had already had a material impact on Facebook's revenues at the time of the IPO.

Defendants contends that the financial media widely reported that the impact of mobile usage and product decisions were continuing to harm Facebook's revenue growth when the Facebook issued the FWP, and any subsequent disclosures after the IPO were immaterial. (See Def. Mem., at 43.) Under the "truth on the market" defense, a corollary to the "fraud on the market" doctrine, "a misrepresentation is immaterial if the

information is already known to the market because the
misrepresentation cannot then defraud the market." Ganino, 228
F.3d at 167. In order for the truth on the market defense to be
successful, "the corrective information must be conveyed to the
public with a degree of intensity and credibility sufficient to
counter-balance effectively any misleading information created
by the alleged misstatements." Id. (internal quotation marks
omitted). However, "the mere presence in the media of sporadic
news reports . . . should not be considered to be part of the
total mix of information that would clarify or place in proper
context the company's representations in its proxy materials."
United Paperworkers Int'l Union v. Int'l Paper Co., 985 F.2d
1190, 1199 (2d Cir. 1993); see also Kronfeld v. Trans World
Airlines, Inc., 832 F.2d 726, 736 (2d Cir. 1987) ("There are
serious limitations on a corporation's ability to charge its
stockholders with knowledge of information omitted from a
document such as a prospectus on the basis that the information
is public knowledge and otherwise available to them."). The
Company also explicitly instructed investors to disregard
accounts in the media:

> In making your investment decision, you should not
> rely on information in public media that is published
> by third parties. You should rely only on statements
> made in this prospectus. . . . We have in the past

received, and may continue to receive, a high degree
of media coverage, including coverage that is not
directly attributable to statements made by our
officers and employees, that incorrectly reports on
statements made by our officers or employees, or that
is misleading as a result of omitting information
provided by us, our officers, or employees.

Registration Statement, at 31.  A reasonable investor will not

be charged to regard press reports as a reliable source of

information after having read such advice.  See SEC v. Bank of

Am. Corp., 677 F. Supp. 2d 717, 719 (S.D.N.Y. 2010) ("[S]ince

the [company] itself warned investors not to rely on the media,

it would be unreasonable for a shareholder to consider the media

pronouncements to be part of the relevant mix of information.").


Defendants Did Fail To Disclose Under Rule 408


Plaintiffs have alleged that the Registration

Statement failed to disclose material information required to be

disclosed by Rule 408 of SEC Regulation C because known

financial effects related to increasing mobile usage and certain

product decisions were not disclosed.  (CAC ¶¶ 188, 197-202;

Def. Op., at 61.)


Rule 408(a) reflects the principle that an issuer's

disclosures must be complete and accurate.  See Nanopierce

78

Techs., Inc. v. Southridge Capital Mgmt., No. 02 Civ. 0767, 2003
WL 22882137, at *4 (S.D.N.Y. Dec. 4, 2003).   Rule 408 states
that, "[i]n addition to the information expressly required to be
included in a registration statement, there shall be added such
further material information, if any, as may be necessary to
make the required statements, in the light of the circumstances
under which they are made, not misleading."   17 C.F.R.
§ 230.408(a).   Defendants are "under a duty to disclose interim
financial information in the [Registration Statement]," if "the
[undisclosed] information was material in light of the financial
information already disclosed to investors."   Nanopierce, 2003
WL 22882137, at *4 (quoting DeMaria, 318 F.3d 1 at 180).   As
previously noted, the Registration Statement contained material
omissions and misrepresentations that rendered it misleading to
investors, and Defendants failed to adequately disclose all
required material information to make the Registration Statement
not misleading.


The Allegations With Respect To
Loss Causation Do Not Require Dismissal


        Defendants assert that Plaintiffs fail to state a
claim because the absence of loss causation is apparent on the
face of the complaint.   Defendants contend that Plaintiffs'

79

allegations of loss causation are inadequate because none of the alleged corrective disclosures mentions Facebook's "product decisions" and the fact that Facebook had lowered its projections was publicized in at least 16 media reports prior to the IPO.  (Def. Mem., at 46-47.)  Defendants contend that Plaintiff's own allegations show the absence of any tie between the May 21 and 22 stock drops and the revelation of any new information about such decisions.  (Id., at 46.)

Generally, loss causation is not an element of a claim under either Section 11 or 12.   See, e.g., In re Giant Interactive Grp., Inc. Sec. Litig., 643 F. Supp. 2d 562, 571 (S.D.N.Y. 2009) ("[L]oss causation is not an element of a claim under either Section 11 or 12."); Levine v. AtriCure, Inc., 508 F. Supp. 2d 268, 272 (S.D.N.Y. 2007) ("Loss causation . . . is not an element of a [Section] 11 claim under the Securities Act.") (citing In re Flag Telecom Holdings, Ltd. Sec. Litig., 411 F. Supp. 2d 377, 382 (S.D.N.Y. 2006), abrogated on other grounds, 574 F.3d 29 (2d Cir. 2009)); Adair v. Kaye Kotts Assocs., No. 97 Civ. 3375(SS), 1998 WL 142353, at *7 (S.D.N.Y. Mar. 24, 1998) ("Loss causation is not an element of a Section 11 claim."); Polycast Tech. Corp. v. Uniroyal, Inc., 792 F. Supp. 244, 259 (S.D.N.Y. 1992) (noting statutory sellers "may now be liable under section 12 whether or not . . . loss

80

causation is shown." (quoting <u>Wilson v. Saintine Exploration and Drilling Corp.</u>, 872 F.2d 1124, 1126 (2d Cir. 1989))); <u>Freeland v. Iridium World Commc'ns, Ltd.</u>, 233 F.R.D. 40, 46 (D.D.C. 2006) ("The absence of loss causation is an affirmative defense under both Section 11 and 12 of the Securities Act rather than an element of Plaintiff's prima facie case."). "Plaintiffs are not required to plead loss causation in the Complaint." <u>Giant</u>, 643 F. Supp. 2d at 572.

While "a plaintiff pursuing a Securities Act claim is not required to affirmatively plead causation, a negative causation defense may be considered on a dismissal motion where the absence of loss causation is apparent on the face of the complaint." <u>Blackmoss Inv. Inc. v. ACA Capital Holdings, Inc.</u>, No. 07 Civ. 10528, 2010 WL 148617, at *11 (S.D.N.Y. 2010). "The absence of loss causation is an affirmative defense under both Section 11 and 12 of the Securities Act rather than an element of Plaintiff's prima facie case." <u>Freeland v. Iridium World Commc'ns, Ltd.</u>, 233 F.R.D. 40, 46 (D.D.C. 2006) (citing 15 U.S.C. § 77k(e)). Defendants bear the burden of demonstrating that something other than the alleged omissions or misstatements at issue caused plaintiffs' loss. <u>In re Flag Telecom Holdings, Ltd. Sec. Litig.</u>, 574 F.3d 29, 36 (2d Cir. 2009).

Defendants have not sufficiently shown the lack of loss causation or the existence of negative causation. Whether the May 19 and May 22 Reuters reports constituted corrective disclosures that revealed Facebook's alleged omissions or misrepresentations and whether such disclosures actually caused the drop in Facebook stock prices are issues of fact and are not appropriate for resolution in the motion to dismiss stage. See Giant, 643 F. Supp. 2d at 572 ("[T]he affirmative defense of negative causation is generally not properly raised on a Rule 12(b)(6) motion."); In re Fuwei Films Secs. Litig., 634 F. Supp. 2d 419, 444 (S.D.N.Y. 2009) ("Given the burden on [d]efendants to establish an affirmative defense such as negative causation, the Court finds that dismissal on this ground is more properly considered on a motion for summary judgment."); In re Citigroup Inc. Bond Litig., 723 F. Supp. 2d 568, 588 n.5 (same).

The alleged corrective disclosures do not specifically mention the Company's product decisions, but this is not fatal to Plaintiffs claim. See, e.g., Freudenberg, 712 F. Supp. 2d at 202 (noting that loss causation may exist when "'truth' about the company's underlying condition, when revealed, causes the 'economic loss'").

82

**Conclusion**

Based on the conclusions determined above, Defendants' motion to dismiss is denied.

The parties will meet and confer upon the schedule for further proceedings which will be the subject of a pretrial conference at 10 a.m. February 4, 2014, or at such other time as determined by counsel and the Court.

It is so ordered.

**New York, NY**
**December // , 2013**

ROBERT W. SWEET

83